<u>**FOR PUBLICATION**</u>

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| Patriot Coal Corporation, *et al.*, | Case No. 12-12900 (SCC) |
| Debtors. | (Jointly Administered) |

------------------------------------------------------------x

**MEMORANDUM DECISION ON MOTIONS**
<u>**TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1412**</u>

**A P P E A R A N C E S:**

DAVIS POLK & WARDWELL LLP
*Attorneys for Debtors*
450 Lexington Avenue
New York, NY 10017
By:    Marshall S. Huebner, Esq.
       Elliott Moskowitz, Esq.
       Damian S. Schaible, Esq.
       Michelle M. McGreal, Esq.

UNITED STATES DEPARTMENT OF JUSTICE
*Office of the United States Trustee*
33 Whitehall Street
21st Floor
New York, NY 10004
By:    Tracy Hope Davis, Esq.
       Andrea B. Schwartz, Esq.
       Susan D. Golden, Esq.

KENNEDY, JENNIK & MURRAY, P.C.
*Attorneys for United Mine Workers of America*
113 University Place
New York, NY 10003
By:    Susan M. Jennik, Esq.
       Serge Ambroise, Esq.

STITES & HARRISON PLLC
*Attorneys for Surety Movants*
250 West Main Street
Suite 2300
Lexington, KY 40507
By:    W. Blaine Early, III, Esq.
       William T. Gorton, III, Esq.

400 West Market Street
Suite 1800
Louisville, KY 40202
By:    Brian H. Meldrum, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Attorneys for Official Committee of Unsecured Creditors*
1177 Avenue of the Americas
New York, NY 10036
By:    Thomas Moers Mayer, Esq.
       Adam Rogoff, Esq.

WEIL GOTSHAL & MANGES LLP
*Attorneys for Citibank and Barclays, First-Out DIP Agent*
767 Fifth Avenue
New York, NY 10153
By:    Marcia L. Goldstein, Esq.
       Joseph H. Smolinsky, Esq.

WILLKIE FARR & GALLAGHER LLP
*Attorneys for Bank of America N.A., Second-Out DIP Agent*
787 Seventh Avenue
New York, NY 10019
By:    Margot B. Schonholtz, Esq.
       Ana M. Alfonso, Esq.

ANDREWS KURTH LLP
*Attorneys for Wilmington Trust Company*
450 Lexington Avenue
New York, NY 10017
By:    Paul N. Silverstein, Esq.
       Jeremy B. Reckmeyer, Esq.

BROWN RUDNICK LLP
*Attorneys for Ad Hoc Consortium of Senior Noteholders*
Seven Times Square
New York, NY 10036
By:    Robert J. Stark, Esq.

BUCHANAN INGERSOLL & ROONEY PC
*Attorneys for Caterpillar Inc., Caterpillar Financial Services Corporation, and Caterpillar Global Mining LLC*
1290 Avenue of the Americas
30th Floor
New York, NY 10104
By:    Kristi A. Davidson, Esq.

MORGAN, LEWIS & BOCKIUS LLP
*Attorneys for UMWA Health and Retirement Funds*
1701 Market Street
Philadelphia, PA  19103
By:    John C. Goodchild, III, Esq.

MCKOOL SMITH
*Attorneys for Certain Interested Shareholders*
One Bryant Park
47th Floor
New York, NY 10036
By:    Michael R. Carney, Esq.

JONES DAY
*Attorneys for Peabody Energy Corporation*
901 Lakeside Avenue
Cleveland, OH 44114
By:    Carl E. Black, Esq.

UNITED MINE WORKERS OF AMERICA
18354 Quantico Gateway Drive
Suite 200
Triangle, VA 22172
By:    Grant Crandall, Esq.

COMMONWEALTH OF KENTUCKY
*Attorney for Department for Natural Resources*
2 Hudson Hollow
Frankfort, KY 40601
By:    Michael P. Wood, Esq. (telephonically)

## TABLE OF CONTENTS

PROCEDURAL HISTORY.........................................................................................................2

FINDINGS OF FACT............................................................................................................8

   I.   The Commencement of the Cases........................................................................8

   II.   The Debtors' Business and Operations................................................................12

        A.  Formation and Domicile of the Debtors ................................................12

        B.  The Debtors' Operations........................................................................12

   III.   The Debtors' Management and Board of Directors.............................................14

        A.  The Debtors' Management .....................................................................14

        B.  Patriot's Board of Directors ...................................................................15

   IV.   The Debtors' Prepetition and Postpetition Capital Structure.............................16

        A.  Prepetition Capital Structure..................................................................16

        B.  The DIP Facilities ..................................................................................17

   V.   Parties-in-Interest in the Debtors' Chapter 11 Cases.........................................18

        A.  The Debtors' Material Contracts and Leases.........................................18

        B.  The Debtors' Current and Former Employees.......................................21

        C.  The Debtors' Creditors and Claimholders ............................................22

   VI.   Commencement of the Debtors' Chapter 11 Cases ...........................................24

DISCUSSION.....................................................................................................................26

   I.   The Bankruptcy Venue Statute – 28 U.S.C. § 1408 ..........................................26

   II.   Transfer of Venue Pursuant to 28 U.S.C. § 1412 ..............................................29

   III.   The Debtors' Cases Must be Transferred
       from this District Pursuant to 28 U.S.C. § 1412 ................................................34

        A.  The Debtors Did Not Act in Bad Faith in Filing in this District............34

        B.  The Debtors' Literal Compliance with Section 1408 ...........................36

        C.  The Applicability of the *Winn-Dixie* Decision ....................................39

i

D.  Administrative Efficiency and the Convenience of the Parties ............................42

E.  The Limited Scope of the Court's Ruling...............................................................44

IV.  Neither the Interest of Justice nor the Convenience of the Parties
Compels Transfer of the Patriot Cases to the Southern District of West Virginia ............46

V.  The Patriot Cases Shall be Transferred to
the United States Bankruptcy Court for the Eastern District of Missouri .........................52

CONCLUSION..........................................................................................................................54

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

The narrow question before the Court is deceptively simple – should the chapter 11 cases of Patriot Coal Corporation and its ninety-eight affiliated debtors be transferred to another district?  The broader question before the Court, however, is dauntingly complex – what is justice?  In order to answer the narrow question the Court must attempt to answer the broader question and give meaning to the "interest of justice" test for venue transfer set forth in 28 U.S.C. § 1412.  This decision will thus address not only the relatively scant case law on venue transfer in large bankruptcy cases but will also examine the historical basis of the concept of venue; the decades-old controversy surrounding the domicile/affiliate rule; and, last but not least, the meaning of justice in the context of the Patriot cases.

It is of utmost importance to note at the outset what is unquestionably not in dispute in these cases: the critical importance of Patriot Coal to its employees – union and non-union alike – and its retirees, as well as their thousands of dependents.  The employees' lives and livelihoods depend on the outcome of these cases.  The retirees' health and access to health care depend on the outcome of these cases.  Indeed, without the dedication and sacrifice of the coal miners and their families, there would be no coal, and there would be no Patriot Coal.  That being said, this chapter 11 proceeding is not a two-party dispute.  It is not "*UMWA v. Patriot*."  It is not "*us v. them*."  It is a collective proceeding in which the Bankruptcy Court is charged with applying the Bankruptcy Code and other applicable law to achieve the overarching goal of chapter 11 – to maximize the value of the Debtors' estates for the benefit of all stakeholders and guide the Debtors, if at all possible, through chapter 11 and beyond to emergence as a stronger company, financially and operationally.  This decision will determine which bankruptcy court will have that privilege and responsibility.

## PROCEDURAL HISTORY

We turn first to a description of the procedural history of these cases.

On July 9, 2012 (the "Petition Date"), Patriot Coal Corporation ("Patriot") and ninety-eight of its subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.   Promptly thereafter, pursuant to 28 U.S.C. § 1412, the United Mine Workers of America (the "UMWA") filed a motion to transfer the Patriot chapter 11 cases to the Southern District of West Virginia (the "UMWA Motion"), in the interest of justice and for the convenience of the parties.[1]  A month later, Argonaut Insurance Company, Indemnity National Insurance Company, US Specialty Insurance, and Westchester Fire Insurance Company (collectively, the "Sureties") filed a motion to transfer the above-captioned chapter 11 cases to the Southern District of West Virginia [Dkt. No. 287] (the "Sureties' Motion").  The Sureties' Motion also seeks transfer in the interest of justice and for the convenience of the parties.

Two joinders to the UMWA Motion and the Sureties' Motion were subsequently filed, one by American Electric Power, Monongahela Power Company and Hope Gas, Inc., d/b/a Dominion Hope [Dkt. No. 178] and one by the West Virginia Attorney General [Dkt. No. 390]. In addition, the Commonwealth of Kentucky, Energy and Environmental Cabinet, Department for Natural Resources (the "Kentucky DNR") filed a notice in which it expressed support for

---

[1]      On July 19, 2012, the UMWA filed a corrected version of its motion.  [Dkt. Nos. 116, 127.]  The UMWA Motion was initially scheduled to be heard on August 2, 2012. [Dkt. No. 127.]  On July 25, 2012, by agreement among the Debtors, the Official Committee of Unsecured Creditors (the "Committee"), and the UMWA, the hearing to consider the UMWA Motion was adjourned to September 11, 2012.  [Dkt. No. 183.]  On July 26, 2012, the Debtors filed a notice of relevant deadlines set by the Court with respect to the UMWA Motion.  Pursuant to that notice, all joinders to the UMWA Motion were to be filed by August 20, 2012; all objections to the UMWA Motion were to be filed by August 24, 2012; and any reply by the UMWA or joinder to any objection was to be filed by August 29, 2012.  [Dkt. No. 196.]

2

(but did not join) the request for transfer of the cases to the Southern District of West Virginia. [Dkt. No. 392.]

On August 22, 2012, two days after the deadline for filing joinders had passed, the United States Trustee (the "U.S. Trustee") filed a separate motion (the "UST Motion,") for entry of an order transferring the Debtors' chapter 11 cases "to a district where venue is proper." [Dkt. Nos. 406, 407.] The UST Motion seeks transfer in the interest of justice; it does not seek transfer to any specific district, nor does it seek transfer for the convenience of the parties. Two joinders were filed to the UST Motion shortly thereafter. On August 27, 2012, the United Mine Workers of America 1992 Benefit Plan, the United Mine Workers of America 1993 Benefit Plan, the United Mine Workers of America 1974 Pension Trust and the United Mine Workers of America Combined Benefit Fund (collectively, the "UMWA Health and Retirement Funds") filed a joinder to the UST Motion only. [Dkt. No. 423.] On August 28, 2012, CompassPoint Partners, L.P., Frank Williams, and Eric Wagoner, an informal group of holders of common stock of Patriot (collectively, the "Interested Shareholders")[2] filed a joinder to the UST Motion only. [Dkt. No. 433.] The UST Motion and the joinders thereto were placed on the same briefing schedule as the earlier-filed motions, and all of the Motions[3] were set for hearing on September 11, 2012.

On August 27, 2012, the Debtors filed an objection to the Motions [Dkt. No. 425] (the "Debtors' Objection") and a declaration from Patriot's Senior Vice President and then-Chief Financial Officer, Mark N. Schroeder. (Declaration of Mark N. Schroeder in Opposition to (i)

---

[2]    On August 24, 2012, the Interested Shareholders filed a motion to appoint an equity committee in the Debtors' cases. By agreement of the parties, this motion is currently scheduled to be heard on December 11, 2012. [Dkt. No. 416.]

[3]    The UMWA Motion, the Sureties' Motion, and the UST Motion collectively will be referred to herein as the "Motions." The UMWA, the Sureties, and the U.S. Trustee collectively will be referred to herein as the "Movants."

Motion of the United Mine Workers of America to Transfer the Case to the Southern District of

West Virginia, (ii) Sureties' Motion to Transfer Jointly Administered Cases to Southern District

of West Virginia, and (iii) Motion of the United States Trustee to Transfer in the Interest of

Justice, dated Aug. 27, 2012 [Dkt. No. 426] ("Schroeder Venue Decl.").[4])  Two additional

objections to the Motions were filed by (i) the Committee, together with the Declaration of

Jordan Kaye in Support of the Committee Objection [Dkt. No. 424, 424-1][5] and (ii) Citibank,

N.A., as administrative agent for the new money lenders and letter of credit issuers under that

certain Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of July 9, 2012

(the "First Out DIP Agent").  [Dkt. No. 427.]

 In addition, joinders to the Debtors' Objection were filed by thirty-five of the Debtors'

unsecured creditors, and an additional fourteen creditors authorized the Debtors to state that they

supported the Debtors' opposition to the Motions.  (Declaration of Jacquelyn A. Jones, dated

October 5, 2012 [Dkt. No. 931] (the "Jones Declaration").)[6]  Complete lists of the parties who (i)

filed joinders to the Debtors' Objection or (ii) authorized the Debtors in writing to state that they

supported the Debtors' Objection to the Motions are included as Exhibits B and C to the

Debtors' Proposed Findings of Fact [Dkt. No. 938] and as Exhibits A and B to the Jones

Declaration.

---

[4] Mr. Schroeder's present title is Senior Vice President of Financial Planning.  Patriot's new Chief Financial Officer is John E. Lushefski.

[5] As described *infra* at p. 23, the Committee is comprised of seven members; the Court understands that the Committee voted 4-3 to oppose the Motions.  *See* Sept. 12, 2012 Hr'g. Tr. at 294:20-295:4.

[6] At the Hearing, the Court requested that the Debtors file a declaration explaining the process the Debtors employed in soliciting joinders to their position.  *See* Sept. 12, 2012 Hr'g. Tr. at 451:2-19.  As set forth more fully in the Jones Declaration, twenty-nine of the thirty-five timely-filed joinders appear to have been prepared using a template provided by the Debtors.  Timely joinders to the Debtors' Objection were timely filed by twenty of the top-fifty unsecured creditors, including six of the ten top-fifty creditors from West Virginia.  One late joinder was filed by a top-fifty creditor.  In total, the Debtors received support – in the form of both timely and untimely joinders or support correspondence – from a total of forty-nine creditors, including twenty-seven of the top-fifty creditors and eight of the ten top-fifty creditors from West Virginia.

