UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

In Re:                                    )
                                          )
PATRIOT COAL CORPORATION, *et. al.*,      )   Case No. 12-51502-659
                                          )   Chapter 11
                                          )
            Debtors.                      )   Jointly Administered
                                          )
                                          )   **PUBLISHED**


### O R D E R

The matter before the Court is Debtors' Motion for Authority to Implement Compensation Plans, the United Mine Workers' Objection to Debtors' Motion for an Order Approving and Authorizing Bonus Plans for Certain Employees, Objection of the United Mine Workers of America 1974 Pension Trust and the United Mine Workers of America 1993 Benefit Plan to the Debtors' Motion for Authority to Implement Compensation Plans, Statement of Support of Bank of America, N.A., as Second Out Dip Agent, With Respect to Debtors' Motion for Authority to Implement Compensation Plans, the Official Committee of Unsecured Creditors' Statement in Support of the Approval of the Debtors' Compensation Plans and Debtors' Omnibus Reply to Objections to Entry of an Order Approving Debtors' Compensation Plans.[1]  A hearing was held on March 18, 2013, at which argument was presented by Debtors Patriot Coal Corporation, *et al.,* the Official Committee of Unsecured Creditors, the United Mine Workers of America, the United Mine Workers of America 1974 Pension Trust and 1993 Benefit Plan, the United States Trustee and Bank of America. Testimony of Mr. Bennett K. Hatfield, President and Chief Executive Officer of Debtors Patriot Coal

---

[1]The Court also considers Notice Regarding Debtors' Motion for Authority to Implement Compensation Plans in which Debtors inform the Court that to appease the United States Trustee's concerns that seven 2013 CERP participants are insiders; Debtors have removed those seven participants from the 2013 CERP and have now increased the existing incentive compensation opportunities of those seven individuals in the 2013 AIP.

Corporation, *et al,* as well as Nick Bubnovich, consultant and former Director of Towers Watson Delaware Inc. was presented in support of the Motion for Authority to Implement Compensation Plans. The matter was taken under submission. Upon consideration of the record as a whole, the Court rules as follows.

### FACTS

On July 9, 2012, Patriot Coal Corporation and a number of its affiliates (hereinafter collectively "Debtors") filed Voluntary Petitions for relief under Chapter 11 of the Bankruptcy Code in the Southern District of New York. These Chapter 11 cases are being jointly administered pursuant to Rule 1015(b) of the Federal Rule of Bankruptcy Procedure as well as the Joint Administration Order entered on July 10, 2012. On December 19, 2012, the cases were transferred to the Bankruptcy Court for the Eastern District of Missouri.

Debtors now seek this Court's approval of its proposed compensation plans which contain two components. The first is the 2013 Annual Incentive Plan (hereinafter "2013 AIP"), an incentive plan, in which approximately 225 employees are eligible to participate. The second is the 2013 Critical Employee Retention Plan (hereinafter "2013 CERP") in which 119 employees are eligible to participate. Some employees are eligible to participate in both the 2013 AIP and the 2013 CERP. Debtors have brought forth the Motion for Authority to Implement Compensation Plans (hereinafter the "Motion") on the basis that Debtors believe that its employees are currently compensated at below market levels and that this below market compensation, coupled with the perceived and actual volatility of Debtors' financial dexterity, has caused several of its key employees to seek other opportunities at a time when these key employees' commitment to Debtors is most essential. As such, following numerous reforms and iterations, Debtors believe that the 2013 AIP and the 2013 CERP (hereinafter collectively the "2013 Compensation Plans"), as set forth in the Motion, are essential to Debtors' continued operations. Due discussion as to how Debtors derived the 2013 Compensation Plans is warranted.

**Pre-Bankruptcy Compensation Plans**

Debtors have historically compensated employees at its corporate offices through salaries, cash incentives and equity awards.  Debtors had a Long Term Equity Incentive Plan (hereinafter "LTEIP") through which participants were eligible to receive equity-based awards such as restricted or deferred stock units and stock options.  The value of the LTEIP awards were therefore tied to the price of a share of Debtors' common stock.  The price per share of Debtors' common stock has significantly declined since Debtors' Chapter 11 cases were filed.   Debtors have discontinued the LTEIP in that no additional awards will be granted and only time-vested restricted stock awards will be delivered when those awards are scheduled to vest, be distributed or when the awarded employee becomes eligible to exercise awarded stock options.  Debtors note that some employees have been required to pay taxes on equity awards that vested pre-petition, however those equity awards will not be delivered due to Debtors' discontinuation of this program.  Debtors also maintain a mine-level incentive program that is not before the Court.  Debtors top six (6) executives were eligible for participation in the LTEIP.

Since 2008, Debtors also had an Annual Incentive Plan (hereinafter the "Pre-Petition Incentive Plans" or "Incentive Plan") in which participants were eligible to receive annual cash bonuses if specified performance objectives were met.  The cash bonuses constituted a certain percentage of the participant's base salary, which ranged from a target amount of 5%-60%, and maximum amounts of 7.5%-90% of base salaries.   Debtors paid out $9.4 million in its 2010 Incentive Plan and $7.9 million in its 2011 Incentive Plan.  No Pre-Petition Incentive Plan payments were made to participants in 2012.  Debtors' top six executives were eligible for participation in Debtors' Pre-Petition Incentive Plans.

Debtors have maintained Pre-Petition Incentive Compensation Plans which aimed to incentivize and retain personnel that have been identified as essential to productivity and profitability at Debtors' individual coal mines. The Pre-Petition Incentive Compensation Plans were

adopted in 2009.  Debtors did not implement a corporate-level retention plan.  As will be discussed below, Debtors now seek for the first time to create a retention program that includes corporate employees; Debtors seek to amalgamate the Pre-Petition Incentive Compensation Plans with a retention program that includes corporate employees.