4

On August 31, 2012, the Sureties filed a reply memorandum in response to the Debtors' Objection and in further support of the Sureties' Motion [Dkt. No. 502], along with the Declaration of Roland B. Doss in support of their reply memorandum [Dkt. No. 502-1].

Also on August 31, 2012, (i) the UMWA filed an omnibus reply to the objections filed to the UMWA Motion [Dkt. No. 506], along with the Declaration of Michael Buckner in Support of Omnibus Reply to [sic] the United Mine Workers of America to Objections to Motion of the United Mine Workers of America to Transfer the Case to the Southern District of West Virginia [Dkt. No. 507] ("Buckner Decl.") and (ii) the U.S. Trustee filed an omnibus reply to the objections filed to the UST Motion [Dkt. No. 509], along with the Supplemental Declaration of Andrea B. Schwartz [Dkt. No. 510].

On September 10, 2012, just one day prior to the scheduled September 11 hearing on the Motions (the "Hearing"), a "Stipulation of Facts for the Purposes of a Hearing on the Motions to Transfer Venue" was submitted to the Court for signature. (Stipulation of Facts for the Purposes of a Hearing on the Motions to Transfer Venue, dated Sept. 10, 2012 [Dkt. No. 546] (the "Stipulation").) The parties to the Stipulation were (i) each of the Movants, (ii) the Debtors, and (iii) the Committee (collectively, the "Parties"). The UMWA Health and Retirement Funds were not parties to the Stipulation.

Pursuant to the Stipulation, the Parties agreed that "the declarations . . . and exhibits submitted by the Parties in connection with the Motions and the responses thereto may be admitted into evidence." The Parties also stipulated to the admission into evidence of (i) the Declaration of Mark N. Schroeder Pursuant to Local Bankruptcy Rule 1007-2, dated July 9, 2012 [Dkt. No. 4] ("Schroeder First Day Decl."), (ii) the voluntary petitions of PCX Enterprises, Inc. and Patriot Beaver Dam Holdings, LLC, (iii) the Revised List of Creditors Holding the 50

5

Largest Unsecured Claims, and (iv) the Debtors' Form 10-Q filed with the Securities and Exchange Commission on August 9, 2012 ("Form 10-Q").  (Stipulation ¶ 1.)  The Parties further "agreed to not examine (either through direct or cross) any of the declarants, including with respect to the: (i) Stipulation of Facts, (ii) documents listed in the Stipulation of Facts, or (iii) Declarations and exhibits annexed thereto, and the facts contained therein are stipulated to expressly by the Parties."  (Stipulation ¶ 2.)

As a consequence of the Stipulation, none of the facts submitted by any of the Parties was contested.[7]  There was no direct testimony or cross-examination of any witnesses at the Hearing.  Notwithstanding the fact that no witnesses took the stand to testify, the Hearing on the Motions lasted approximately sixteen hours over two days.[8]  At the conclusion of the Hearing, the factual record closed.  *See* Sept. 12, 2012 Hr'g. Tr. at 450:25-451:19.

On October 5, 2012, proposed findings of fact and conclusions of law and post-hearing memoranda were filed with the Court by ten parties.  Those parties are as follows: (i) the Debtors [Dkt. Nos. 938, 950]; (ii) the Committee [Dkt. No. 908]; (iii) Bank of America, N.A., the Second Out DIP Agent [Dkt. No. 939]; (iv) Citibank, N.A., the First Out DIP Agent [Dkt. No. 952]; (v) Wilmington Trust Company [Dkt. No. 862]; (vi) Caterpillar Inc., Caterpillar Financial Services Corporation, and Caterpillar Global Mining LLC (collectively, "Caterpillar") [Dkt. No.

---

[7]     No party-in-interest served a single document request or deposition subpoena or requested any discovery from the Debtors or from any other party.  At the outset of the second day of the Hearing, counsel to the UMWA Health and Retirement Funds, without prior notice to any party or the Court, sought to call a witness.  The Court denied the request, for the reasons set forth on the record.  *See* Sept. 12, 2012 Hr'g. Tr. 94:23-95:25.

[8]     The Hearing was made available by live video broadcast to courtrooms in the Southern District of West Virginia and the Eastern District of Missouri.  The Court understands that hundreds of interested parties viewed the Hearing at these locations.  The broadcast was made possible thanks to the efforts of Vito Genna, the Clerk of Court for the United States Bankruptcy Court for the Southern District of New York, and his counterparts in the Southern District of West Virginia and the Eastern District of Missouri, Matthew Hayes and Dana McWay.  The Court expresses its gratitude to them for helping achieve the Court's goal of providing access to the Hearing to as many people as possible.  *See* Sept. 11, 2012 Hr'g. Tr. at 40-41.

860]; (vii) the UMWA [Dkt. Nos. 956, 958]; (viii) the Sureties [Dkt. Nos. 888, 902]; (ix) the

U.S. Trustee [Dkt. Nos. 871, 873]; and (x) the UMWA Health and Retirement Funds [Dkt. No.

867].  The Committee; Bank of America, N. A.; Citibank, N.A.; the Ad Hoc Noteholders;[9] and

Caterpillar each joined in the proposed finding of fact filed by the Debtors.

On or about September 12, 2012, the Court began to receive letters from retiree members

of the UMWA who had been employed by Patriot, and/or by Peabody, Magnum, or Arch.

Approximately 386 letters have been received as of the date of this decision and all of them have

been placed on the docket of these cases.  Pursuant to the Court's direction requiring the UMWA

to disclose the facts and circumstances surrounding the outpouring of letters to the Court, the

UMWA filed the Declaration of Robert J. Scaramozzino, dated October 24, 2012 [Dkt. No.

1469], which includes as an attachment thereto a copy of a September 28, 2012 letter sent by the

UMWA to its members encouraging them to write letters to the Court.  Because the record of the

proceeding on the Motions was closed at the conclusion of the Hearing, the letters are not a part

of the record with respect to the Motions.  Nonetheless, each and every letter has been reviewed

by the Court and is a part of the record of the Debtors' cases.

For the reasons set forth in detail below, the UST Motion is granted.  The UMWA

Motion and the Sureties' Motion are granted in part and denied in part.  Having considered the

Motions, the voluminous memoranda in support of and in opposition to the Motions, the

arguments of counsel at the Hearing, and all of the evidence, including the Stipulation, the

Declarations, and all documentary exhibits admitted into evidence, as well as the post-trial

proposed findings of fact and memoranda, and, mindful that a court should not blindly accept

---

[9]     The "Ad Hoc Noteholders" are comprised of institutions holding approximately $100.6 million (or 40.2%)
of the Senior Bonds.  *See* Joinder of Ad Hoc Noteholders to Debtors' Objection and Creditors' Committee's
Objection [Dkt. No. 480].

findings of fact and conclusions of law proffered by the parties (*see St. Clare's Hosp. and Health Ctr. v. Ins. Co. of North Am., (In re St. Clare's Hosp. and Health Ctr.)*, 934 F.2d 15 (2d Cir. 1991) (citing *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656 (1964))), and having conducted an independent analysis of the law and the facts, the Court makes the following findings of fact and conclusions of law.[10]

## FINDINGS OF FACT

### I.   The Commencement of the Cases

1.      On June 1, 2012, debtor PCX Enterprises, Inc. ("PCX") was incorporated under the laws of the State of New York.  (Stipulation ¶ 3(a).)[11]  PCX does not have any employees. (Schroeder Venue Decl. ¶ 37.)  PCX does not have any business operations nor does it have an office in New York.  (Transcript of the Patriot Coal 341 Meeting on August 23, 2012 ("341 Mtg. Tr.") at 21:1-2; 23:6-8 (attached to Omnibus Reply to the Objections to UMWA Motion [Dkt. No. 506] as Ex. A).)  The principal asset of PCX is a business checking account in the amount of $97,985; the account was opened at a branch of Capital One Bank, located at 1432 Second Avenue, New York, New York, 10021.  (Stipulation ¶ 3(c).)

2.      On June 14, 2012, debtor Patriot Beaver Dam Holdings, LLC ("Patriot Beaver Dam") was formed under the laws of the State of New York.  (Stipulation ¶ 3(b).)  Patriot Beaver Dam does not have any employees.  (Schroeder Venue Decl. ¶ 37.)  Patriot Beaver Dam does not have an office in New York.  (341 Mtg. Tr. at 36:16-17.)  The principal asset of Patriot Beaver

---

[10]      The findings of fact and conclusions of law herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

[11]      As discussed *supra* at pp. 5-6, the Parties stipulated to certain facts in the Stipulation.  Such facts have been included in the Court's Findings of Fact.

Dam is a certificate evidencing a 100% membership interest in Beaver Dam Coal Company, LLC; it is held in New York by counsel to the First Out DIP Agent.  (Stipulation ¶ 3(c).)

3.  Pursuant to an assumption agreement, effective as of June 1, 2012, PCX became a guarantor of Patriot's obligations under the Credit Facility (as defined below).  Pursuant to an assumption agreement, effective as of June 14, 2012, Patriot Beaver Dam became a guarantor of Patriot's obligations under the Credit Facility.  (Schroeder Venue Decl. ¶ 25.)

4.  Pursuant to pledge supplements, effective as of June 1, 2012 and June 14, 2012, PCX and Patriot Beaver Dam, respectively, granted a security interest in all of their respective rights, titles, and interests in and to all of their personal property to secure their guarantee obligations.   In connection with these secured guarantees, Bank of America, N.A., as administrative agent of the Credit Facility, filed UCC Financing Statements in June 2012 that cover "all of the assets . . . whether now existing or hereafter arising" of PCX and Patriot Beaver Dam.  (Schroeder Venue Decl. ¶ 26.)

5.  Pursuant to the Fourth Supplemental Indenture, dated as of June 22, 2012, PCX and Patriot Beaver Dam became guarantors of the obligations of Patriot, as issuer, to pay the principal of, premium (if any), and interest on the Senior Bonds (as defined below).  (Schroeder Venue Decl. ¶ 32.)

6.  Pursuant to the Second Out DIP Facility (as defined below) and the Final Order (I) Authorizing Debtors (A) To Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), and (B) To Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Prepetition Secured Lenders Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364, dated August 3, 2012 [Dkt.

No. 275], the agents under the DIP Facilities (as defined below) have superpriority liens on the assets of PCX and Patriot Beaver Dam.  (Schroeder Venue Decl. ¶ 53.)

7.      On July 9, 2012, PCX filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. Its petition lists the county of residence of PCX as "New York County, NY" and indicates that the principal assets of PCX are located in "New York, NY."  PCX filed in this District because the "[d]ebtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District" and because "[t]here is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District."  (In re PCX Enterprises, Inc., No. 12-12899-scc [Dkt. No. 1].)

8.      On July 9, 2012, Patriot Beaver Dam filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  Its petition lists the county of residence of Patriot Beaver Dam as "New York County, NY" and indicates that the principal assets of Patriot Beaver Dam are located in "New York, NY."  Patriot Beaver Dam filed in this District because the "[d]ebtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District."  (In re Patriot Beaver Dam Holdings, LLC, No. 12-12898-scc [Dkt. No. 1].)

9.      The Petitions of PCX and Patriot Beaver Dam both list their mailing address as: c/o CT Corporation System, 111 8th Avenue, New York, NY 10011.  (In re Patriot Beaver Dam Holdings, LLC, No. 12-12898-scc [Dkt. No. 1] and In re PCX Enterprises, Inc., No. 12-12899-scc [Dkt. No. 1].)

10

10.     Of particular significance to the Court's decision and analysis is the fact that the Parties stipulated prior to the Hearing that the Debtors formed both PCX and Patriot Beaver Dam to ensure that the provisions of 28 U.S.C. § 1408(1)[12] were satisfied, and for no other purpose. (Stipulation ¶3(d).)

11.     On the Petition Date, Patriot filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. The petition lists the county of residence of Patriot as "Saint Louis County, MO" and indicates that the principal assets of Patriot are located in "New York, NY."  According to the petition, Patriot filed in this District because "[t]here is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District."  (In re Patriot Coal Corporation, No. 12-12900-scc [Dkt. No. 1].)

12.     Patriot is the direct or indirect parent of each of the Debtors, including PCX and Patriot Beaver Dam.   (Schroeder First Day Decl. ¶16).   Patriot's corporate headquarters is located at 12312 Olive Boulevard, Suite 400, St. Louis, Missouri, 63141.  (In re Patriot Coal Corporation, No. 12-12900-scc [Dkt. No. 1].)

13.     On the Petition Date, the ninety-six other Debtors each filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  According to their petitions, each of these Debtors filed in this District because "[t]here is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District."

---

[12]     Paragraph 3(d) of the Stipulation reads as follows: "The Debtors formed both PCX and Patriot Beaver Dam to ensure that the provisions of Section 1408(1) of the Bankruptcy Code were satisfied, and for no other purpose." At the Hearing, it was clarified by the parties that the words "of the Bankruptcy Code" were erroneously included in this subsection, and Paragraph 3(d) should have instead stated "the provisions of Section 1408(1) of title 28 of the United States Code were satisfied, and for no other purpose."

11

## II.     The Debtors' Business and Operations

### A.     Formation and Domicile of the Debtors

14.     Prior to October 31, 2007, Patriot and a number of its subsidiaries were wholly-owned subsidiaries of Peabody Energy Corporation ("Peabody"), the world's largest private-sector coal company, and their operations were a part of Peabody's operations.  On October 31, 2007, Patriot was spun off from Peabody through a dividend of all outstanding shares of Patriot. (Schroeder Venue Decl. ¶ 5.)[13]  The agreements relating to Patriot's October 31, 2007 spin-off from Peabody included a Delaware choice of law provision.  (*Id.*)

15.     On July 23, 2008, Patriot acquired Magnum Coal Company.  The agreements relating to Patriot's acquisition of Magnum Coal Company included a Delaware choice of law provision.  (Schroeder Venue Decl. ¶ 6.)  Prior to its acquisition by Patriot, Magnum had acquired certain assets of Arch Coal, Inc.  The agreements relating to Magnum's acquisition of Arch included a New York choice of law provision.  (*Id.*)

16.     With respect to the domicile of the ninety-nine Debtors, thirty-seven were formed in West Virginia while sixty-two were formed in other states, including fifty in Delaware, five in Virginia, four in Kentucky, two in New York (PCX and Patriot Beaver Dam), and one in Indiana.  (Schroeder Venue Decl. ¶ 7.)