**The Eve of Bankruptcy**

Towers Watson Delaware Inc. (hereinafter "Towers") has been retained by the Compensation Committee of Debtors' Board of Directors (hereinafter "Compensation Committee") since January 2008.  The lead consultant of Towers to the Compensation Committee is Mr. Nick Bubnovich (hereinafter "Mr. Bubnovich").  Mr. Bubnovich testified that he has gathered and analyzed market data to conduct a benchmarking analysis which sought to evaluate Debtors' compensation levels for its employees.  The Towers benchmarking analysis revealed that the current compensation of most of Debtors' corporate employees is below the market median for their positions.

In June or July of 2012, Debtors created an earlier iteration of the 2013 AIP and 2013 CERP presented to the Court (hereinafter collectively "2012 Compensation Plans").  The 2012 Compensation Plans offered 281 employees the chance to earn bonus compensation in addition to their base salaries which totaled an aggregate maximum of $12.3 million.  Mr. Bubnovich testified that he had a narrow role in the creation of the 2012 Compensation Plans in that he recommended competitive compensation levels – specifically, the range of retention payments that correspond to competitive annual incentive opportunities – for the participants,  the appropriate timing of payments, some criteria for the selection of the participants and he provided some information about the retention plans of other companies.  The 2012 Compensation Plans were ultimately created by Mr. Bennett Hatfield (hereinafter "Mr. Hatfield"), CEO of Debtors Patriot Coal Corporation, et. al., with the assistance and impetus of other management and members of Debtors' executive team, and were approved by Debtor Patriot Coal's Board of Directors.  Debtors

-4-

then informed their employees by letter in mid-2012 of the employee's eligibility to participate in the 2012 Compensation Plans.

**Iterations of the 2012 and 2013 Compensation Plans**

The Official Committee of Unsecured Creditors (hereinafter the "OCUC") was starkly opposed to the 2012 Compensation Plans which were presented by Debtors to counsel to the OCUC on November 29, 2012, and the full OCUC on December 4, 2012.  The OCUC informed Debtors on December 5, 2012 that no member of the OCUC supported the 2012 Compensation Plans.  The initial resistance was due, in part, to the concern that the 2012 Compensation Plans would adversely effect Debtors' pursuit of concessions from workers and retirees in imminent Sections 1113 and 1114 negotiations and litigation.  Debtors and the OCUC began negotiations as well as several telephonic and in-person meetings, and developed several iterations of the 2012 Compensation Plans.  The fourth iteration of the 2012 Compensation Plans were presented by Debtors to the OCUC, accepted by the OCUC, and is essentially the 2013 Compensation Plans now presented to the Court.  As a result of these negotiations, the OCUC asserts that the 2013 AIP and 2013 CERP now proposed to the Court is a reflection of a 44% cut in cost and structural change to ensure that retiree sacrifices will not increase management compensation.  As such, the OCUC is in support of Debtors' Motion and urges that the relatively modest cost of these programs are outweighed by the value of the 2013 Compensation Plans.

**Proposal to the Court – The 2013 Compensation Plans**

Debtors now request that this Court permit Debtors to implement the 2013 Compensation Plans.   Mr. Hatfield testified that the 2013 Compensation Plans were a result of his initiative, however, he sought the advice of his executive team, counsel for Debtors, Towers and the Compensation Committee.  Mr. Hatfield also used Blackstone, a financial advisory organization, to assist with crunching the numbers for the 2013 Compensation Plans. Mr. Hatfield notes that the mining operations have their own incentive plans in place, however, he believed that implementing

a program at the corporate level was essential.  Debtors proffer, and this Court accepts, that if all 2013 AIP and 2013 CERP payments are made, the maximum combined cost will be 0.36% of Debtors' annual revenues.

**The 2013 AIP**

With the impetus of lower management, Mr. Hatfield and the Compensation Committee have identified approximately 225 employees that are best able to help maximize Debtors' financial and operational performance.  These 225 employees (hereinafter "Proposed AIP Participants") comprise approximately five to six percent (5-6%) of Debtors' workforce, and include employees in operations management, finance, human resources, legal, engineering and sales, as well as administrative assistants, maintenance technicians and general office staff.  Mr. Hatfield testified that individuals such as accounting clerks and administrative assistants were included as participants of the 2013 AIP because they are part of the team and ultimately contribute to Debtors' success in that they too must rise to the challenge to perform their duties at the lowest cost to Debtors.  Debtors' top six (6) executives have voluntarily withdrawn from consideration for participation in the 2013 AIP.

To create the 2013 AIP, Debtors relied on Towers' benchmarking analysis in which the current compensation of 109 of the 225 Proposed AIP Participants were compared to market salaries, in addition to an analysis of incentive programs that were approved in other Chapter 11 reorganizations.  None of the comparative Chapter 11 cases used by Towers were debtors in the coal industry.  Mr. Bubnovich also testified that he assisted in the design of the 2013 AIP in a limited capacity in that he recommended that EBITDA and cash flow be a target metric, in addition to operational metrics.  Mr. Bubnovich relied in part on Towers' compensation database which includes approved incentive programs in other Chapter 11 cases, as well as the Mercer Executive Compensation Survey, a nation-wide survey which comprises employees with higher compensa-tion.  Mr. Bubnovich testified that he believes the design of the 2013 AIP to be more conservative than he has seen in the past because Debtors' top management will not participate in the 2013 AIP.

Furthermore, there is broad inclusion of corporate employees and the potential incentive payments under the 2013 AIP are capped at threshold levels in that there are no additional payments made to the Proposed AIP Participants if Debtors exceed their performance targets; further, there is no opportunity for partial payment if a metric is not attained.