### B.     The Debtors' Operations

17.     The Debtors' principal business is the mining and preparation of metallurgical coal and thermal coal.  (Schroeder First Day Decl. ¶ 6). The Debtors' mining operations are located in Appalachia and the Illinois Basin, with the Appalachian operations located in West

---

[13]     Counsel for the Debtors remarked at the Hearing that the "circumstances surrounding Patriot's spinoff from Peabody will most assuredly be looked at with extraordinary seriousness by both the Debtors and the Creditors' Committee."  Sept. 12, 2012 Hr'g. Tr. at 226:16-18.

Virginia and the Illinois Basin operations located in Kentucky. (Form 10-Q at 43.) Nine of the Debtors' twelve active mining complexes are located in West Virginia and three are located in Kentucky. (Stipulation ¶ 3(e).)

18.      The states of residence listed on the Voluntary Petitions of the ninety-nine Debtors are as follows: West Virginia (where 54 entities are located); Missouri (where forty entities are located); Kentucky (where three entities are located); and New York (where two entities, Beaver Dam and PCX, are located). (Debtors' Voluntary Petitions, Case Nos. 12-12898 to 12-12911, 12-12913, 12-12914, and 12-12916 to 12-12999, Dkt. No. 1 for each).

19.      The Debtors own, lease, or hold under other arrangements coal reserves, surface property, and other real estate interests in various counties in many states, including Illinois, Indiana, Kentucky, Missouri, Ohio, Pennsylvania, and West Virginia. (Schroeder First Day Decl. ¶ 7.)

20.      The Debtors' operations include company-operated mines, contractor-operated mines, coal preparation facilities, and train, barge, and truck loading facilities. The Debtors also export coal under various throughput arrangements through ship loading terminals located in Baltimore, Maryland; Hampton Roads, Virginia; Newport News, Virginia; and New Orleans, Louisiana. (Schroeder Venue Decl. ¶ 15.)

21.      In 2011, the Debtors sold a total of 31.1 million tons of coal. The Debtors supply coal to a diverse base of domestic and international customers, including electricity generators, industrial users, and steel and coke producers in various countries across North America, Europe, South America and Asia, including Belgium, Bosnia and Herzegovina, Brazil, Canada, China, France, Hungary, Italy, Japan, Mexico, South Korea, Spain, Sweden, the Ukraine, and the United Kingdom, and various states in the United States, including Florida, Georgia, Illinois, Indiana,

13

Kentucky, Maryland, Michigan, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, West Virginia, and Wisconsin.  (Schroeder Venue Decl. ¶ 4.)  Nearly 95 percent of this coal was sold to customers outside of West Virginia.  Roughly one million tons of coal – or approximately three percent of total sales volume – were sold to customers in New York and an additional twenty-nine percent of the total sales volume was exported to international customers. (Schroeder Venue Decl. ¶ 16.)

22.    The Debtors are involved in lawsuits in many jurisdictions around the country, and have been named as defendants in cases commenced in Illinois, Indiana, Kentucky, Louisiana, Missouri, New York, North Carolina, and Pennsylvania.  (Schroeder Venue Decl. ¶ 21.)  The Debtors are also defendants in several pending lawsuits in West Virginia.  (*See generally* Form 10-Q.)

23.    The Debtors have been subject to litigation in West Virginia regarding selenium. (Form 10-Q, p. 20.)

24.    The Debtors are parties to a court-approved consent decree in the U.S. District Court for the Southern District of West Virginia regarding allegations of selenium pollution from Debtors' operations.    (Sureties' Motion, Exhibit B (Consent Decree in *Ohio Valley Environmental Coalition v. Patriot Coal Corp.*, Case No. 11-CV-00115 (S.D.W.V. March 15, 2012)).)

## III.    The Debtors' Management and Board of Directors

### A.    The Debtors' Management

25.    The Debtors' corporate headquarters and executive offices are located in St. Louis, Missouri.  Many of the Debtors' key corporate functions are based in St. Louis.  These include the following departments: Accounting, Accounts Payable, Accounts Receivable, Financial Reporting, Treasury, Tax, Internal Audit, Legal, Sales and Market Research, Contract

14

Management, Payroll, Corporate Development, Planning, Information Services, Human Resources, and Benefits.  (Schroeder Venue Decl. ¶ 8.)  All of the Debtors' books and records, including those established post-petition, are located in St. Louis, Missouri. (341 Mtg. Tr. at 14:13-21.)

26.    At the time of the Hearing, Patriot's executive management team was comprised of the following six members: Irl F. Engelhardt, Chairman and Chief Executive Officer; Bennett K. Hatfield, President and Chief Operating Officer; Robert W. Bennett, Senior Vice President and Chief Marketing Officer; Charles A. Ebetino, Jr., Senior Vice President – Global Strategy and Corporate Development; Joseph W. Bean, Senior Vice President of Law and Administration, General Counsel, and Assistant Secretary; and Mr. Schroeder.  (Schroeder Venue Decl. ¶ 10.)[14]

27.    Three members of the Debtors' executive management team – Mr. Engelhardt, Mr. Bean, and Mr. Schroeder – work in St. Louis, Missouri and reside in Missouri or Illinois.  A fourth member of the executive management team, Mr. Ebetino, resides in Ohio and has an office in Patriot's corporate headquarters in St. Louis, Missouri and an office in Charleston, West Virginia.  The two remaining members of the executive management team, Mr. Hatfield and Mr. Bennett, reside in West Virginia and have offices in (i) Charleston, West Virginia and (ii) Patriot's corporate headquarters in St. Louis, Missouri.  (Schroeder Venue Decl. ¶ 11.)

**B.     Patriot's Board of Directors**

28.    At the time of the Hearing, there were eight directors on Patriot's board of directors (the "Board"): J. Joe Adorjan; Bobby R. Brown; Irl F. Engelhardt; Michael P. Johnson;

---

[14]    Mr. Lushefski was appointed Chief Financial Officer on September 21, 2012, increasing Patriot's executive management team to seven members.  Mr. Lushefski resides in New Jersey and works in Patriot's corporate headquarters in St. Louis, Missouri.

Janiece M. Longoria; John E. Lushefski; Michael M. Scharf; and Robert O. Viets.[15]  (Schroeder Venue Decl. ¶ 12.)  The directors reside in Arkansas, Florida, Illinois, Missouri, New Jersey, Oklahoma, and Texas.  (Schroeder Venue Decl. ¶ 13.)

29.    At the time of the Hearing, there had been approximately fifty-five meetings of the Board following Patriot's spin-off from Peabody in October 2007.  Thirty-two of the fifty-five meetings were held in person, including twenty-nine in Missouri, one in West Virginia, one in Texas, and one in Florida.    The remaining twenty-three meetings were conducted telephonically.  (Schroeder Venue Decl. ¶ 14.)

IV.    **The Debtors' Prepetition and Postpetition Capital Structure**

A.    **Prepetition Capital Structure**

30.    Patriot, as borrower, and substantially all of the other Debtors, as guarantors, were parties to that certain $427.5 million Amended and Restated Credit Agreement, dated as of May 5, 2010 by and among substantially all of the Debtors, Bank of America, N.A., as administrative agent, and the lenders party thereto (as amended, supplemented, modified, or amended and restated from time to time, the "Credit Facility").  The Credit Facility provided for the issuance of letters of credit and direct borrowings, was governed by New York law, and included a New York forum selection clause.  (Schroeder Venue Decl. ¶ 24.)

31.    Patriot is also party to a $125 million accounts receivable securitization program, which provided for the issuance of letters of credit and direct borrowings.  The operative agreement, dated as of March 2, 2010, is governed by New York law and includes a New York forum selection clause.  This agreement is among (i) non-Debtor Patriot Coal Receivables (SPV) Ltd., (ii) Debtor Patriot Coal Corporation, as Servicer, (iii) various purchasers and LC

---

[15]    Mr. Lushefski resigned from the Board when he was named Chief Financial Officer of Patriot.

participants, and (iv) Fifth Third Bank, as Administrator and as LC Bank.  (Schroeder Venue Decl. ¶ 27; Stipulation at ¶ 3(f).)

32.     Patriot has issued two series of unsecured notes: (a) $250 million in 8.25% senior unsecured notes due 2018 (the "Senior Bonds"); and (b) $200 million in 3.25% unsecured convertible notes due 2013 (the "Convertible Bonds").  The indenture trustees named in these debt instruments are located in Delaware and Minnesota, respectively [Dkt. No. 98 at 3] and the instruments are governed by New York law.  (Schroeder Venue Decl. ¶ 28.)

33.     As of July 11, 2012, entities based in New York appear to hold the largest amounts of Senior Bonds and Convertible Bonds.  (Schroeder Venue Decl. ¶¶ 29-31.)

34.     In 2005, Debtor Cleaton Coal Company issued unsecured promissory notes in conjunction with an exchange transaction involving the acquisition of Illinois Basin coal reserves.  The promissory notes and related interest are payable in annual installments of $1.7 million and mature in January 2017.  These instruments are governed by Kentucky law. (Schroeder Venue Decl. ¶ 33.)

### B.     The DIP Facilities

35.     The Credit Facility has been replaced by Debtor-in-Possession ("DIP") facilities. (Schroeder Venue Decl. ¶ 24 n.1.)   On July 9, 2012, Patriot entered into the Superpriority Secured Debtor-in-Possession Credit Agreement (the "First Out DIP Facility").  The First Out DIP Facility matures in October 2013, with a possible extension to December 2013.  [Dkt. No. 78-1 at § 1.01.]  On July 11, 2012, Patriot entered into the Amended and Restated Superpriority Secured Debtor-in-Possession Credit Agreement (the "Second Out DIP Facility").  The Second Out DIP Facility matures in October 2013, with a possible extension to December 2013.  [Dkt. No. 78-1 at § 1.01.]  The Court has authorized the financing contemplated by the First Out DIP Facility and the Second Out DIP Facility (together, the "DIP Facilities") on a final basis,

17

pursuant to which Patriot may borrow and obtain letters of credit up to an aggregate principal or face amount of $802 million. [Dkt. No. 275 at ¶ 6(a).] Three of the five agents under the DIP Facilities and joint lead arrangers are headquartered in New York. (Schroeder Venue Decl. ¶ 48.)

36.     Both the First Out DIP Facility and the Second Out DIP Facility contain (a) a New York choice of law provision and a New York forum selection clause (Schroeder Venue Decl. ¶ 52; Dkt. No. 78-1 at § 12.14(a)-(b); Dkt. No. 78-3 at § 10.14(a)-(b)) and (b) a covenant that obligates the Debtors to comply with applicable environmental laws and regulations. [Dkt. No. 78-1 at § 6.13; Dkt. No. 78-3 at Article VI.]

37.     As reflected on Schedule 2.01 to the Second Out DIP Facility, three of the four Sureties are beneficiaries of letters of credit in the outstanding principal amount of $32.4 million. Each Second Out DIP lender agreed to make advances to reimburse the issuers of those letters of credit for amounts, if any, drawn by the Sureties. (Schroeder Venue Decl.¶ 54.)

## V.     Parties-in-Interest in the Debtors' Chapter 11 Cases

### A.     The Debtors' Material Contracts and Leases

38.     The Debtors own, lease, or hold under other arrangements coal reserves, surface property, and other real estate interests in many states, including Illinois, Indiana, Kentucky, Missouri, Ohio, Pennsylvania, and West Virginia. (Schroeder Venue Decl. ¶ 34.)

39.     Of the fifteen largest lessors from whom Debtors lease property, measured by coal reserves, six are headquartered in West Virginia. The other nine lessors are headquartered in other states, including Tennessee, Virginia, Kentucky, Pennsylvania, and Missouri. (Schroeder Venue Decl. ¶ 35.)

40.     The Debtors have entered into a master equipment lease with each of their twenty equipment lessors. The twenty equipment lessors are headquartered in at least a dozen states,

including California, Connecticut, Illinois, and New Jersey.  Of the twenty master leases, four are governed by New York law.  (Schroeder Venue Decl. ¶ 19.)

41.    Approximately 78 percent of the Debtors' 2011 coal sales were under term (one year or longer) coal supply agreements that specify the coal sources, quality and technical specifications, shipping arrangements, pricing, force majeure, and other provisions unique to agreements reached with each purchaser.  (Schroeder Venue Decl. ¶ 17.)  New York law governs forty-one of the Debtors' sixty-five coal sales contracts.    These contracts represent approximately forty-three percent of the Debtors' committed sales.  Two of the Debtors' sales contracts are governed by West Virginia law, amounting to five percent of the Debtors' committed sales volume.  (Schroeder Venue Decl. ¶ 18.)

42.    The Debtors entered into indemnity agreements with the sureties that issue surety bonds on the Debtors' behalf.  The indemnity agreement that governs the relationship between the Debtors and Westchester Fire Insurance Company – one of the four Sureties – is governed by New York law and includes a New York forum selection clause.   None of the other three indemnity agreements is governed by West Virginia law.  (Schroeder Venue Decl. ¶ 20.)

43.    The issuers of the Debtors' surety bonds are located in various states, including Tennessee, Minnesota, Pennsylvania, Connecticut, and New Jersey.  (Schroeder First Day Decl., Ex. A, Sched. 5; UMWA Motion, Ex. D (Patriot Creditors).)  The Debtors have a total of $238 million of outstanding surety bonds.  (Schroeder First Day Decl., Ex. A. Sched. 5.)  The bonds issued by the four Sureties who filed the Sureties' Motion[16] total approximately $69 million and

---

[16]    The Sureties issue reclamation bonds to bond the Debtors' environmental reclamation obligations.  These bonds are contingent debt.  *See* Sept. 12, 2012 Hr'g. Tr. at 17:24-18:8.

comprise approximately 29 percent of the total surety bonds issued by the Debtors.  *See id.*; Sept 12, 2012 Hr'g. Tr. at 131:19-132:7.