At the insistence of the OCUC, Towers performed a second benchmarking analysis which included coal industry-specific data.  In the second benchmarking analysis, the salaries of 151 of the 225 Proposed AIP Participants were analyzed.  The second benchmarking analysis revealed that Debtors' employees were slightly more undercompensated than the initial benchmarking analysis revealed, but the results were not significantly different in Mr. Bubnovich's estimation.

The amounts payable under the 2013 AIP range generally from one and a quarter percent (1.25%) to 20% of the Proposed AIP Participants' base salaries.  The actual percentage of the Proposed AIP Participants' base salary has been previously determined by Mr. Hatfield, management and the Compensation Committee.  The 2013 AIP proposes two six-month performance periods.  The first period will span from January 1, 2013 through June 30, 2013 (hereinafter "First Period").  The second period will span from July 1, 2013 through December 31, 2013 (hereinafter "Second Period").  The actual incentive payments contemplated by the 2013 AIP will be paid 30-60 days after the end of each period.  All 2013 AIP payments will be made by Debtor Patriot Coal, the parent company.

Since the Motion was filed, as will be further discussed below, six (6) individuals which were deemed to be insiders by the U.S. Trustee have been removed from the 2013 CERP.[2]  Those six (6) individuals were also participants of the 2013 AIP.  Following their removal from the participation in the 2013 CERP, they became eligible for an increased incentive payment under the 2013 AIP.

---

[2]The Court acknowledges that the U.S. Trustee expressed concern about seven (7) insiders, however, one of those individuals is no longer employed by Debtors and is therefore no longer relevant.

These six (6) individuals are now eligible for 2013 AIP payments which range from approximately 40-60% of their base salaries.

The 2013 AIP proposes to offer incentive cash bonuses to the Proposed AIP Participants if certain performance metrics are met.  In total, there are five (5) performance metrics, each of which is given a different weight.  Four (4) performance metrics are collective corporate goals – financial (weighted at 60%), safety (weighted at 5%), Mine Safety and Health Administration Compliance (weighted at 5%) and Environmental (weighted at 5%) – and the fifth is tailored to each participant, individually (weighted at 25%).  Each metric must be met for the Proposed AIP Participant to receive that portion of the incentive payment.  For example, if all of the metrics are met except the financial metrics, the Proposed AIP Participant can only receive an incentive payment of 40% of the amount that individual was eligible to receive.

*Financial Performance*

There are two financial performance requirements of the 2013 AIP, each of which is weighted at 30% of the total incentive compensation.  Debtors are required to meet a threshold of $75.1 million in Earnings Before Interest, Taxes, Depreciation, Amortization and Pensions at the end of the First Period, and $72.4 million at the end of the Second Period.  "Pensions" was added to this financial metric based on feedback from Debtors' financial advisors, as well as the OCUC and the financial advisors to the OCUC, to avoid any incentive to management that might affect the negotiations and litigation of the impending Sections 1113 and 1114 Motion.

Incentive payments on account of Debtors' financial performance also requires that Debtors meet the liquidity requirements of Debtors' D.I.P. credit agreements pursuant to Debtors' five-year plan.  As such, during the First Period, Debtors must achieve liquidity of $205.8 million and $100.6 million during the Second Period.  Debtors are currently exceeding the liquidity target of the 2013 AIP, however, Debtors' liquidity has been steadily decreasing.  If liquidity continues to decrease at the current pace, Mr. Hatfield does not believe that Debtors will meet the liquidity

-8-

requirements of the Second Period.  Debtors are also behind pace to meet the EBITDAP target of the First Period.

*Safety Incidence Rate*

The overall safety incidence rate of Debtors must be 3.27 throughout the 2013 AIP, and this factor is weighted at 5%.  This number represents the number of accidents per 100 men, and it does not account for the severity of the accident.  Debtors had a record safety incidence rate for 2012, however, Mr. Hatfield testified that Debtors' performance has been miserable for 2013 due to accidents in January and February of 2013 at several of Debtors' mining complexes.  As such, Debtors will likely miss this incentive payment target for the First Period.

*Mine Safety and Health Adminstration Compliance*

The overall Mine Safety and Health Administration (hereinafter "MSHA") incidence compliance rate is weighted at 5%.  Here, Debtors must achieve a rate of no more than 0.95.  This rate is known as the violations per inspector rate, and reflects how many violations of federal regulations occur at a mining operation when an inspector is present.  As such, a lower number indicates less incidents and thus an increased compliance rate.  Like the safety incidence rate, Debtors had a record MSHA compliance rate in 2012.  Debtors admit that the 0.95 target is lower than Debtors' 2012 rate, however, Mr. Hatfield testified that it is unrealistic to expect a "home run" of Debtors' mining operations every year and vehemently stated that the 0.95 target is not only reasonable but remains aggressive.

*Environmental*

Pursuant to the Surface Mining Control and Reclamation Act, Debtors must achieve an overall environmental incidence rate of 0.0092 throughout the 2013 AIP.  The environmental metric is weighted at 5%.  There was little discussion at the hearing or in the pleadings about the environmental targets or Debtors' current performance level with regard to the environmental target.

*Individual Targets*

Mr. Hatfield testified that at the end of 2012, each Proposed AIP Participant underwent an annual review at which time, three to five (3-5) specific qualitative goals, which relate to that individuals' scope of work and promotes the overall enhancement of Debtors' business performance, were set in writing for that individual to achieve in 2013. As such, Debtors propose that those targets set at the end of 2012 serve as the fifth and final 2013 AIP metric for each individual Proposed AIP Participant. This metric is weighted at 25%. The supervisor of each Proposed AIP Participant will determine whether that individual has attained their particular qualitative goals and thus whether that individual has earned this portion of the incentive payment for which they are otherwise eligible.