44.    The Sureties have headquarters and have issued bonds in the Debtors' cases as follows:[17] (i) Indemnity National Insurance Company is based in Knoxville, Tennessee and has issued approximately $11 million in bonds; (ii) Westchester Fire Insurance Company is based in Philadelphia and has issued approximately $5 million in bonds; (iii) Houston Casualty, the parent of US Specialty Insurance, is based in Houston and has issued approximately $24 million in bonds; and (iv) Argonaut Insurance Company is based in Houston and California and has issued approximately $26.5 million in bonds.[18]  More than 34 percent (over $23 million) of the approximately $69 million in total bonds issued by the Sureties consists of bonds in favor of state and local regulators outside of West Virginia.

45.    Under the Second Out DIP Facility, Bank of America issued letters of credit in the aggregate principal amount of approximately $32 million as collateral for three of the four Sureties' bond obligation.  (FF ¶ 37).  That collateral reduces the Sureties' exposure by nearly 50 percent – to approximately $37 million in total.[19]  Of this contingent unsecured exposure, the maximum amount supporting the Sureties' obligations to regulators in West Virginia is approximately $25 million.  Indemnity National Insurance Company, one of the four Sureties, has zero West Virginia-related economic exposure, and another of the Sureties, Westchester Fire

---

[17]    It is worth noting that when the Court first inquired at the Hearing about the location of the Sureties, counsel for the Sureties did not know where their clients were located.  *See* Sept. 12, 2012 Hr'g. Tr. at 17:8-18:8.

[18]    *See* Sept. 12, 2012 Hr'g. Tr. at 49:6-17.

[19]    *See* Sept. 12, 2012 Hr'g. Tr. at 423:18-23 (Sureties' counsel's acknowledgement that the Sureties' "uncollateralized exposure across the Debtors' obligations" is only approximately $37 million).

Insurance Company, has less than $1 million in West Virginia-related maximum economic exposure.[20]

46.    None of the issuers of the Debtors' letters of credit is located in New York; these issuers are located in North Carolina, Ohio, and Pennsylvania.  (Schroeder First Day Decl., Ex. A, Sched. 5; UMWA Motion, Ex. D (Patriot Creditors).)

**B.    The Debtors' Current and Former Employees**

47.    The Debtors collectively employ more than 4,000 people in active status, working in both full-time and part-time positions.  These employees include miners, engineers, truck drivers, mechanics, electricians, administrative support staff, managers, directors, and executives.  Approximately 42 percent of these employees are unionized and are represented by the UMWA under collective bargaining agreements; the majority of Patriot's employees are not members of the UMWA.  (Schroeder Venue Decl. ¶ 36).

48.    As of as of July 2012, there were approximately 11,860 retirees covered as primary insureds under benefit plans administered by the Debtors (the "Retirees").  The Retirees reside in forty-one different states, with approximately thirty-eight percent living in West Virginia.  Approximately fifty percent of the Retirees live in the Illinois Basin coal region, which includes Illinois, Indiana, and Kentucky.  (Schroeder Venue Decl. ¶ 39.)

49.    Of the 11,860 Retirees, 10,388 were UMWA members.  The unionized Retirees reside in thirty-nine different states, with approximately thirty-nine percent living in West Virginia and approximately fifty percent in the Illinois Basin region.  (Schroeder Venue Decl. ¶ 40.)  There are approximately 4,000 retired UMWA members in Illinois, Indiana, and Western Kentucky.  (Buckner Decl. ¶ 7.)

---

[20]      *See* Sureties' Motion, Exhibit C; Post-Hearing Memorandum of Bank of America at pp. 3-5.

50.    Nine of the ninety-nine Debtors are signatories to collective bargaining agreements: Highland Mining Company, LLC; Hobet Mining, LLC; Apogee Coal Company, LLC; Heritage Coal Company LLC; Pine Ridge Coal Company, LLC; Mountain View Coal Company, LLC; Colony Bay Coal Company; Eastern Associated Coal, LLC; and Gateway Eagle Coal Company, LLC.  (Schroeder Venue Decl. ¶ 38.)

51.    The UMWA's headquarters are located in Triangle, Virginia.  (Buckner Decl. ¶ 4.)  The UMWA is represented in these cases by Kennedy, Jennik & Murray, P.C., with offices at 113 University Place, New York, New York.

52.    A bargaining team has been established by the UMWA in order to conduct negotiations with the Debtors pursuant to section 1113 of the Bankruptcy Code. (Buckner Decl. ¶ 3.) The team is composed of three International District Vice Presidents who oversee jurisdictions in which Debtors conduct active mining operations. They are Joe Carter, Mike Caputo, and Steve Earle.  The other member of the negotiating team is UMWA President Cecil Roberts.  All of the members of the UMWA negotiating team currently reside and work in West Virginia with the exception of Steve Earle, who resides and works in Kentucky.  (Buckner Decl. ¶¶ 3-7.)

53.    At the end of August 2012, the UMWA held "mass membership" meetings in both Evansville, Indiana and Charleston, West Virginia for its active and retired members and their dependents in order to review developments in the Debtors' cases to date and to provide information to members.  (Buckner Decl. ¶ 9.)

**C.    The Debtors' Creditors and Claimholders**

54.    According to the "List of Creditors Holding 5 Largest Secured Claims" [Dkt. No. 4, Schedule A], the Debtors' five largest secured creditors are located in California, Illinois,

Missouri, New Jersey, and Ohio.  Several of these creditors have offices and operations across the country and throughout the world.  (Schroeder Venue Decl. ¶ 41.)

55.     There are seven members of the Committee.  The members, who were appointed on July 18, 2012, are: (1) Wilmington Trust Company, located in Wilmington, Delaware; (2) U.S. Bank National Association, located in Boston, Massachusetts; (3) United Mine Workers of America, located in Triangle, Virginia; (4) UMWA Health and Retirement Funds, located in Washington, D.C.;[21] (5) Gulf Coast Capital Partners, LLC, located in Naples, Florida; (6) Cecil Walker Machinery, located in Louisville, Kentucky; and (7) American Electric Power, located in Columbus, Ohio.  (Schroeder Venue Decl. ¶ 42.)

56.     The Debtors' fifty largest unsecured creditors hold approximately $507 million in liquidated claims.  This total does not include the value of unliquidated claims.  (Schroeder Venue Decl. ¶ 44.)

57.     Of the Debtors' fifty largest unsecured creditors, ten are based in West Virginia, and their claims account for approximately $9.6 million of the approximately $507 million in liquidated unsecured claims against the Debtors.  (Schroeder Venue Decl. ¶ 45.)  None of the Debtors' fifty largest unsecured creditors is located in New York. (Revised List of Creditors Holding the 50 Largest Unsecured Claims [Dkt. No. 98].)

58.     The Debtors' largest unsecured creditor from West Virginia ranks thirteenth on their list of the largest unsecured claims, with an unliquidated claim estimated at less than $3.2 million.  The Debtors' largest unsecured creditor, Wilmington Trust Company, which is located in Wilmington, Delaware, has a $250 million claim.  (Schroeder Venue Decl. ¶ 46.)

---

[21]     The UMWA Health and Retirement Funds are represented by (i) Morgan, Lewis & Bockius LLP, which is located in Philadelphia, Pennsylvania and New York, New York and (ii) Mooney, Green, Sandon, Murphy & Welch, P.C., which is located in Washington, D.C.

59.    The twenty top vendors of the Debtors for the first six months of 2012 have headquarters in twelve different states, with five located in West Virginia and two located in New York.  (Schroeder Venue Decl. ¶ 47; Stipulation at ¶ 3(g).)  Of the five located in West Virginia, two supported retaining venue in the Southern District of New York and the other three did not assert a position.

60.    Twenty of the Debtors' fifty largest unsecured creditors – including six of the ten creditors from West Virginia – filed timely joinders in support of the Debtors' Objection.  In addition, five of the remaining top-fifty creditors of the Debtors, including two from West Virginia, timely submitted letters or e-mails to the Debtors requesting that the Debtors represent to the Court that they oppose the Motions and support these cases remaining in the Southern District of New York.  Two top-fifty creditors offered untimely support for the Debtors' Objection, for a total of twenty-seven out of the top-fifty unsecured creditors supporting this Court retaining venue in New York.  [Dkt. Nos. 423 and 433, respectively.]

61.    American Electric Power (located in Canton, Ohio), Monongahela Power Company (located in Greensburg, Pennsylvania), and Hope Gas, Inc., d/b/a Dominion Hope (located in Carlsburg, West Virginia) filed a timely joinder in support of the Motions.  [Dkt. No. 98.]  The West Virginia Attorney General filed the other timely joinder in support of the Motions.  [Dkt. No. 390.]  Untimely joinders (to the UST Motion only) were filed by the UMWA Health and Retirement Funds, located in Washington, D.C., and the Interested Shareholders, located in Connecticut and Virginia.

## VI.    Commencement of the Debtors' Chapter 11 Cases

62.    A number of events led to the commencement of the Debtors' chapter 11 cases, including reduced demand for coal, increased regulation of power plants and coal mining, and substantial legacy labor costs.  (Schroeder First Day Decl. ¶¶ 21-39.)

24

63.     In recent years, the demand for coal has decreased, in large part because alternative sources of energy have become increasingly attractive to electricity generators in light of declining natural gas prices and more burdensome regulation of the coal industry.  At the same time, the Debtors' liabilities have increased as the Debtors face sharply rising costs to comply with such regulations.  (Schroeder First Day Decl. ¶ 21.)

64.     The Debtors also have substantial legacy costs, primarily in the form of medical benefits and pension obligations.  The Debtors currently provide benefits to more than three times the number of retirees and non-active employees and those parties' dependents than to active employees.  (Schroeder First Day Decl. ¶ 33.)

65.     As a result of these factors, the Debtors' financial performance has experienced a significant decline.  For the twelve months ended March 31, 2012, the Debtors reported revenues of $2.33 billion and Adjusted EBITDA of $164 million from the sale of approximately 29.4 million tons of coal.  The Debtors' net loss during the same period was $198.5 million.  (Schroeder First Day Decl. ¶ 13.)

66.     The Debtors elected to commence their chapter 11 cases in New York because they determined that it was in the best interests of all stakeholders to do so.  No evidence was submitted to the contrary.  As Mr. Schroeder stated in his Declaration:

> The Debtors determined that the Southern District of New York (the "SDNY") is the optimal venue for the Debtors' chapter 11 cases and in the best interests of the Debtors, their creditors and other stakeholders and these estates.  The Debtors' legal and financial advisors are all located in New York, and the Debtors' significant financial creditors, along with their professional advisors, are also located in New York.  Moreover, along with their advisors, the agent under the proposed "first out" DIP financing facility and two of the three arrangers under the proposed DIP financing facilities are New York-based institutions, and the DIP financing contemplates that the Debtors' cases be venued in the SDNY.  I believe that had we filed in one of the other jurisdictions that were also available to us (i) most of our domestic and foreign creditors would have been

inconvenienced and (ii) the costs and inefficiency of administration of the estates would have materially increased.

(Schroeder First Day Decl. ¶ 43.)   Pursuant to the Stipulation, the Debtors did not call Mr. Schroeder to testify as a witness, nor was he cross-examined by the UMWA or any other party.

**DISCUSSION**

Against the foregoing extensive factual backdrop, the Court now turns to the questions of law presented by the Motions.   The analysis begins, as it must, with the applicable statutory provisions.

**I.        The Bankruptcy Venue Statute -- 28 U.S.C. § 1408**

Section 1408 of title 28 of the United States Code provides:

> Except as provided in section 1410 of this title, a case under title 11 may be commenced in the district court for the district—
> (1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district; or
> (2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

28 U.S.C. § 1408.

The linkage between venue and particular geographic locations dates back hundreds of years.   The original meaning of "venue" under English law was the neighborhood from which jurors were to be drawn because of their personal knowledge of the facts and the parties. The jurors' personal knowledge formed the basis for the jury's decision in actions at law, including those involving title to land, trespass, and debt.   The use of such a jury of so-called "recognitors" was well established by 1200 A.D. in the circuit courts that travelled throughout England.   After the English law courts settled at Westminster after 1200 (in order to avoid the inconvenience of

26

judges travelling and moving court records), the key factor in determining the place of trial continued to be the convenience of the courts, not that of the parties. The Statute of Westminster in 1285 thus specifically authorized the trial of cases at Westminster *nisi prius* – "unless before" that time a circuit court had arrived in the local community to conduct a trial, hence the name "*Nisi Prius*" courts.   Otherwise, the jurors and litigants would travel to Westminster for the trial.[22]

As proof by sworn witnesses replaced proof by jurors, the necessity of using local jurors diminished.   Nonetheless, there continued to be a requirement that a plaintiff "lay" an action in the county in which the claim arose, regardless of whether the action was local or transitory in nature.  "Transitory" actions were those not identified with any particular location, including actions on contracts and debt, while "local" actions were those so closely connected with the place in which they arose that it was held they could *only* have arisen there.  Trespass to land, ejectment, and replevin fell into the latter category.[23]   As the distinction between transitory and local actions developed in sixteenth and seventeenth century England, personal actions on debt and on contracts no longer had to be venued where they arose but could also be brought where the defendant and/or his chattels could be found.[24]

The rules and procedures of the English judicial system were in large measure continued in America with the enactment of the Federal Judiciary Act of 1789.  Significantly, however, the

---

[22]     *See* Shirley M. Sortor, *Venue Problems in Wisconsin*, 56 Marq. L. Rev. 87 (1972).

[23]     *Id.* at 88.