## The 2013 CERP

Debtors also seek to implement the 2013 CERP which will include approximately 113 employees. Mr. Bubnovich's initial benchmarking analysis included an evaluation 56 of the Proposed CERP Participants' salaries relative to market salaries. By agreement with the U.S. Trustee, the following individuals were removed from the 2013 CERP: the Senior Vice President of Operations, the Vice President of Safety, the Vice President and Associate General Counsel and Corporate Secretary, the Vice President of Operations, the Vice President and Treasurer, the Vice President of Investor Relations and the Assistant Secretary and Senior Counsel.[3] As previously mentioned, the U.S. Trustee formed the belief that these individuals were insiders because they were appointed by Debtor Patriot Coal Corp.'s Board of Directors. Those listed employees were also Proposed AIP Participants and by compromise between at least the U.S. Trustee and Debtors, the incentive payment proposed for those individuals in the 2013 AIP was increased.

---

[3]One of these seven (7) employees is no longer employed by Debtors, however, the exact title of that employee has not been specifically identified to the Court.

Mr. Hatfield testified that no Proposed CERP Participant is involved with Debtors' finances in that none have authority to make company-wide or strategic decisions, none can dictate corporate policy or the disposition of corporate assets and none are elected or appointed by Debtor Patriot Coal's Board of Directors.  Mr. Hatfield further testified that some Proposed CERP Participants do have spending authority of up to one million dollars ($1,000,000.00) however, given the size of Debtors' operations, this spending authority is relatively minor and is therefore not determinative.  Moreover, while some employees have seemingly executive titles, Mr. Hatfield stated that these titles are for morale purposes only, and any employee with actual executive authority has been removed from, or was never included in, the 2013 CERP.

The Proposed CERP Participants comprise approximately three percent (3%) of Debtors' workforce.  Those individuals provide services in Debtors' mine operations, mine management, finance, human resources, legal, engineering and sales.  No 2013 CERP Participant has a significant role in Debtors' Board of Directors, and only the Corporate Secretary attends some Board of Directors meetings to perform ministerial tasks such as taking minutes of the meetings. Mr. Hatfield testified that management has selected these individuals for participation in the 2013 CERP based on the determination that these individuals are high-performing employees who possess critical skills and institutional knowledge required to enhance Debtors' viability.  These Proposed CERP Participants are eligible for retention compensation that equal between 11% and 45% of their annual base salary.

Distribution of the 2013 CERP payments are divided into three installments.  The first and second installments each constitute 25% of the total award for which the Proposed CERP Participants are eligible.  The first installment is payable as of March 31, 2013 (hereinafter "First Installment"), and the second installment is payable as of September 30, 2013 (hereinafter "Second Installment").   The third and final installment will constitute 50% of the total award, and is not payable until March 31, 2014 or 90 days after Debtors' emergence from Chapter 11, whichever is

-11-

later (hereinafter "Third Installment").  Mr. Bubnovich testified that even if all the 2013 Compensation Plan distributions are issued, save few exceptions, the participating employees' total compensation will still remain below market levels.

**Post-Bankruptcy Cost Reductions**

Debtors have announced an across-the-board salary cut of 2.5% effective March 1, 2013, reduced hourly wage rates for certain non-union job classifications and implemented additional rollbacks in benefit programs for all of its current employees.  More specifically, Debtors announced that they will seek to terminate eight traditional retiree health plans, eliminate its medical premium reimbursement program and eliminate life insurance coverage for active employees upon retirement.  Debtors will also reduce holiday, personal, vacation, legacy deferred vacation balances, 401(k) supplements and legacy retirement programs.

**Debtors' Arguments in Support of the Motion**

Debtors argue that the proposed participants of the 2013 Compensation Plans have experienced significant reduction in total compensation.  As such, Debtor's ability to minimize the loss of its employees, particularly its critical employees will ultimately be a major catalyst of Debtors' reorganization.  Debtors argue that they have experienced excessive attrition which if not curtailed, can ultimately derail Debtors' reorganization.  Specifically, Debtors argue that over 30 key employees have left Debtors and sought other employment from June 5, 2012 through March 18, 2013, the day of the hearing on the Motion.  According to Mr. Hatfield, those individuals have cited the uncertainty about the success of Debtors' reorganization as the reason for leaving.  Some of the titles of the departed key employees are the Vice President of Operations for West Kentucky, Vice President of Sales, Senior Internal Auditor, Senior Analyst-Market Research, Senior Manager - Financial Reporting, Assistant General Counsel and Manager – Maintenance UG.  Debtors further argue that they have experienced some difficulty with finding suitable replacement for those vacant positions and have resorted on occasion to the use of outside consultants which has ultimately cost

-12-

Debtors double the amount of a qualified employee's salary.  Debtors further argue that some of Debtors' employees have remained with Debtors during Debtors' difficult financial times with the expectation that their reduction in income will be alleviated by the implementation of the 2013 Compensation Plans.  Debtors insist that because coal prices have drastically decreased, attainment of the financial metrics of the 2013 AIP will be exceptionally challenging.  Nonetheless, Debtors believe that implementation of the 2013 Compensation Plans is essential to improve Debtors' chances of maintaining control of their workforce while simultaneously giving due consideration for Debtors' financial constraints.

**Statements in Support of the Motion**

The OCUC is in support of Debtors' Motion for the reasons enumerated above.  Creditor Bank of America, as Second Out Dip Agent, is also in support of Debtors' Motion.  The U.S. Trustee by agreement did not file an objection to Debtors' Motion.