[24]     *Id.* at 89.  Since the United States Bankruptcy Court is a court of equity, it is worth noting that the history of venue in English courts of equity, or Chancery courts, is altogether different from that of the law courts. Chancery was originally a religious court that sat only in Westminster; its *subpoena* power extended to all of England.  Since its decisions were based on evidence given by witnesses under oath, there was no concept of laying venue in a particular locale for the purpose of forming a jury of local citizens with personal knowledge of the facts of a case.  *Id.* at 90.

fears and prejudices of the colonists led Congress and state legislatures to give increased emphasis to the need to protect the defendant's interests in laying venue.[25]  Venue was generally required to be laid where the defendant resided.  Local federal courts were established to ensure fairness and convenience to defendants.[26]  The principal factors we continue to look to today under applicable venue statutes and case law – convenience of the parties and witnesses, the location of the defendant, and the scope and type of jurisdiction required for enforcement of judgments – are thus deeply rooted in history.  Notably, personal knowledge of the facts at issue in a case by the trier of fact ceased long ago to be a venue consideration.

Federal practice with respect to venue has continued to evolve to keep pace with the rapidly changing nature of our nation, from the development of interstate commerce to the rise of the corporation and national banks to the dawn of the digital age.  Life and the law are decidedly more complex than they were when the very first federal court convened, here in the Southern District of New York in 1789.  Nonetheless, the concept of venue remains one of fairness and convenience.  To the extent that geography can be cited as a basis for venue rules, it is important to keep the foregoing history in mind, for it is fairness, rather than geography, that has been and should continue to be the key factor in determining the appropriateness of venue.  *See* Note*: Forum Shopping Reconsidered*, 103 HARV. L. REV. 1677, 1688-89 (1990) (forum shopping violates "fair play by allowing parties to circumvent fate" and "highlights elements of randomness in the administration of justice").  While the Court agrees with the UMWA's observation that venue based on domicile implies that there is "a nexus between a person and a

---

[25]     Charles Warren, *New Light on the History of the Federal Judiciary Act of 1789*, 37 HARV. L. REV. 49, 72 (1923).

[26]     Sortor at 92.  Kentuckians, then citizens of Virginia, threatened to secede from the Union unless provided with a local court.  *See* William Wirt Blume, *Place of Trial of Civil Cases – Early English and Modern Federal*, 48 MICH. L. REV. 1, 36 (1949).

place of such permanence as to control the creation of legal relations and responsibilities of the utmost significance," *Williams v. North Carolina*, 325 U.S. 226 (1945),[27] it does not necessarily follow that the only location that satisfies this test in these cases is West Virginia.  The tenor of the Motions of both the UMWA and the Sureties reflects unfortunate remnants of the types of "geographic" fears and prejudices that are unfounded and have no place in this matter.

## II.    Transfer of Venue Pursuant to 28 U.S.C. § 1412

We turn next to the transfer of venue pursuant to section 1412 of title 28 of the United States Code, which provides that "[a] district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties."  28 U.S.C. § 1412.[28]  Section 1412 is written in the disjunctive, meaning that each of the two prongs – "in the interest of justice" or "for the convenience of the parties"[29] – constitutes an independent ground for transferring venue.  *See In re Asset Resolution LLC*, 2009 Bankr. LEXIS 3711 at *6 (Bankr. S.D.N.Y. Nov. 24, 2009).  According to the Second Circuit:

> The "interest of justice" component of §1412 is a broad and flexible standard which must be applied on a case-by-case basis.  It contemplates a consideration of whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness . . . .

*Gulf States Exploration Co. v. Manville Forest Prod. Corp. (In re Manville Forest Prod. Corp.)*, 896 F.2d 1384, 1391 (2d Cir. 1990).  The decision of whether to transfer venue pursuant to

---

[27]    UMWA Post-Hearing Mem. of Law at p. 3.

[28]    While section 1412 is applicable in bankruptcy cases in which venue is "proper," section 1406 of title 28 is applicable to bankruptcy cases in which venue is improper.  It provides that "the district court in a district in which a case is filed laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."  The Motions have been brought pursuant to section 1412 only.

[29]    This formulation of the test for interfering with a party's venue choice can be traced to the case of *Holmes v. Wainright*, 102 Eng. Rep. 624 (K. B. 1803), in which Lord Ellenborough, C.J., stated that venue should be changed only if "all the conveniences and justice of the case preponderates in favor of the application."  By 1803, Lord Ellenborough had the benefit of some 700 years of learning on venue disputes in England, dating back to the reign of William II.  *See generally*, Blume at 28.

section 1412 is within a court's discretion according to "an individualized, case-by-case consideration of convenience and fairness." *Manville*, 896 F.2d at 1391 (citations omitted).

A movant seeking transfer of a bankruptcy case to a different venue bears the burden of proof, and that burden must be carried by a preponderance of the evidence. *Manville*, 896 F.2d at 1390.   Moreover, the Second Circuit has stated that the district in which the underlying bankruptcy case is pending "is presumed to be the appropriate district for hearing and determination of a proceeding in bankruptcy." *Id*. at 1391.   A debtor's choice of forum is entitled to great weight if venue is proper pursuant to section 1408. *See, e.g., In re Enron Corp.*, 284 B.R. 376 (Bankr. S.D.N.Y. 2002) ("*Enron II*").   As will be seen, the failure of certain of the Movants to carry their burden of proof played a significant role at the Hearing and in the Court's decision.

Courts in the Second Circuit have applied the flexible standard embodied in section 1412 in various ways, some using specified factors, *see In re Dunmore Homes, Inc.*, 380 B.R. 663, 671-72 (Bankr. S.D.N.Y. 2008) (citing *Enron Corp. v. Arora (In re Enron Corp.)*, 317 B.R. 629, 638-39 (Bankr. S.D.N.Y. 2004) ("*Enron III*")), and some without applying a factor test, *see Grumman Olson Indus. v. McConnell (In re Grumman Olson Indus.),* 329 B.R. 411, 437 (Bankr. S.D.N.Y. 2005).   It has also been noted that it is "appropriate to add as an additional relevant factor, though it may rarely be applicable, the integrity of the Bankruptcy Court system." *In re Éclair Bakery Ltd.*, 255 B.R. 121, 142 (Bankr. S.D.N.Y. 2000).[30]   While a court considering a transfer of venue must base its analysis on the facts underlying the particular case before the

---

[30]     Bankruptcy courts in the District of Delaware have frequently articulated and applied a "center of gravity" test in determining whether to transfer bankruptcy cases. *See, e.g.*, *In re Ernst Home Center, Inc.,* Case No. 96-01088 (PJW) (Bankr. D. Del. August 28, 1996) (transferring case to Washington because "center of gravity" of the case was on the West Coast, not in Delaware).

Case 12-51502    Doc 1    Filed 07/09/12    Entered 11/30/12 13:45:11    Main Document
Pg 37 of 61

court, *see, e.g., Enron III*, 317 B.R. at 638, a number of decisions in this District, while factually distinguishable, are instructive.

In *Dunmore Homes*, the court granted a motion pursuant to section 1412 to transfer a chapter 11 case filed in the Southern District New York to the Eastern District of California, despite the fact that section 1408 had been satisfied.  After examining each of the factors courts have considered in evaluating the convenience of the parties[31] and the interest of justice[32] prongs under section 1412, Judge Glenn identified numerous facts that weighed in favor of transfer of the *Dunmore Homes* case, including the location of the debtor's management, employees, and office and the location of parties-in-interest in the case, all of which were based in California. *Dunmore Homes*, 380 B.R. at 677.  The court also noted that the debtor lacked any ties to New York other than its recent incorporation and its efforts to secure financing there.  While the court recognized that a debtor's selection of venue is afforded great weight, it concluded that the "thin nexus" of the debtor to New York and the "overwhelming contacts" between the debtor and California, "combined with no overriding factors making it substantially more likely that the Debtor's prospects for a successful reorganization would be enhanced if this Court were to retain jurisdiction" mandated a transfer of venue in the interest of justice.  *Id.* at 675-76.  The court also

[31]    The court in *Dunmore Homes* stated that the "convenience of the parties" prong has six factors: (i) proximity of creditors of every kind to the court, (ii) proximity of the debtor, (iii) proximity of witnesses necessary to the administration of the estate, (iv) location of the assets, (v) economic administration of the estate, and (vi) necessity for ancillary administration if liquidation should result.  *See Dunmore Homes*, 380 B.R. at 676 (citations omitted).  These factors are sometimes referred to in the caselaw as the "*CORCO* factors," as they were set forth in the Fifth Circuit's decision in *In re Commonwealth Oil Refining Co.*, 596 F.2d 1239 (5th Cir. 1979), *cert. denied*, 444 U.S. 1045 (1980) ("*CORCO*") which affirmed a decision of the bankruptcy court declining to transfer venue of oil refining debtors from Texas to Puerto Rico.  The factor given the most weight is the promotion of the economic and efficient administration of the estate.  *CORCO*, 596 F.2d at 1247.

[32]    The court in *Dunmore Homes* listed the considerations regarding the interest of justice as whether: (i) transfer would promote the economic and efficient administration of the bankruptcy estate, (ii) the interests of judicial economy would be served by the transfer, (iii) the parties would be able to receive a fair trial in each of the possible venues, (iv) either forum has an interest in having the controversy decided within its borders, (v) the enforceability of any judgment would be affected by the transfer, and (vi) the plaintiff's original choice of forum should be disturbed.  *See Dunmore Homes*, 380 B.R. at 671-72 (citing *Enron III*, 317 B.R. at 638-39).

concluded that the moving parties had met their burden under the "convenience of the parties" prong of section 1412 as well as the "interest of justice" prong. *Id.* at 677.

In the first of three venue-related decisions in the Enron chapter 11 cases, Judge Gonzalez denied motions to transfer venue from the Southern District of New York to the Southern District of Texas pursuant to section 1412. *In re Enron Corp.*, 274 B.R. 327 (Bankr. S.D.N.Y. 2002) ("*Enron I*"). Although all but three of the debtors had their principal place of business in Texas and some creditors were best served by the case being transferred to Texas, the court denied the motions to transfer venue filed by several creditors and parties-in-interest, finding that the movants did not show by a preponderance of the evidence that transfer of venue was in the interest of justice or for the convenience of the parties and that, after considering "matters of judicial economy, timeliness and fairness as well as the efficient administration of the estate, the interest of justice [was] best served by retaining jurisdiction." *Id.* at 351. Among other things, facts that the court emphasized in its ruling included: (i) all of the parties "most essential" to the reorganization of the debtors were located in New York, (ii) the creditors' committee strongly opposed transfer of venue, (iii) the debtors' finances were "extremely complex" and they would need access to the capital markets and financial experts in New York, and (iv) a learning curve had already been established in the cases which contributed to judicial economy. *Id.* at 350-51.

In *Enron II*, the court denied a motion to transfer venue of the chapter 11 case of one of Enron's subsidiaries, San Juan Gas Company, Inc., to the District of Puerto Rico. The movant, an unsecured creditor of San Juan Gas, did not dispute that venue was proper pursuant to section 1408 but sought transfer, pursuant to section 1412, solely of the San Juan Gas chapter 11 case. *Enron II*, 284 B.R. at 385. After employing the *CORCO* factors and giving the most weight to

32

the promotion of the economic and efficient administration of the estate, the court concluded that the creditor did not meet its burden to show that the transfer was warranted for the convenience of the parties or in the interest of justice. *Id*. at 406. The court found that centralizing parent and subsidiary debtors in the same district (as contrasted with the creditor's request to "fragment" the case) furthers the objectives of the Bankruptcy Code and may be in the interest of justice. *Id.* at 404.[33]

The case in the bankruptcy context that comes closest to the facts here at issue is *In re Winn-Dixie Stores, Inc.*, Case No. 05-11063 (RDD) (Bankr. S.D.N.Y. April 12, 2005) ("*Winn-Dixie*"). In *Winn-Dixie*, the debtors sought venue in New York by incorporating an entity shortly before their chapter 11 filing, admittedly solely to establish venue and meet the requirements of section 1408. *See Winn-Dixie*, Hr'g. Tr. at 166. After a creditor filed a motion to transfer venue to the Bankruptcy Court for the Middle District of Florida, where the debtors' supermarket operations and management were primarily located, the debtors at first opposed the motion but later consented to the transfer. In a decision issued from the bench, the court found that transfer of the debtors' cases was in the interest of justice under section 1412 and ordered their transfer, overruling the objection of the creditors' committee. *Id*. Judge Drain stated that "[g]iven the circumstances here . . . and really solely the following factor, that [the Winn-Dixie affiliate entity] was formed solely to establish venue in New York, I conclude that transfer of venue here would be in the interests of justice under Section 1412 and therefore will order the transfer of the cases to the Middle District of Florida." *See Winn-Dixie*, Hr'g. Tr. at 166-167.

---

[33]        The third *Enron* decision also denied transfer of venue pursuant to section 1412 after analyzing the *CORCO* factors based on the facts. *See Enron III*, 317 B.R. 629 (Bankr. S.D.N.Y. 2004).

Having set forth the factual background as well as the applicable statutory and decisional framework, we turn next to the consideration of the Motions.

### III.    The Debtors' Cases Must be Transferred from this District Pursuant to 28 U.S.C. § 1412

No party disputes that section 1408 of title 28 has been "satisfied" in these cases; the parties stipulated to this fact prior to the Hearing.  By incorporating PCX and Patriot Beaver Dam in New York in the weeks prior to the Petition Date, the Debtors achieved literal and technical compliance with the venue statute and used these entities as a basis for filing all of the Patriot chapter 11 cases in New York.  The Debtors argue that this fact is dispositive – and requires that the cases remain in this District.  The U.S. Trustee has also argued that this fact is dispositive – and requires that the cases be transferred to another District.  Stated differently, it is the Debtors' position that the eve-of-filing steps taken by the Debtors to satisfy the venue statue should not be considered in the "interest of justice" analysis. The Court disagrees with the Debtors, for the following reasons.