**The UMWA's Objections to the Motion**

The United Mine Workers of America (hereinafter "UMWA") objects that the 2013 AIP includes insiders and is in essence a retention plan which must be held to a higher legal standard for approval.  Further, the UMWA argues that the 2013 CERP necessarily contains insiders – or at least, Debtors have not sufficiently proven that the 2013 CERP does not contain insiders – therefore, Debtors must meet the requirements of Section 503(c)(1), and have failed to do so. Further, the UMWA does not believe that Debtors have presented this Court with sufficient information about the Proposed AIP Participants or the Proposed CERP Participants for this Court to appropriately evaluate the Motion.  The UMWA also argues that Debtors have not proven that the 2013 Compensation Plans are necessary in that Debtors have not demonstrated that Debtors have an attrition problem, above the attrition that companies of the size and magnitude of Debtors would ordinarily experience, particularly in a post-recession climate.  Finally, the UMWA argues that Debtors have not demonstrated that coal mining companies typically implement compensation

plans and therefore, Debtors cannot be compared to companies in other industries as a basis for
determining either the necessity or equitableness of the 2013 Compensation Plans.

**The UMWA 1974 Pension Trust and 1993 Benefit Plan's Objections to the Motion**

The United Mine Workers of America 1974 Pension Trust and 1993 Benefit Plan (hereinafter
"UMWA 1974 and 1993 Funds") object that very little effort beyond that ordinarily expected of
Debtors' employees will be required to achieve the performance metrics outlined in the 2013 AIP.
The UMWA 1974 and 1993 Funds argue that Debtors have not established that the 2013
Compensation Plans have a reasonable relationship to the results to be obtained or that the
incentives will result in value to the estate.  Further, the UMWA 1974 and 1993 Funds argue that
the 2013 Compensation Plans are patently discriminatory and unfairly benefit the highest paid
employees of Debtors in that 20 of the 225 participants in the 2013 AIP are eligible to receive more
than 50% of the total 2013 AIP distributions.  And, roughly 13% of the approximately 270
participants of the 2013 Compensation Plans are eligible to receive almost 50% of the total
payments to be distributed.

## JURISDICTION

This Court has jurisdiction of this matter pursuant 28 U.S.C. §§ 151, 157 and 1334 (2012)
and Local Rule 81-9.01(B) of the United States District Court for the Eastern District of Missouri.
This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) (2012).  Venue is proper in this District
under 28 U.S.C. § 1409(a) (2012).

## CONCLUSIONS OF LAW

The Court must determine whether Debtors should be permitted to implement the 2013
Compensation Plans.  Debtors submit that the purpose of the 2013 Compensation Plans is to give
its current corporate employees some incentive beyond their base salary to optimize Debtors'
operational performance.  Debtors also wish to create a monetary plan to retain those who have
been identified by management to be key employees.  This Court has heard argument presented

-14-

both in support and against the Motion against the backdrop of another motion which seeks concessions by Debtors' unionized miners pursuant to Section 1113 and to modify retiree benefits pursuant to Section 1114. Debtors' motion concerning Sections 1113 and 1114 must rise and fall on its own merits. At this time, the Court is presented with the Motion which is focused on what, if anything, is required to incentivize and retain Debtors' employees to ultimately aid in Debtors' reorganization process. The Motion asks this Court to consider the incentive required for both higher, but not the highest, lower, and all employees in between, at the corporate offices, as well as some mining operations.

Section 363(c) permits a Debtor In Possession to "use property of the estate in the ordinary course of business." Section 363(b)(1) provides that the Debtor In Possession may "use, sell, or lease, other than in the ordinary course of business, property of the estate..." 11 U.S.C. § 363(b)(1) (2012). Section 503(c) provides:

> Notwithstanding subsection (b), there shall neither be allowed, nor paid—
> (1) a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that—
> (A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
> (B) the services provided by the person are essential to the survival of the business; and
> (C) either—
>> (i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or
>> (ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to

-15-

> or incurred for the benefit of such insider for any
> purpose during the calendar year before the year in
> which such transfer is made or obligation is incurred;
> ...
>
> (3) other transfers or obligations that are outside the ordinary course
> of business and not justified by the facts and circumstances of the
> case, including transfers made to, or obligations incurred for the
> benefit of, officers, managers, or consultants hired after the date of
> the filing of the petition.

11 U.S.C. § 503(c) (2012).

Transfers are in the ordinary course of business if the transfers are within the "interested

parties' reasonable expectations of what transactions the debtor in possession is likely to enter in

the course of its business." *Armstrong World Indus. v. James A. Phillips, Inc. (In re James A.*

*Phillips, Inc.),* 29 B.R. 391, 394 (S.D.N.Y. 1983). Any transfer made outside the ordinary course

of business for the benefit of officers, managers or consultants hired after the date of the filing of

the petition must be justified by the facts and circumstances of the case, which ordinarily means

that the business judgment standard of Section 363(b) applies. *In re Velo Holdings, Inc.,* 472 B.R.

201, 212 (Bankr. S.D.N.Y. 2012); *In re Dana Corp.* ("Dana II")*,* 358 B.R. 567, 576 (Bankr. S.D.N.Y.

2006); 11 U.S.C. § 503(c)(3) (2012). To determine whether an incentive plan meets the business

judgment test, a court may consider the following:

> -Is there a reasonable relationship between the plan proposed and
> the results to be obtained, i.e., will the key employee stay for as long
> as it takes for the debtor to reorganize or market its assets, or, in the
> case of a performance incentive, *is the plan calculated to achieve*
> *the desired performance?*
>
> - Is the cost of the plan reasonable in the context of the debtor's
> assets, liabilities and earning potential?
>
> - Is the scope of the plan fair and reasonable; does it apply to all
> employees; does it discriminate unfairly?
>
> - Is the plan or proposal consistent with industry standards?
>
> - What were the due diligence efforts of the debtor in investigating
> the need for a plan; analyzing which key employees need to be

incentivized; what is available; what is generally applicable in a
particular industry?

- Did the debtor receive independent counsel in performing due
diligence and in creating and authorizing the incentive compensa-
tion?