#### A.    The Debtors Did Not Act In Bad Faith in Filing in this District

No party has alleged, and there is no evidence in the record, that the Debtors acted in bad faith in filing their chapter 11 cases in New York.  Indeed, it could be argued that doing so was entirely consistent with, or even required by, the Debtors' fiduciary duties.  In the Schroeder First Day Declaration, Mr. Schroeder stated that

> The Debtors determined that the Southern District of New York (the "SDNY") is the optimal venue for the Debtors' chapter 11 cases and in the best interests of the Debtors, their creditors and other stakeholders and these estates. . . . .  I believe that had we filed in one of the other jurisdictions that were also available to us (i) most of our domestic and foreign creditors would have been inconvenienced and (ii) the costs and inefficiency of administration of the estates would have materially increased.

34

(Schroeder First Day Decl. ¶ 43, FF ¶ 66.)  The Schroeder First Day Declaration was admitted into evidence, and none of the Movants elected to cross-examine Mr. Schroeder on this or any other statement in his two declarations.  The evidence in the record thus establishes that the Debtors chose to file in this District in good faith, and several of the Movants acknowledged as much on the record.[34]

At the Hearing, there was speculation (but no evidence) by the Movants as to why the Debtors determined to file these cases in New York.  The UMWA, when asked why the Debtors chose New York, said "venue was better for them in New York."[35]  When questioned further by the Court, counsel for the UMWA stated that "them" referred to the 99 Debtors who filed chapter 11 petitions; counsel reluctantly conceded that, in a chapter 11 case, a debtor is comprised of its economic stakeholders and that the Debtors here may in fact have chosen New York to maximize value to their stakeholders.[36]  No allegations were made or evidence adduced that the Debtors improperly sought to avoid another district or to hinder another party in interest,[37] although the Sureties did argue that filing in this District was motivated in part by

---

[34]     *See, e.g.*, Sept. 11, 2012 Hr'g. Tr. at 69:3-5 ("[Ms. Jennik]: I am not aware of evidence that [the filing] was made in bad faith."); Sept. 12, 2012 Hr'g. Tr. at 12:5-6 ("[Ms. Schwartz]: The United States Trustee does not assert that there was bad faith; that wasn't part of our motion . . . ."); *id.* at 45:12-17 ("[Mr. Meldrum]: [W]e don't – I think like everybody – doubt that the debtors attempted to do their best in selecting venue, and they obviously have a lot of considerations to balance.  We don't think there was any sort of inside gaming going on for the benefit of somebody who hasn't been hurt."); Sept. 11, 2012 Hr'g. Tr. at 113:23-114:4 ("[Ms. Schwartz]: I thought I understood the Court to say, would it be a breach of that duty if they didn't try to file a case where the substantive law was better.   THE COURT: Well, in good faith, in good faith, which – [Ms. Schwartz]: No one's saying other than that."); Sept. 12, 2012 Hr'g. Tr. at 119:12-14 ("[Mr. Goodchild, for UMWA Health and Retirement Funds]: I know everybody else has said that they don't challenge bad – or challenge good faith, or anything like that.")

[35]     *See* Sept. 11, 2012 Hr'g. Tr. at 69:16-18.

[36]     *See* Sept. 11, 2012 Hr'g. Tr. at 69:21-71:4.

[37]     *See e.g.*, *In re EB Capital Management LLC*, 2011 Bankr. LEXIS 2764 (Bankr. S.D.N.Y. July 14, 2011); *see also In re Éclair Bakery Ltd.*, 255 B.R. at 132 (transferring case after finding that the debtor had filed for bankruptcy in another district three previous times and was indisputably shopping for a different result).

Patriot's attempt to "escape"[38] its environmental obligations, implying that this Court would be less inclined to protect West Virginia's land and natural resources, and by extension, the health and welfare of her citizens – or less capable of doing so – than a West Virginia court.    As the Court indicated at the Hearing in the strongest possible terms, such arguments are without merit.[39]

### B.    The Debtors' Literal Compliance with Section 1408

Notwithstanding the absence of bad faith on the part of the Debtors and the deference to which the Debtors' venue choice is entitled, the Court concludes that the Debtors' purposeful creation of the venue-predicate affiliates in New York on the eve of filing must be considered in the "interest of justice" analysis set forth in section 1412.  To ignore it would be to condone the Debtors' strategy and elevate form over substance in a manner that courts have found impermissible; it would run afoul of any reasonable application of the intent of the venue statute. While the Debtors did in fact comply with section 1408, *how* they complied with the statute must be taken into account when considering the "interest of justice" prong of section 1412.

The  Court  has  searched  extensively  for  analogues  to  the  facts  here  presented,  for situations in which courts have looked beyond "literal compliance" with a statute and declined to uphold a party's course of conduct notwithstanding such compliance.  In the bankruptcy context, "artificial impairment" cases come to mind, in which a plan proponent nominally impairs the claims of a class in order to achieve technical compliance with the cramdown provisions of section 1129(a)(10).  *See, e.g.*, *Windsor on the River Assocs. v. Balcor Real Estate Fin. (In re Windsor on the River Assocs., Ltd.)*, 7 F.3d 127, 132-33 (8th Cir. 1993) (rejecting manufacture of

---

[38]    *See* Sureties' Reply Memorandum at p. 7.

[39]    *See* Sept. 12, 2012 Hr'g. Tr. at 30:25-32:1.

an impaired class for sole purpose of ensuring plan approval by at least one impaired class); *In re Washington Assoc.*, 147 B.R. 827, 831 (E.D.N.Y. 1992) (same); *In re Dunes Hotel Assoc.*, 188 B.R. 174, 184 (Bankr. D.S.C. 1995) (same).  In the realm of tax law, another area of the law in which courts are called upon to interpret and apply the provisions of a complex statute, the "substance-over-form doctrine"[40] provides a useful analytical framework in which to explore the notion that literal compliance with a statute may not be sustainable if the actions taken do not comport with the statute's purpose.

In the landmark tax case of *Helvering v. Gregory*, 69 F.2d 809 (2d Cir. 1934), the taxpayer Evelyn Gregory owned a corporation (United Mortgage) which in turn owned another corporation (Monitor).  To minimize the taxes she would pay on United Mortgage's sale of its valuable shares in Monitor, Mrs. Gregory formed another corporation and transferred the shares of Monitor from United Mortgage to the newly formed corporation as a "reorganization," in literal compliance with the provisions of the tax code.  She then wound up the new corporation (which was in existence for only a few days and had no business purpose), taking the Monitor shares as a liquidating dividend.  After the government assessed a deficiency against her for using the "reorganization" to avoid the payment of taxes on the transaction, Mrs. Gregory filed a claim with the United States Board of Tax Appeals, which ruled in her favor and expunged the deficiency.  The government appealed the Board's decision to the Second Circuit.  In a decision by Judge Learned Hand, the Second Circuit reversed the Board's order, finding that the transaction undertaken by the taxpayer was not what was contemplated by the statute.  As the Court observed, in words that are compellingly applicable here:

---

[40]        *See* Allen D. Madison, *The Tension Between Textualism and Substance-Over-Form Doctrines in Tax Law*, 43 SANTA CLARA L. REV. 699 (2003).

> [I]f what was done here . . . was what was intended by [the statute] it is of no consequence that it was all an elaborate scheme to get rid of income taxes, as it certainly was. *Nevertheless, it does not follow that Congress meant to cover such a transaction, not even though the facts answer the dictionary definitions of each term used in the statutory definition*. It is quite true, as the Board has very well said, that as the articulation of a statute increases, the room for interpretation must contract; *but the meaning of a sentence may be more than that of the separate words, as a melody is more than the notes, and no degree of particularity can ever obviate recourse to the setting in which all appear, and which all collectively create*.

*Id.* at 810-811 (emphasis added).

The taxpayer appealed the Second Circuit's decision to the Supreme Court, arguing that she had complied with all elements of the statute and that her motive should not make unlawful what the statute permits. The Supreme Court affirmed the Second Circuit's ruling, pointing out that although a new corporation was created, it was for no purpose other than to avoid the payment of taxes, and when that function was fulfilled, it was wound up. The Court stated that:

> The whole undertaking, though conducted according to the terms of subdivision (B), was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else. The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, *because the transaction upon its face lies outside the plain intent of the statute*. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose.

*Gregory v. Helvering*, 293 U.S. 465, 470 (1935) (emphasis added). Simply put, what was done was not "the thing which the statute intended." *Id.* at 469.[41]

So too here. Notwithstanding the absence of bad faith on the part of the Debtors in filing these cases in the Southern District of New York in literal compliance with section 1408, this Court cannot allow the Debtors' venue choice to stand, as to do so would elevate form over

---

[41]    It is beyond the scope of this opinion to address, let alone attempt to resolve, the debate between strict textualists, such as Justice Antonin Scalia, and modern textualists who, like Hand and Sutherland, acknowledge that statutory language has meaning only in context. *See generally,* John F. Manning, *What Divides Textualists from Purposivists*, 106 COLUM. L. REV. 1 (2006); John M. Walker, Jr., *Judicial Tendencies in Statutory Construction: Differing Views on the Role of the Judge*, 58 N.Y.U. ANN. SURV. AM. L. 203 (2002).

substance in way that would be an affront to the purpose of the bankruptcy venue statute and the integrity of the bankruptcy system. Creating PCX and Patriot Beaver Dam solely for the purpose of establishing venue is not "the thing which the statute intended."

### C.    The Applicability of the *Winn-Dixie* Decision

Although at the Hearing the Debtors advanced eleven separate arguments as to why *Winn-Dixie* is distinguishable from the instant case, the Court is convinced that Judge Drain's straightforward rationale for transferring the *Winn-Dixie* cases in the interest of justice applies with equal force in these cases and is not at odds with the Second Circuit's decision in *Capitol Motor Courts v. LeBlanc Corp.*, 201 F.2d 356 (2d Cir. 1953). As in the Patriot cases, the debtors in *Winn-Dixie* sought venue in New York by incorporating an entity shortly before their chapter 11 filing, admittedly solely to establish venue and meet the requirements of section 1408. In its decision, the court stated that "the interests of justice require transfer where . . . the facts were created to fit the statute," which is distinguishable from "applying the statute to fit the facts." *Winn-Dixie*, Hr'g. Tr. at 169-170. The court emphasized that it was transferring the cases not because venue was established in bad faith or wrongfully, but "simply because I don't believe it just to exploit the loophole in the statute to obtain venue here." *Id.* at 167; s*ee also In re Jitney Jungle*, Case No. 99-3602 (MFW) (Bankr. D. Del. Dec. 7, 1999), Hr'g. Tr. at 168:20-21 ("finding that [venue] is not illegal does not establish that it is fair"). Moreover, as Judge Drain aptly observed, "the interests of justice prong of [section 1412] will not always serve the convenience of the parties," *Winn-Dixie*, Hr'g. Tr. at 167, an observation that can be traced to Judge Friendly in *New York Central Railroad Co. v. U.S.*, 200 F. Supp. 944 (S.D.N.Y. 1961), which was a decision on a section 1404(a) motion.

Whether one characterizes the creation of venue as exploiting a loophole or as simply not fair, one thing is clear: it is not the thing which the statute intended. While the Court agrees, at

least as a general matter, with the Debtors' observation that it is the province of Congress and not the courts to close loopholes in legislation,[42] nothing in our jurisprudence requires the Court to condone every strategy devised by clever lawyers to outsmart statutory purpose and language, even where, as here, they do so with the best of intentions.  To do so here would violate Judge Friendly's oft-quoted maxim that "[t]he conduct of bankruptcy cases not only should be right but must seem right."  *In re Ira Haupt & Co.*, 361 F.2d 164, 168 (2d Cir. 1966).  Since the integrity of the bankruptcy process is implicated, and in the absence of any evidence that upsetting the Debtors' selected venue will have dire consequences for the Debtors' stakeholders, these cases should and must be transferred.

In reaching its decision, the Court considered and rejected several additional arguments advanced by the Debtors, including the following.  In the Debtors' Objection, they note that for years Congress has declined to close the "loophole" and change the venue statue.  Specifically, the Debtors point to the fact that a bill introduced in the House of Representatives in 2011 was not enacted, *see* H.R. 2533, 112th Cong. (2011), and argue that this demonstrates that Congress is aware of the purported venue "loophole" and has declined to remedy it.[43]  But the history of proposed venue "reforms" in Congress is a long and tortuous one that has generated much controversy among politicians, bankruptcy practitioners, and academics; given the current political climate in Congress, its inaction on H.R. 2533 can hardly be viewed as a decision on the merits of the proposals to remove domicile as a predicate for venue and/or to abolish or modify the affiliate filing rule.

---

[42]        *See* Debtors' Objection, pp. 47-49.

[43]        *See id.*

The Debtors quite correctly point out that if the Patriot corporate group already happened to have either (a) one or more affiliates incorporated in New York prior to the months leading up to the chapter 11 filing or (b) one or more affiliates with a principal place of business in New York, the Debtors could have taken advantage of those facts and properly filed these cases in New York. *See*, *e.g.*, *Enron I*, 274 B.R. at 341 (finding that section 1408 was satisfied because debtor EMC maintained its principal place of business in New York). They question the logic of allowing the propriety of a venue selection to turn on such "happenstance."[44] The Court expresses no view as to whether the decision on the Motions would be different if those were the facts presented, except to echo Judge Drain's observations in *Winn-Dixie* that the creation of facts to fit the statute is a far cry from taking advantage of the facts as they existed before the Debtors embarked on their path to a chapter 11 filing.[45]

Here, as in *Winn-Dixie*, the Debtors created facts in order to satisfy the statute, as opposed to taking advantage of the facts as they existed. Permitting the Debtors' cases to remain in this District under these circumstances would all but render the venue statute meaningless. It would allow potential large corporate debtors to choose what they view as the optimal venue for their bankruptcy cases and, in preparation for filing chapter 11, incorporate an affiliate in that location for purposes of satisfying section 1408. If "past is prologue," many major financial institutions in their capacities as post-petition lenders would use their influence on their borrowers to cause the debtors' filings to occur in this District. Sept. 12, 2012 Hr'g. Tr. at 183-4; 312-314; *see generally* DIP Agreement at Article IV. Section 1408 should not be interpreted

---

[44]     *See* Sept. 12, 2012 Hr'g. Tr. at 280:9-23.