*Dana II,* 358 B.R. at 576–77 (emphasis in original) (citations omitted); *see also In re Global Home
Prods., LLC,* 369 B.R. 778, 786 (Bankr. D. Del. 2007); *see generally Matter of Interco, Inc.,* 128
B.R. 229, 234 (Bankr. E.D. Mo.1991).

Congress added Section 503(c) to the Bankruptcy Code in 2005 to "eradicate the notion that
executives were entitled to bonuses simply for staying with the Company through the bankruptcy
process." *In re Global Home Prods., LLC,* 369 B.R. at 784 (internal quotations omitted).  A court
"must examine a proposed [incentive plan] ... and determine whether the proposed targets are
designed to motivate insiders to rise to a challenge or merely report to work." *In re Hawker
Beechcraft, Inc.,* 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012)(citing *In re Velo Holdings,* 472 B.R. at
209).  A plan that does not require affirmative action beyond that contemplated prepetition is not
incentive, but is retentive and cannot be approved under the more lenient standards for incentive
plans. *See In re Residential Capital, LLC,* 478 B.R. 154, 171-73 (Bankr. S.D.N.Y. 2012).  A court
must determine whether the debtor has proposed a retentive plan disguised as an incentive plan
in order to circumvent the requirements of Section 503(c)(1). *In re Velo Holdings, Inc.,* 472 B.R. at
209.  "Although a purported [incentive plan] may contain some retentive effect, that does not mean
that the plan, overall, is retentive rather than incentivizing in nature." *Id.* at 209-10 (citing *In re Dana
Corp. ("Dana I"),* 351 B.R. 96, 102 (Bankr. S.D.N.Y. 2006)).  The burden of proof that the incentive
plan is not a retentive plan lies with the proponent of the plans. *In re Hawker Beechcraft, Inc.,* 479
B.R. at 313.

Debtors argue first that the 2013 Compensation Plans may be implemented by Debtors in
the ordinary course of business pursuant to Section 363(c).  Alternatively, Debtors argue that the

Court should permit Debtors to implement the 2013 Compensation Plans because Debtors have met their burden under Section 363(b) and Section 503(c)(3). Debtors refute that any insiders are eligible to participate in the 2013 CERP or that the 2013 AIP is in actuality retentive.

At the outset, this Court rejects Debtors' contention that implementation of the 2013 Compensation Plans is in the ordinary course of business. To the contrary, there is no dispute that no distributions were made pursuant to the 2012 Compensation Plans, and prior thereto, Debtors have never implemented a retention plan at the corporate level. The structure of the 2013 Compensation Plans is considerably different from Debtors' LTEIP and Pre-Petition Incentive Plan. Moreover, both the 2013 AIP and 2013 CERP target the duration of Debtors Chapter 11 cases, which by definition is not an 'ordinary course' transaction in that the relief sought in Debtors' Chapter 11 cases is extraordinary. As such, given that Debtors have never implemented a combined corporate and mine level retention plan, nor have they implemented and made distributions pursuant to an incentive plan like the 2013 AIP, Debtors' creditors would not expect Debtors to implement a compensation plan in Debtors' ordinary course. Further, there is no evidence before the Court, or even an affirmative statement, that it is customary for mining companies to implement compensation plans. For these reasons, implementation of the 2013 Compensation Plans is not in the ordinary course of Debtors' business.

Section 363(b)(1) provides that Debtors may use property of the estate outside of the ordinary course of business. The point of contention however is whether Debtors must meet the higher standard of Section 503(c)(1) or whether Section 503(c)(3) applies. The UMWA and the UMWA 1974 and 1993 Funds argue that the 2013 AIP is in actuality a retentive plan, and, because the 2013 AIP contains insiders, and because Debtors have not proven that the 2013 CERP does not contain insiders, Section 503(c)(1) applies and Debtors cannot meet this standard.

The 2013 AIP has set specific performance targets that must be achieved before the incentive payments can be made. Essentially, 60% of the targets depend on Debtors' financial

performance, 15% depend on Debtors' safety and environmental compliance and the remaining 25% depends on each individual Proposed AIP Participant's performance. Mr. Hatfield testified that Debtors are on pace to miss the EBITDAP component of the financial requirements.

Debtors have diversified the target metrics such that in this Court's estimation, the targets are designed to incentivize the Proposed AIP Participants in as much as any such incentivizing plan proposed during a Chapter 11 case can be designed to incentivize.  Given Debtors' volatile situation, and the undisputed fact that the price of coal has decreased, the Court cannot conclude that the Proposed AIP Participants merely have to show up to work to achieve the targets.  Further, while the MSHA target under the 2013 AIP is lower than Debtors' achieved 2012 MSHA compliance rate, the Court accepts Mr. Hatfield's testimony that it would be unreasonable to expect an above average, record-breaking performance at its mining operations every year, particularly given the concentration of challenges faced by Debtors in the upcoming months that Debtors did not face in times past.  So too, given the size and span of Debtors' operations, it is reasonable to require individualized targets, and it is reasonable that each Proposed AIP Participants' direct supervisor both set and monitor attainment of those objectives.  Debtors have reasonably proposed to distribute the 2013 AIP payments in three installments to ensure that the Proposed AIP Participants remain encouraged to exceed pre-bankruptcy expectations and meet the proscribed targets throughout the course of Debtors' bankruptcy cases.

The Court acknowledges that the Third Installment may not be made until after Debtors emerge from bankruptcy, which intimates a retentive purpose.  Based on the diversification of the performance targets and the lack of partial awards however, this Court concludes that the 2013 AIP is incentive in nature and design, with at most a retentive by-product.  As such, the Court concludes that there is a relationship between the 2013 AIP and the intended results in that the 2013 AIP is designed to incentivize the Proposed AIP Participants to do what is necessary to positively influence Debtors' overall performance and ultimate reorganization.