[45]     *See Winn-Dixie*, Hr'g. Tr. at 169 ("I should note . . . that my decision makes a critical distinction between creating the facts to fit the statute, which I believe is undeniable here, as opposed to applying the statute to fit the facts. Again, in the context of forum shopping, this is a very big distinction.").

41

in a way that gives debtors a free pass to conduct their cases here, or in any other district they choose.

### D.    Administrative Efficiency and the Convenience of the Parties

Finally, the Debtors, citing *Enron I* and *Enron II*, argue that the "interest of justice" argument propounded by the U.S. Trustee cannot outweigh the convenience to all parties and the administrative efficiency of proceeding in this District.  They maintain that it cannot be in the interest of justice to transfer these cases "where all parties concede that venue was properly laid, where the costs to the estates and the creditor community would be enormous, and where the U.S. Trustee does not even argue that another forum would be more convenient."  Debtors' Objection at pp. 3-4, 36-40, 57-58.  The Debtors argue in essence that since venue in this District will allow them to achieve the best chapter 11 outcome for the most of their stakeholders, the means (incorporating PCX and Patriot Beaver Dam) justify the ends and therefore the Motions should be denied.  They assert that transferring these cases would eliminate "the tremendous efficiencies that are gained by proceeding in New York City, a global transportation hub" and "undermine the goal of the Bankruptcy Code of maximizing the value of these estates."[46]  There is some merit to the Debtors' observations on this point.  While such a utilitarian view of justice is compelling, and consistent with the Court's finding that the Debtors have not acted in bad faith, it unfortunately cannot be squared with the venue statute.  While it is true that under *CORCO* the factor given the most weight by courts is typically the promotion of the economic and efficient administration of the estate, 596 F.2d at 1247, this factor cannot be given the most weight in every case.  If it were, a forum such as the Southern District of New York would invariably trump other venues in the section 1412 analysis relating to large corporate chapter 11

---

[46]    Debtors' Objection at p. 5.

cases because of its convenient access to capital markets, its transportation accessibility, and its concentration of leading chapter 11 practitioners.

Finally, the Debtors argue that venue in this District is supportable because the Debtors do have connections to New York.  New York entities hold the largest amount of the Senior Bonds and Convertible Bonds; virtually all of the Debtors' prepetition debt instruments and both of their DIP agreements are governed by New York law or contain a New York forum selection clause; New York law governs forty-one of the Debtors' sixty-five coal sales contracts; the key business information of Patriot and its subsidiaries is hosted in New York; and the Debtors' professionals, the agents under the DIP Facilities (three of five) and their counsel, counsel for the Committee, and counsel for many of the Debtors' key stakeholders (including the UMWA) are located in New York.  It cannot be said, however, that Patriot has a meaningful presence in New York. The Debtors have no operations or assets or employees in New York.  The fact that New York law governs many of the Debtors' sales contracts is not dispositive, as the law of West Virginia or other states may apply in equal force to environmental and other issues that may arise during the pendency of the Debtors' bankruptcy cases.  While most of the key professionals in these cases are located in New York, allowing the cases to remain here because the professionals are here would be condoning a "bootstrap" venue selection strategy that is at odds with the purpose of the venue statute, and with the interest of justice.

To be clear, ordering the transfer of the Debtors' cases is a particularly difficult call in light of the overwhelming support the Debtors have received from their stakeholders[47] and the evidence that it would be administratively efficient to conduct the cases in this District.  The

---

[47]     The Court notes that the U.S. Trustee took a position in *Winn-Dixie* which is contrary to its position in these cases; the U.S. Trustee opposed the transfer of the venue of the Winn-Dixie debtors' cases, urging the court to listen instead to the "true stakeholders" in the case who held almost $600 million in debt and who also opposed transfer of the cases.  *See Winn-Dixie*, Hr'g. Tr. at 107.

Motions are opposed by the Committee,[48] as well as by forty-nine individual creditors.  Such creditors include (a) twenty-seven of the Debtors' top-fifty creditors, including eight of the ten located in West Virginia;[49] (b) the agents under the DIP Facilities, who have agreed to finance borrowings by the Debtors of up to an aggregate principal or face amount of $802 million; and (c) Wilmington Trust Company, the indenture trustee for $250 million in Senior Bonds and a creditor of all of the Debtors.  These parties argue that the Movants failed to establish that a venue transfer would result in a better outcome for the Debtors' stakeholders as a whole, "whether such stakeholders are calculated by counting heads or counting dollars."  (Post-Hearing Brief of First Out DIP Agent ¶ 6).  These parties also contend that the Movants introduced little, if any, evidence that established that transfer of these cases from New York would serve the convenience of all parties in these cases, or that the Southern District of West Virginia is more convenient than New York.   As discussed more fully below, the Court agrees, and for that reason, among others, the Patriot cases will not be transferred to the Southern District of West Virginia.

### E.    The Limited Scope of the Court's Ruling

In directing transfer of these cases in the interest of justice, the Court is not establishing a *per se* or categorical rule; accordingly, the teaching of cases such as *United States v. Noland*, 517 U.S. 535 (1996) is not implicated.  As the Court indicated at the Hearing, the result here may indeed have been different if the U.S. Trustee had been the only party-in-interest seeking to transfer the Debtors' cases – that is, if no *economic* party-in-interest had sought to transfer

---

[48]    Courts have held that the position of the Committee on a motion to transfer venue, while not dispositive, should be given weight in light of its statutory role as a fiduciary to and representative body of the unsecured creditors.  *See Enron I*, 274 B.R. at 345.

[49]    Of the Debtors' fifty largest unsecured creditors, ten are based in West Virginia, and their claims account for approximately $9.6 million of the approximately $507 million in liquidated unsecured claims against the Debtors.  (Schroeder Venue Decl. ¶ 45; FF ¶ 57.)

venue.[50]  It may also have been different if there were any evidence in the record of substantial, let alone "catastrophic," economic consequences of moving the cases in the form of increased costs of administration and thus lower economic recoveries to stakeholders.[51]

With respect to the former point, the Court wholeheartedly concurs with Judge Gerber's observations in *In re Houghton Mifflin Harcourt Publ'g Co.*, 474 B.R. 122, 124 (Bankr. S.D.N.Y. 2012) regarding the importance of deferring to the collective wisdom of the parties with "money on the line."  If the entirety of the Debtors' economic stakeholders had implored the Court to leave venue unchanged because a transfer of venue would have taken dollars from their pockets, it would be difficult to square the interest of justice with the purposeful infliction of economic harm on a debtor's creditors.  But that is not this case.  While it is clear that there is vast creditor support for the Patriot Debtors' venue choice, it is not the unanimous support that was present in *Houghton Mifflin*.

With respect to the issue of the economic consequences of transferring the cases, although the Debtors did not have any burden to meet on this issue, there is nonetheless nothing in the record that leads the Court to believe that transfer will have significant let alone "enormous" economic consequences here.  The Court recognizes that the transfer of these cases may well involve some increased costs for the estates, but the mere possibility that there will be such costs does not warrant a different result.  The efficient administration of the cases is of course an important factor in the Court's analysis, but it would not be appropriate to treat it as a dispositive factor.  As discussed above, given the arguments of the Debtors and DIP Agents

---

[50]     *See* Sept. 12, 2012 Hr'g. Tr. at 429-444.

[51]     In their joinder, the Ad Hoc Noteholders argue that the relief requested in the Motions "courts disaster in a variety of ways."  There is no evidence in the record of such disastrous consequences.  *See* Joinder of Ad Hoc Noteholders to Debtors' Objection and Creditors' Committee's Objection at p. 3.

about the importance of New York in the financial world, adopting such an approach would lead to venue in this District more often than it otherwise should.  Needless to say, the courts in this District stand ready to handle any and all cases that rightfully belong in this District.  That has always been the case and will remain so hereafter.

Doing justice in a particular case can impose a cost, and we as a society have determined that we are prepared to pay that cost from time to time to ensure the integrity of our laws and our system of government.  Indeed our jurisprudence is replete with examples of socially costly conflicts between differing notions of justice.   One obvious example is the so-called "exclusionary rule," which curtails the use of illegally obtained evidence in criminal trials.  As the Supreme Court has noted, "[t]he exclusionary rules generates 'substantial social costs,' *U.S. v. Leon*, 468 U.S. 897, 907 (1984), which sometimes include setting the guilty free and the dangerous at large."  *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).  The cost to the Patriot estates of transferring these cases to another district is impossible to determine; it may be material or it may be *de minimis*.[52]  It is a cost that the estates will simply have to bear, and the Court is confident that the parties will work together to minimize it.

## IV.     Neither the Interest of Justice nor the Convenience of the Parties Compels Transfer of the Patriot Cases to the Southern District of West Virginia

While the UMWA Motion and the Sureties' Motion request that the Court transfer the Debtors' cases to the Southern District of West Virginia, the Court finds that the evidence in the

---

[52]      This is underscored by the UMWA's view that the *principle* of having the cases heard in West Virginia is more important to them than the specter of increased costs to the stakeholders, including their members.  At the Hearing, counsel for the UMWA stated that, even if all other things were equal but estate administration would cost less in this District than it would in West Virginia, "the mine workers – and I'm speculating here – but on that hypothetical, I believe the mine workers would want that case to be heard in West Virginia. . . . .  That's where they are.  That's where they work.  And they think the judges in that community should be deciding the bankruptcy case."  *See* Sept. 11, 2012 Hr'g. Tr. at 73:2-23, 74:16-22.  Stated differently, the UMWA believes its members would rather receive a lower monetary recovery from a West Virginia judge than a higher monetary recovery from this Court.  It is important to note in this context that the UMWA does not speak for the majority of Patriot's employees or, of course, the Debtors' other creditors.

record has not established that the "interest of justice" or the "convenience of the parties" supports or requires transfer of the cases to the Southern District of West Virginia. With respect to the latter prong of the section 1412 test, there is no evidence in the record that transferring the cases to West Virginia would meaningfully serve the convenience of the parties.[53]  With respect to the former prong, the arguments of the UMWA and the Sureties can be summarized quite simply. Rather than have the cases proceed here in "lower Manhattan"[54] where "the financiers and the bankers"[55] are, the cases should be heard in West Virginia, where the coal is and where there are judges who "understand," who "live near coal miners, grew up with them, worship with them and break bread with them."[56]  In other words, the UMWA and the Sureties would have this Court give them, rather than the Debtors' lenders, what they perceive to be the home field advantage. But it is not in the interest of justice merely to swap one party's perceived home field advantage for another. The Court categorically rejects such a parochial formulation of justice.

The UMWA has advanced an "interest of justice" argument based on its subjective perception of fairness (or advantage) to its members and their desire to have the Debtors' cases

---

[53]     As the Court observed at the Hearing, the Movants failed to provide evidence that the Debtors' cases could be handled more efficiently or more conveniently in West Virginia. *See, e.g.*, Sept. 12, 2012 Hr'g. Tr. at 81:1-90:19 ("The Court: What's the evidence for the very sweeping statement that it would be less costly to move the case to West Virginia? . . . . [M]y point, Ms. Jennik is that you don't know, so . . . you've made a claim that it would cost less in terms of professional fees, but there is no actual evidence . . . . there is no coherent cost model that's been presented on which I can conclude that the statement you made is supported by the facts . . . ."); Sept. 12, 2012 Hr'g. Tr. at 39:21-48:8.

[54]     *See* UMWA Post Hearing Mem. of Law at p. 2 ("These issues are critical to the thousands of interested persons in West Virginia, and to the state of West Virginia, and it does not 'seem right' to them that issues so important to their lives and to the state's economy will be resolved far away in lower Manhattan.").

[55]     *See* Sept. 11, 2012 Hr'g. Tr. at 71:24-72:2 ("[Ms. Jennik]: And I don't know exactly where they held meetings, but I don't think it is essential to the case that it be heard in New York because the financiers and the bankers are in New York."); *id.* at 68:21-68:24 ("[Ms. Jennik]: [T]he debtors and the objectors have argued that these cases need to be in New York, because this is where the bankers are. This is the financial center of the world.").

[56]     *See* UMWA Reply at 24; *see also* Sept. 12, 2012 Hr'g. Tr. at 411:20-24 ("[Ms. Jennik]: . . . but a judge in West Virginia understands the impact of this case, the decisions that are made in this case will be felt not in New York but in West Virginia. That's the group of people that will be impacted by the decisions made in this case.").

transferred to West Virginia and West Virginia only.  At the Hearing, counsel for the UMWA

argued that if the cases were not transferred to West Virginia, any other result would not "*seem

right*" to the UMWA's members.[57]   To be clear, the UMWA represents approximately forty

percent of the Debtors' workforce; it does not speak for nearly sixty percent of the workforce.[58]

The UWMA views this fact as immaterial since, it argues, the Debtors are free to reduce non-

union employee costs without resort to the Court.[59]   This is a divisive and troubling viewpoint, to

say the least.  As observed by the First Out DIP Agent, "[t]he fact that a single constituency may

prefer a particular venue over the Debtor's chosen forum is patently insufficient to warrant a

transfer of venue in the interest of justice.  In fact, a transfer on such facts would be particularly

unjust in the face of an impression that the transfer is being made to advantage such party over

other stakeholders."[60]   Or, as objecting creditor Caterpillar stated at the Hearing:

> [W]hen you're talking about the appearance of justice . . . you have to take into
> account the flip side of that and that by moving this to West Virginia there will at
> least be the appearance or the suggestion that perhaps some party in this case
> believes that that court is more sympathetic whether they are or not.  And I think
> we can all agree in the room today that one court is not going to be any more
> inclined to side with one party or another than another, but the point remains that
> the constituency of the union apparently believes that may be true and that leads

---

[57]    *See* Sept. 12, 2012 Hr'g. Tr. at 410:21-411:1 ("[Ms. Jennik]: [I]t does not seem right to the miners and the retirees in West Virginia and Kentucky that a judge remote from them would decide their fate."); *see also id.* at 415:5-14 ("[Ms. Jennik]: What I am saying is that the members, the members who make the ultimate decision on whether they will accept any negotiated agreement are very fearful and distrustful and would not – do not perceive that it would be fair to them if the case is not decided in West Virginia.  And so when you asked me yesterday would the union oppose the – would the union make the same motion if the case was brought in St. Louis or Delaware or somewhere else, the union members believe that the case should be heard in West Virginia.  That's what they believe.  That's what they believe is fair treatment of them."); *id.* at 416:19-21 ("[Ms. Jennik]: [I]t will not seem right to them.  It will not seem right to them that a court very far away from them decides their fate.").  Counsel for the UMWA also stated that negotiations between the Debtors and the UMWA "will be that much more difficult if members think they are not being treated fairly," which is how they will feel if the Debtors' cases are administered by a court other than the Bankruptcy Court for the Southern District of West Virginia.  *See id.* at 414:6-16.