The total cost of the 2013 Compensation Plans, if all targets are met during the First Period and Second Period – which all agree, it is highly unlikely at least for the First Period – is $6.9 million, only 0.36% of Debtors' total annual revenues. Debtors distributed $9.4 million in incentive payments in 2010, and in 2011, $7.9 million in incentive payments. No incentive payments were made in 2012. The cost for the First Period of the 2013 AIP will be a maximum approximately $1.2 million, and another $1.2 million for the Second Period. Against this backdrop, Debtors' proposal is not unreasonable in light of Debtors' assets, liabilities, and the need for consistency in Debtors' human resources during this reorganization in order to optimize Debtors' market performance and earning potential.

Mr. Hatfield testified that the 2013 AIP aims to include all its corporate employees, which essentially means all of its employees at its corporate offices. As previously mentioned, this includes management, administrative assistants, maintenance technicians, general office staff, and the like. It also includes employees in management, finance, human resources, legal, engineering and sales. The UMWA 1974 and 1993 Funds argue that the 2013 AIP is not fair and equitable because the employees that have the highest salaries are eligible for most of the funds allocated for incentive payments. The UMWA 1974 and 1993 Funds' objection is well taken, however, the Court is hard-pressed to imagine a corporation where such incentive payments would not be "top heavy."[4] With all sensitivity to the contributions of all employees to an organization, the facts

---

[4] Here, the Court recognizes that several courts have approved incentive and retention plans where a greater portion of distributions are allocated to top management. *See In re Global Aviation Holdings Inc.,* 478 B.R. 142, 145-46 (Bankr. E.D.N.Y. 2012) (where retention plan for five top employees was approved and payments in the following amounts were made: Director of Safety – $18,050.00, Vice President, Flight Operations – $50,696.00, Chief Pilot – $29,355.00, Senior Director of Maintenance – $15,750.00, Director, Quality Assurance and Projects – $23,180.00, for an aggregate retention distribution of $137,031.00); *In re Borders Group,* 453 B.R. 459, 465-67 (Bankr. S.D.N.Y. 2011) (where an incentive plan was approved which provided for 15 key executives, to the inclusion of the CEO, to receive incentive payments of 55-75% of base salary, incentive payments to 10 lower-level executives of 40% of base salary and retention payments to 25 director-level employees in the aggregate amount of $933,000.00, where individual retention distributions ranged from $28,000.00 to $53,000.00); *In re EaglePicher Holdings, Inc.,* No. 05-12601, 2005 WL 4030132, *3 (Bankr. S.D. Ohio Aug. 26, 2005) (where retention plan for 3.6-3.8% of the debtors' employees was approved and the three most senior employees were

remain that certain key personnel perform duties that are more integral to the viability of the organization and such individuals are generally compensated at higher levels. Consequently, decisions made by those individuals will generally have a more drastic effect on the company's overall performance. On this basis therefore, it is not unreasonable, or even unfair, that those individuals be eligible for higher incentive and retention payments. The 2013 AIP is broad in its participant pool such that it does not seek to only incentivize senior management and disregard the general workforce. Furthermore, the top six executives of Debtors have voluntarily withdrawn from any participation in the 2013 Compensation Plans. The Court also notes that Debtors maintain a mine-level incentive program that is not before the Court. The Court concludes that the scope of the 2013 AIP is fair and reasonable, particularly since it applies to all employees. As such, the 2013 AIP does not discriminate unfairly.

Debtors relied on Towers' benchmarking analysis to determine the appropriate incentive payments. Mr. Bubnovich testified that even if the full $6.9 million is distributed, the vast majority of Debtors' employees will receive total compensation that is below market levels. There is no dispute that the total compensation previously afforded to the 2013 AIP Participants has significantly decreased since 2010. Further, the Court accepts the logical conclusion that many employees of Debtors perform duties that develop a transferable skill set which may not be exclusive to the mining industry. As such, the Court is not excessively resistant to the relative silence regarding compensation plans in the mining industry, nor is the Court convinced that Debtors' employees' only, or even most likely, alternative employment is exclusive to the mining industry. It was therefore appropriate that Towers' benchmarking analysis be broader than the coal industry. Irrespectively, the second benchmarking analysis which included coal industry market data conducted by Towers revealed that Debtors' employees were even more undercompensated

eligible to obtain 28% of the total retention distributions of $7.9 million).

-21-

than originally deduced.  As such, given the structure of the 2013 AIP, particularly the performance targets, the Court concludes that the 2013 AIP is sufficiently consistent with industry standards to satisfy this Court's review of Debtors' business judgment.

Mr. Hatfield testified extensively that he relied on his direct reports and the information provided to his direct reports to determine who the 2013 AIP Participants should be.  Mr. Hatfield further testified that Debtors have experienced their highest level of attrition in Debtors' history and believe that Debtors' restructuring will be derailed if attrition levels are not abridged.  Given the size of Debtors and the number of employees, Debtors' method in selecting the 2013 AIP participants is reasonable.  Further, Debtors properly obtained outside assistance from both Blackstone and Towers in devising and structuring the 2013 AIP, and have appropriately incorporated the feedback from the OCUC and the U.S. Trustee.   Debtors have expended sufficient due diligence in investigating the need for an incentive plan.

In sum, the Court is satisfied that the 2013 AIP is the product of the proper exercise of Debtors' business judgment.  The 2013 AIP is primarily incentive and as such, the appropriate standard is that of Section 503(c)(3).  And, based upon the facts and circumstances as discussed above, this Court will grant Debtors' Motion as to the 2013 AIP and grant Debtors authority to implement the 2013 AIP.