[58]    In addition, only nine of the ninety-nine Debtors are signatories to the collective bargaining agreement with the UMWA; the remaining Debtors have no direct obligation to the UMWA or its members.

[59]    *See* UMWA Reply at 5, fn. 5.

[60]    Post-Hearing Brief of First Out DIP Agent at 8.

us right into the appearance of what is just and what is right. And for that reason, frankly, we think it is more appropriate to keep the case in what may be a more neutral territory.

Sept. 12, 2012 Hr'g. Tr. at 396:14-397:5.

While the UMWA and the Sureties acknowledge that they believe that both this Court and the West Virginia court would be "fair" and "sympathetic,"[61] the record leaves little doubt that the UMWA believes it would be *fairer to them* for the Debtors' cases to be heard in West Virginia by a West Virginia judge whose experience living in "coal country" would help him better "understand" their concerns.[62] Simply put, they wish to benefit from proceeding in what they perceive as a more empathetic forum, ruling out the possibility that a judge anywhere else could understand their concerns.[63] Putting aside the debate over whether empathy should be a factor in judicial decision-making,[64] granting such a request would not be in the interest of justice. As the UMWA itself urges, the "perception of justice" is just as important a concern as technical compliance with the law.[65] Transferring these cases to West Virginia would create a perception problem of an even greater magnitude than would retention of them in this District. As appropriately summarized by Caterpillar,

---

[61]     *See* Sureties' Post-Hearing Memorandum at p. 4 ("The Sureties do not doubt that either forum will provide fairness in these bankruptcy proceedings."); Sept.11, 2012 Hr'g. Tr. 75:25-76:5("[Ms. Jennik:] I think judges in general are sympathetic to the plight of those who are not wealthy. . . . And I think that would be true in the Southern District of New York and the Southern District of West Virginia.").

[62]     *See, e.g.*, Sept. 11, 2012 Hr'g. Tr. at 76:7, 77:2-77:4; Sept. 12, 2012 Hr'g. Tr. at 411:20-24.

[63]     *See generally*, Martha L. Minow and Elizabeth V. Spelman, *Passion for Justice*, 10 CARDOZO L. REV. 37 (1988) (the ability to place yourself in someone's shoes can be knowledge-based as well as experience-based); Sonia Sotomayor, *A Latina Judge's Voice*, 13 BERKELEY LA RAZA L.J. 87, 92 (2002) ("[W]e should not be so myopic as to believe that others of different experiences or backgrounds are incapable of understanding the values and needs of people from a different group."); *see also* President Barack Obama, Press Briefing by Press Secretary Robert Gibbs (May 1, 2009) ("[J]ustice isn't about some abstract legal theory or footnote in a case book; it is about how our laws affect the daily realities of people's lives – whether they can make a living and care for their families . . . . that quality of empathy, of understanding and identifying with people's hopes and struggles [is] an essential ingredient for arriving at just decisions and outcomes.").

[64]     *See, e.g.*, Kathryn Abrams, *Empathy and Experience in the Sotomayor Hearings*, 36 OHIO N.U. L. REV. 263 (2010).

[65]     UMWA Post-Hearing Mem. of Law at p. 2.

49

> [T]he UMWA [has] based its Motion not on what venue would better lead to an
> efficient and effective reorganization or on what venue would be better able to
> address the interests of all of the Debtors' constituents, but rather on the unionized
> workers' perception that the Southern District of West Virginia would be a more
> advantageous forum for them and for them alone.

Post-Hearing Submission of Caterpillar at p. 3.  Despite conceding that the Debtors did not act in

in bad faith in filing in this District, the UMWA asks this Court to transfer the cases to West

Virginia because to do anything else will not seem fair to the UMWA members and could have a

negative impact on their willingness to engage in good faith negotiations with the Debtors.   That

is not a request for justice; that is an ultimatum.  It is forum-shopping that is just as inappropriate

as the forum selection strategy employed by the Debtors, if not worse.

The Sureties advance a similarly myopic argument.[66]  Noting, quite properly, that the

location of the Debtors' mining operations and the environmental obligations stemming from the

mines have a "profound impact" on the people and the environment of West Virginia, the

Sureties argue that the cases therefore should be heard there.  They argue that the state regulatory

authorities of Kentucky and West Virginia play the major role in governmental oversight of the

Debtors' environmental compliance, and because the "evidence" of enormous environmental

liabilities is also there, the cases should be transferred to West Virginia.[67]

Particularly in light of the perception and convenience concerns discussed above, the

Court finds that neither the location of certain of the Debtors' mining operations nor the location

of the Debtors' regulators justifies transferring the Debtors' cases to West Virginia, and it rejects

---

[66]    The Court notes that the Sureties represent 29 percent of the total face amount of surety bonds issued to the
Debtors.  *See* FF ¶ 43.  Of this 29 percent, only approximately $25 million, or 10.5 percent, represents contingent
unsecured exposure supporting the Sureties' obligations to regulators in West Virginia.  FF ¶ 45.  No other surety
bond issuers joined the Sureties' Motion.

[67]    *See* Sept. 12, 2012 Hr'g. Tr. at 28:12-20 ("[Mr. Meldrum]: I want it to go to West Virginia because that's
where the operations are, that's where the evidence is, that's where the value is, that's where the enormous
environmental liabilities are, that's where the regulators are, that's where the engineers are.").

the Sureties' argument on this point.  The Sureties have not met their burden under the law or the facts to show that the existence of such regulatory regimes mandate transfer to West Virginia or to any other particular location.  Only two regulators (the West Virginia Attorney General and the Kentucky DNR) filed statements in support of the Motions, one of which specified that it was not a joinder.  Notably, no one on behalf of the West Virginia Attorney General even appeared at the Hearing, either in-person or telephonically, to urge the transfer of the Debtors' cases to West Virginia.  Moreover, as the Sureties concede, bankruptcy courts routinely apply and interpret other states' laws and regulatory regimes, and the applicable law pertaining to a particular environmental dispute arising in these cases could be analyzed in either forum without issue.[68] Consistent with well-established case law, *see*, *e.g.*, *Midlantic Nat'l. Bank v. N.J. Dept. of Environmental Protection*, 474 U.S. 494 (1986), bankruptcy courts wherever located are acutely aware of the role they must play as stewards of the environment.  The citizens of West Virginia should rest assured that these cases and the interests of their state will be in capable and caring hands wherever they are heard.

For all of the foregoing reasons, the Court cannot conclude that it would be in the interest of justice to transfer the Debtors' cases to West Virginia.  The analysis regarding the appropriate venue for these cases must focus on the interests and convenience of *all* parties, not just those of the UMWA, notwithstanding the volume of the UMWA's voice and how fervently it believes in its position.  The Court must consider and give appropriate weight to the opposition of, among others, the Committee; twenty-seven of the Debtors' fifty largest unsecured creditors, eight of whom are located in West Virginia; the agents under the DIP Facilities, who have agreed to finance borrowings by the Debtors of up to an aggregate principal or face amount of $802

---

[68]    *See* Sept. 12, 2012 Hr'g. Tr. at 37:11-23.

million; and Wilmington Trust Company, the indenture trustee for $250 million in Senior Bonds and a creditor of all of the Debtors.  The Court also gives weight to the fact that only a small portion of the total anticipated claims against the Debtors are held by parties based in West Virginia;[69] the majority of the Debtors' trade creditors and counterparties to leases and executory contracts are based elsewhere.  The Court also notes that the UMWA Health and Retirement Funds did not join the request of the Sureties and the UMWA to transfer the cases to West Virginia; rather, the funds only joined the request of the U.S. Trustee to transfer venue of the cases to "an appropriate jurisdiction."[70]  Finally, even apart from the serious perception issues discussed above, neither the UMWA nor the Sureties carried their burden of establishing that a transfer of these cases to West Virginia would be convenient for the parties as contemplated by the second prong of section 1412.

**V.      The Patriot Cases Shall Be Transferred to the United States Bankruptcy Court for the Eastern District of Missouri**

If not to West Virginia, where then should the Patriot cases be transferred?  The Southern District of West Virginia is only one of a number of possible venues that may be proper for the Debtors' chapter 11 cases pursuant to section 1408,[71] including districts in Delaware, Kentucky, Illinois, Missouri, Indiana, and Virginia.[72]

---

[69]       Of the Debtors' fifty largest unsecured creditors, ten are based in West Virginia, and their claims account for approximately $9.6 million (or approximately 1.89 percent) of the approximately $507 million in liquidated unsecured claims against the Debtors.  FF ¶ 57.

[70]       *See* Joinder of UMWA Health and Retirements Funds to UST Motion [Dkt. No. 423].

[71]       The language of section 1412 does not by its terms limit transfer of a bankruptcy case only to a district in which the case could have been commenced under section 1408; instead, section 1412 simply states that the court may transfer a case under title 11 to a court "for another district."  *See* 28 U.S.C. § 1412.

[72]       *See* Debtors' Objection at p. 15, fn. 6.

In light of the foregoing findings and conclusions and consistent with well-settled law that the location of a debtor's assets[73] is not an important venue consideration, particularly when a debtor is reorganizing rather than liquidating,[74] the Court concludes that transferring these cases to the Eastern District of Missouri will serve the interest of justice and, as among venue choices other than this District, best serve the convenience of the parties.  The Debtors' corporate headquarters and executive offices are located in St. Louis, Missouri and many of the Debtors' key corporate functions are based there.  All of the Debtors' books and records, including those established post-petition, are located in St. Louis, Missouri.  Several members of the Debtors' executive management team work in St. Louis and reside in Missouri or Illinois, and the remaining members, despite residing elsewhere, have offices in Patriot's corporate headquarters in St. Louis.  Of the thirty-two in-person meetings that have been held by Patriot's Board, twenty-nine were held in Missouri.  Moreover, the corporate headquarters of Peabody are also in St. Louis; this fact is significant in light of the issues that have been raised by the UMWA with respect to its spin-off of Patriot and its responsibility to provide promised cradle-to-grave health care benefits to Patriot employees and retirees who worked for Peabody prior to the spin-off.

While the Court has declined to accept the argument that the physical location of the coal in West Virginia is a significant factor here, the Court notes that the proximity of St. Louis to the Illinois Basin region also supports the transfer of the cases to St. Louis.  While the Court also

---

[73]    The Court also rejects the UMWA's argument that a particular court's level of experience with coal cases is an important factor; neither the Bankruptcy Code nor the venue statute contemplates courts being specialized by industry or otherwise.

[74]    *See, e.g.*, *CORCO*, 596 F.2d at 1248 (denying motion to transfer venue and reasoning that the location of assets "is of little importance in a Chapter XI proceeding where the goal is financial rehabilitation, not liquidation"); *Enron II*, 284 B.R. at 390 (reasoning that "[t]he location of the assets is not as important when the ultimate goal of the bankruptcy case is rehabilitation rather than liquidation"). The Court also notes that although nine of the Debtors' twelve mining complexes are located in West Virginia, the Debtors have substantial assets in other jurisdictions as well.

does not accept the arguments advanced by the UMWA that the participation of its members *as witnesses* in hearings is a critical factor in these cases, the Court does agree with the UMWA that it is important to consider the desire of the UMWA members to attend and observe hearings in these cases, the outcome of which will fundamentally affect their lives. While St. Louis may not be as convenient as Charleston for some employees and retirees, it is by no means remote from coal country. Indeed, the evidence reflects that more Patriot retirees live in the Illinois Basin than in West Virginia or any other location. St. Louis is accessible by car or bus from southern Illinois, southern Indiana,[75] and Kentucky. St. Louis is also a convenient and accessible transportation hub for the many parties-in-interest and professionals who will be required to travel to hearings.[76] And, as was demonstrated by the video broadcast of the Hearing, technology can and should be utilized to allow unlimited real-time access to these proceedings for those who are unable to travel to St. Louis.

## CONCLUSION

Although they are not part of the record on the Motions, hundreds of hand-written letters have been received by the Court from "the people whose hands mine the Debtors' coal"[77] and their widows and children. Many of them enclosed family pictures, or lists of ailments and medications. Some of them asked for a personal response. All of them were respectful, and compelling. This decision reflects the Court's attempt to craft a just and balanced solution to the

---

[75]     At the end of August 2012, the UMWA held "mass membership" meetings in Evansville, Indiana and Charleston, West Virginia for its active and retired members and their dependents in order to review developments in the Debtors' cases to date and to provide information to members. (Buckner Decl. ¶ 9, FF ¶ 53.) The choice of the Evansville meeting location by the UMWA undoubtedly reflects the fact that there are a large number of UMWA members residing in the Illinois Basin area.

[76]     In considering alternative venues, courts have considered transportation options, especially where parties-in-interest do not all reside in the same place. *See, e.g., Enron I*, 274 B.R. at 339, 351 (comparing accessibility of New York and Houston, Texas and declining to transfer debtors' cases to Houston).

[77]     UMWA Post-Hearing Mem. of Law, p. 3.

question of which bankruptcy court will become the next custodian not only of these cases but also of these letters.

As it would have been a great privilege to preside over these cases, it is with considerable regret that the Court concludes that the Patriot chapter 11 cases shall be transferred to the United States Bankruptcy Court for the Eastern District of Missouri, in the interest of justice pursuant to 28 U.S.C. § 1412.

IT IS SO ORDERED.

Dated: November 27, 2012
New York, New York

/s/ Shelley C. Chapman
UNITED STATES BANKRUPTCY JUDGE