The Court will now discuss the 2013 CERP.  The UMWA insists that Debtors have not met their burden of proof that the 2013 CERP does not contain insiders because it is unfathomable that a corporation the size of Debtors operates at the direction of only six (6), or perhaps 12 or 13 individuals. The UMWA specifically identified an individual on a board of a jointly-administered Chapter 11 Debtor-subsidiary of Debtor Patriot Coal that is a participant of the 2013 CERP.  As such, the UMWA and the UMWA 1974 and 1993 Funds argue that the appropriate standard for review of the 2013 CERP is that enumerated under Section 503(c)(1) rather than Section 503(c)(3). Debtors respond that the 2013 CERP does not contain any insiders, and any thought that the 2013

CERP included insiders should have been dispelled upon Notice of the Agreement reached with the U.S. Trustee which required the removal of six individuals from the 2013 CERP because individuals were appointed by Debtor Patriot Coal's Board of Directors.

Section 101(31)(B) provides, in relevant part, that an "insider" of a corporate debtor includes: (i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor.  11 U.S.C. § 101(31)(B) (2012).  The list of insiders provided by Section 101(31) is illustrative, not exclusive.  *In re Rosen Auto Leasing, Inc.,* 346 B.R. 798, 804 (B.A.P. 8th Cir. 2006).  The term "director," while not defined by the Bankruptcy Code, has been determined by courts to mean an individual who sits on a corporation's board of directors.  *See Rupp. v. United Security Bank (In re Kunz),* 489 F.3d 1072, 1077 (10th Cir. 2007) ("When the term 'director' is used in reference to a corporation . . . the term plainly means a person who is a member of the governing board of the corporation and participates in corporate governance.")  Likewise, while the term "'officer" is not defined by the Bankruptcy Code, an "officer" is defined as a "person elected or appointed by the board of directors to manage the daily operations of a corporation, such as the CEO, president, secretary, or treasurer." Black's Law Dictionary 1193 (9th ed. 2009).

Whether an employee is an insider turns on the "degree of involvement in the debtor's affairs . . . the label an employer chooses to attach to a position is not dispositive for purposes of insider analysis." *In re Global Aviation Holdings,* 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012).  An insider must "exercise sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." *In re Borders Group, Inc.,* 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011) (citing *In re Babcock Dairy Co.,* 70 B.R. 657, 661 (Bankr. N.D. Ohio 1986)).  "An individual's title, by itself, in insufficient to establish that an individual is a director or officer." *Id.* at 468-69 (citing *In re Longview Aluminum, LLC,* 419 B.R. 351, 355 (Bankr. N.D. Ill. 2009) ("[I]t is not

simply the title 'director' or 'officer' that renders an individual an insider; rather it is the set of legal rights that a typical corporate director or officer holds.")).

Here, all 2013 CERP payments and 2013 AIP payments will be made by Debtor Patriot Coal Corp. as the parent company.  As such, it is the insiders of Debtor Patriot Coal Corp. that are relevant.  The top six (6) executives of Debtor Patriot Coal Corp. have voluntarily excluded themselves from any participation in the 2013 Compensation Plans.  Debtors have addressed the concerns of the U.S. Trustee by removing the previously enumerated six (6) employees that were appointed by Debtor Patriot Coal's Board of Directors from participation in the 2013 CERP.  As such, no Proposed CERP Participant was appointed by Debtor Patriot Coal's Board of Directors. Debtors have further explained that any other individual who has any involvement with the Board of Directors, particularly the Corporate Secretary, has a principally ministerial role.

The Court is satisfied that the appropriate individuals have been excluded from participation in the 2013 CERP in that the remaining participants are not insiders.  Mr. Hatfield testified that many individuals are given executive titles but in effect do not have any corresponding executive authority.  Mr. Hatfield testified that some 2013 CERP participants have spending authority of up to one million dollars ($1,000,000.00), however this alone is not sufficient for this Court to conclude that those individuals are insiders, particularly given the sheer size of Debtors and their operations. Mr. Hatfield also testified that all Board members as well as all individuals that report to top executives are also excluded from the 2013 CERP.  Furthermore, the individuals that report to the individuals that report to the Board of Directors are not all included in the 2013 CERP.  While some of those that remain in the 2013 CERP have a high level of responsibility, the Court is satisfied that they are not insiders.  Debtors have affirmatively stated that no Proposed CERP Participant makes critical financial and operational decisions for Debtors, none have authority to make company-wide or strategic decisions and none exercise sufficient authority over Debtors to dictate corporate policy

-24-

or the disposition of corporate assets.  Finally, it is clear to this Court that no 2013 CERP participant gave significant input to the creation of the 2013 Compensation Plans.

Therefore, the appropriate standard of review of the 2013 CERP is that contained under Section 503(c)(3).  For the same reasons enumerated in the above discussion of the 2013 AIP, the Court simultaneously concludes that the 2013 CERP is similarly a sound exercise of Debtors' business judgment.  The 2013 CERP aims to reduce or prevent attrition of essential employees, which is in the best interest of all stakeholders, particularly Debtors' estates.  The 2013 CERP Participants were selected as those with the skills most critical to Debtors' successful reorganization, the loss of which would be more costly to Debtors.  Therefore,

**IT IS ORDERED THAT** Debtors' Motion for Authority to Implement Compensation Plans is **GRANTED**; and

**IT IS FURTHER ORDERED THAT** United Mine Workers' Objection to Debtors' Motion for an Order Approving and Authorizing Bonus Plans for Certain Employees is **OVERRULED**; and

**IT IS FURTHER ORDERED THAT** Objection of the Untied Mine Workers of America 1974 Pension Trust and the United Mine Workers of America 1993 Benefit Plan to the Debtors' Motion for Authority to Implement Compensation Plans is **OVERRULED**; and

**IT IS FURTHER ORDERED THAT** the 14 day stay imposed by Bankruptcy Rule 6004(h) is waived.

KATHY A. SURRATT-STATES
Chief United States Bankruptcy Judge

DATED: May 16, 2013
St. Louis, Missouri

Copies to:

All Creditors and Parties in Interest.

-25-