UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| PATRIOT COAL CORPORATION, *et. al.*, | ) | Case No. 12-51502-659 |
| | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | **PUBLISHED** |

### MEMORANDUM DECISION AND ORDER ON MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENTS AND TO MODIFY RETIREE BENEFITS PURSUANT TO 11 U.S.C. §§ 1113, 1114 OF THE BANKRUPTCY CODE

The matter before the Court is the Motion to Reject Collective Bargaining Agreements and to Modify Retiree Benefits Pursuant to 11 U.S.C. §§ 1113, 1114 of the Bankruptcy Code and the UMWA's Objection to the Motion to Reject Collective Bargaining Agreements and to Modify Retiree Benefits Pursuant to 11 U.S.C. §§ 1113 and 1114.  Also filed were the following objections of other interested parties, whose participation was limited by this Court to I) one 15-page brief or objection, ii) an opening statement, and iii) a closing argument: Statement of the Official Committee of Unsecured Creditors in Connection with the Debtors' Motion to Reject Collective Bargaining Agreements and to Modify Retiree Benefits Pursuant to 11 U.S.C. §§ 1113, 1114 of the Bankruptcy Code which was withdrawn in part at the time of closing argument,[1]  Objection to Motion to Reject

---

[1]  At closing argument, counsel for the Official Committee of Unsecured Creditors read the following agreement into the record: The Committee, by majority vote of its unconflicted members, has determined to withdraw its objection to the implementation of the Fifth Proposal, based on the following agreements and reservations. The Debtors and the Committee agree that: one, the Committee's advisors received Blackstone's detailed recovery analysis in the last seventy-two hours; two, the Committee's advisors have engaged in detailed discussion with the Debtors' advisors over the last seventy-two hours to more closely reconcile their respective recovery models and the assumptions used to analyze various percentages of equity that are allocable to the UMWA in certain circumstances; three, among the assumptions affecting the allocation of equity to the UMWA are: the probable amount of the UMWA's claims, preliminary estimates of the value distributable to unsecured creditors, the allocation of that value among the various Debtors, the amount of third-party trade and litigation claims against the various Debtors, the likelihood that intercompany claims are allowed or disallowed, and the likelihood of substantive consolidation.  The Committee has determined that the Fifth 1114 Proposal allocates to the UMWA approximately thirty-nine percent of the equity value of the reorganized Debtors, comprised of thirty-five percent of the equity, plus

Collective Bargaining Agreements and to Modify Retiree Benefits Pursuant to 11 U.S.C. §§ 1113,

1114 of the Bankruptcy Code filed by The Ohio Valley Coal Company and The Ohio Valley

Transloading Company, Objection to Debtors' Motion to Reject Collective Bargaining Agreements

and to Modify Retiree Benefit[s] Pursuant to Sections 1113 and 1114 of the Bankruptcy Code filed

by Drummond Company, Inc., Objection to Debtors' Motion to Reject Collective Bargaining

Agreements and to Modify Retiree Benefit[s] Pursuant to Sections 1113 and 1114 of the Bankruptcy

Code filed by Energy West Mining Company, Statement of Bank of America, N.A., as Second Out

DIP Agent, With Respect to the Hearing on Debtors' Motion to Reject Collective Bargaining

Agreements and to Modify Retiree Benefits Pursuant to 11 U.S.C. §§ 1113, 1114 of the Bankruptcy

Code, Limited Objection of U.S. Bank National Association, as Indenture Trustee, to Debtors'

Motion to Reject Collective Bargaining Agreements and to Modify Retiree Benefits Pursuant to 11

U.S.C. §§ 1113, 1114 of the Bankruptcy Code, Objection of Wilmington Trust Company, as

Indenture Trustee, to the Debtors' Motion to Reject Collective Bargaining Agreements and to Modify

Retiree Benefits Pursuant to 11 U.S.C. §§ 1113, 1114 of the Bankruptcy Code, Noteholders'

Objection to Motion to Reject Collective-Bargaining Agreements and to Modify Retiree Benefits

---

royalty and profit-sharing payments, which the Committee values as equal to an additional four percent of
the equity. The Committee continues to believe that the Fifth Proposal's allocation of thirty-nine percent of
the equity value to the UMWA is high. However, after seventy-two hours of consultation and modeling by
the Committee and Debtor[s'] advisory team, the Committee, by a majority vote of its unconflicted
members and the Debtors have agreed that, based on the range of assumption[s] shared by Houlihan and
Blackstone, even if substantive consolidation is given a zero likelihood and the disallowance of
intercompany claims is given a zero likelihood, the Fifth Proposal's allocation of equity to the UMWA is fair
and equitable with respect to other creditors.  Because the Committee and the Debtors have reached a
mutual understanding on the basis of the Fifth Proposal's allocation of equity to the UMWA, the
Committee, by a majority vote of its unconflicted members, no longer requests proof of such basis or a
second hearing on the implementation on the Fifth Proposal and withdraws that portion of its statement in
support that objects to the implementation of that Proposal without proof that it treats creditors fairly and
equitably.  The Debtor[s] and the Committee agree that the range of assumptions shared by Houlihan and
Blackstone is not an admission with respect to any assumption. Neither the Debtors nor the Committee
shall be bound by any of the shared assumptions in any future litigation. The Debtors and the Committee
agree that the foregoing determination is without prejudice to the rights of any party with respect to
substantive consolidation or the allowance of intercompany claims. The Committee has made no
determination as to whether substantive consolidation or the allowance of intercompany claims is
appropriate or inappropriate.1113/1114 Hr'g Tr. 18:24-21:3, May 3, 2013.

Pursuant to 11 U.S.C. §§ 1113 and 1114, Objection to Debtors' Motion to Reject Collective Bargaining Agreements and to Modify Retiree Benefit[s] Pursuant to Sections 1113 and 1114 of the Bankruptcy Code filed by Cliffs Natural Resources Inc. and Sureties' Reservation of Rights Regarding Debtors' Motion to Reject Collective Bargaining Agreements and to Modify Retiree Benefits Pursuant to 11 U.S.C. §§ 1113, 1114 of the Bankruptcy Code.  In response to the various objections filed by the "other interested parties" as well as the UMWA's Objection, Debtors filed Omnibus Reply Memorandum of Law in Further Support of the Debtors' Motion to Reject Collective Bargaining Agreements and to Modify Retiree Benefits Pursuant to 11 U.S.C. §§ 1113, 1114 and the UMWA filed UMWA's Omnibus Reply Memorandum Regarding the Motion to Reject Collective Bargaining Agreements and to Modify Retiree Benefits Pursuant to 11 U.S.C. §§ 1113 and 1114.  Also of note is that on April 2, 2013, as represented in this Court's April 5, 2013 Order, this Court granted the Motion to Intervene by the United Mine Workers of America 1974 Pension Trust and the United Mine Workers of America 1993 Benefit Plan in large part because of the contents of the 1113 Proposal at that time.   Upon counsel's representation that the 1974 Pension Trust and the 1993 Benefit Plan cannot "independently grant concessions" and must "work with the bargaining parties that created these obligations in the first place,"[2] the Court granted Debtors' oral motion to limit the participation of the 1974 Pension Trust and 1993 Benefit Plan going forward,[3] in large part because these parties do not have the ability to negotiate which is an inherent component of Sections 1113 and 1114.  Nevertheless, the Court also considers the Objection of the United Mine Workers of America 1974 Pension Trust and the United Mine Workers of America 1993 Benefit Plan to the Debtors' Motion to Reject Collective Bargaining Agreements and to Modify Retiree Benefits

---

[2]   1113/1114 Hr'g Tr. 169:20-170:2, April 29, 2013.

[3]   1113/1114 Hr'g Tr. 174:23-175:15, April 29, 2013. By agreement of Debtors and the UMWA, the Declarations, as well as the Deposition Designation of Mr. Dale Stover, witness for the 1974 Pension Trust and 1993 Benefit Plan, as well as the 2012 Retiree Bonus Account Plan, were admitted.

Pursuant to 11 U.S.C. §§ 1113, 1114 of the Bankruptcy Code as well as the Objection and Joinder of the United Mine Workers of America 2012 Retiree Bonus Account Plan to Objection of the UMWA 1974 and 1993 Plans to Debtors' Motion to Reject Collective Bargaining Agreements and to Modify Retiree Benefits Pursuant to 11 U.S.C. §§ 1113, 1114 of the Bankruptcy Code.  The Court held hearings on this matter which commenced on April 29, 2013 and concluded on May 3, 2013. The matter was taken under submission.  In accordance with the '30-day from the commencement of the hearing' constraint imposed by Congress as stated in Section 1113(d)(2), and because of the implicitly intertwined nature of the relief requested pursuant to Sections 1113 and 1114 in Debtors' Motion to Reject Collective Bargaining Agreements and to Modify Retiree Benefits Pursuant to 11 U.S.C. §§ 1113, 1114 of the Bankruptcy Code (hereinafter the "1113/1114 Motion"), the Court herein rules on the 1113/1114 Motion in its entirety.

## I. INTRODUCTION

On July 9, 2012, Debtor Patriot Coal Corporation and a number of its affiliates (hereinafter collectively "Debtors") filed Voluntary Petitions for relief under Chapter 11 of the Bankruptcy Code in the Southern District of New York.  These Chapter 11 cases are being jointly administered pursuant to Federal Rule of Bankruptcy Procedure 1015(b) as well as the Joint Administration Order entered on July 10, 2012.  Debtors are authorized to operate their businesses and manage their properties as Debtors In Possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  On December 19, 2012, the cases were transferred to the Bankruptcy Court for the Eastern District of Missouri following the Southern District of New York's Memorandum Decision entered on November 27, 2012, which instructed that the cases would be transferred.

As observed by the Bankruptcy Court for the Southern District of New York in the Memorandum Decision on Motions to Transfer Venue Pursuant to 28 U.S.C. § 1412, there is unquestionably no dispute that the lives and livelihoods of Debtors' employees, both union and non-union, current and retired, depend on the outcome of Debtors' reorganization.  "The retirees' health

and access to health care depend on the outcome of these cases. Indeed, without the dedication and sacrifice of the coal miners and their families, there would be no coal, and there would be no Patriot Coal." *In re Patriot Coal Corp.,* 482 B.R. 718, 722 (Bankr. S.D.N.Y. 2012). There can be no Patriot Coal stock to dispute, or tonnage payments to negotiate, or companies to reorganize, unless there are men and women willing to bend their knees to excavate coal.

And, as the Bankruptcy Court for the Southern District of New York observed, and this Court now observes, this Court has been charged with applying the Bankruptcy Code and other applicable law to the facts and circumstances presented. The overarching goal for this Court is to guide Debtors through the Bankruptcy Code, particularly its Chapter 11 strictures, to maximize the value of Debtors' estates for the organized benefit of all stakeholders, including the United Mine Workers of America's (hereinafter the "UMWA") constituents – the coal miners, employees, retirees and other beneficiaries that the UMWA represents – and guide Debtors to emerge from Chapter 11 as a financially and operationally stronger company. This Court has accepted both the privilege and responsibility of this task and undoubtedly has been weighing the intellectual scales of the matter presented, inexorably to this purpose – this Memorandum Decision and Order.

As of the date of entry of this Memorandum Decision and Order, this Court has received over 900 letters from interested parties, all of which have been read by the Court and placed on the record as correspondence. Many of these letters discuss the imminence of bankruptcy cases for retired coal miners and their families should Debtors be permitted to modify the Collective Bargaining Agreements (hereinafter "CBA" or "CBAs") and the Retiree Benefits. Many discuss the horrendous conditions of the coal mines when those individuals first began to work, and how hard it was to achieve the promises made pursuant to both the previous and the current CBAs. Some discuss how physically, mentally and emotionally grueling being a coal miner was, many of whom worked as coal miners for over 30 years – a sacrifice made with due consideration of the promised health care from cradle to grave. The Court has received numerous medication lists, lists of various

coal mining-related diagnoses and personal accounts of the years of hard work, and, all the reasons why these sacrifices were worth it for the promise of health care for life and an earned pension.  One retiree in particular informed the Court that when he first began working, he was given two weeks vacation which was taken when instructed by his superior, and when he retired over 30 years later, he had two weeks vacation which was taken when instructed by his superior. Many coal miners talk of six (6) and seven (7) day work-weeks, of over 12 hours a day.  Some letters discuss various injuries sustained while working in coal mines, limbs of self and relatives lost, and the lives lost of relatives and friends.  None of these letters, or their comments have been lost on this Court.  And, as counsel for the UMWA so eloquently stated, many current and retired coal miners do not have cost spreading abilities, because, for many, cost spreading "means cutting your pills in half. Cost spreading abilities for retirees means making a choice today over medicine or food.  And, if you are a diabetic it means making a very difficult choice indeed.  Cost spreading abilities for workers means that they either give up their seniority and go out and face the vicissitudes of the modern day unemployment situation, or accept massive wage cuts..."[4]

The Court's evaluation however **must** begin with this threshold question: What does the Bankruptcy Code and *stare decisis* require?  So too, the matter before the Court begs the following questions: Is it indeed that Debtor Patriot Coal Corporation was created to fail, or is it that hindsight is 20/20 – and, does the answer to that question have anything to do with the matter before the Court today? What is better – something for a period of time or nothing in a short amount of time? What of the current employees; the fate of the rank and file UMWA-represented coal miners?  And, while the 1113/1114 Motion does not affect any retirees who have been diagnosed with black lung disease and receive certain benefits by federal law pursuant to the Coal Act, what of those with diagnoses other than black lung disease and who do not receive any benefits under the Coal Act?

---

[4]  1113/1114 Hr'g Tr. 109:16-22, May 3, 2013.

-6-

If the relief requested is granted, will the resulting pool of funds be allocated according to the health needs of the retirees?  What of the prospects of a strike in the event that this Court determines that Debtors have met their statutory burden to reject and modify the CBAs and to modify the Retiree Benefits? What of the lives, financial viability, and broken promises if this Court determines that Debtors have met their statutory burden to reject and modify the CBAs and to modify the Retiree Benefits?  What effect will this Court's ruling have on local economies, particularly those in mining communities that thrive on the patronage of those affected by the outcome of the 1113/1114 Motion?  But, again, what does the Bankruptcy Code and *stare decisis* require?

This Memorandum Decision and Order will address the history of the subject CBAs and Retiree Benefits, the history of Debtors and their assumption of CBAs and the liabilities for the Retiree Benefits, the Sections 1113 and 1114 Proposals made by Debtors and ultimately, this Court's application of the law to the facts presented in the ephemeral 25 days provided to this Court by the Bankruptcy Code to perform this daunting task.

## II. FINDINGS OF FACT

### A. What Is Coal?

Coal is a fossil fuel that forms from the remains of vegetation as long as 400 million years ago.  The plants from eons ago captured energy through photosynthesis to create compounds (carbon) in plant tissue.  When those plants and trees died, they ultimately sunk to the bottom of swamps and formed a dense material called peat.  As the earth's surface changed over time and sand deposits accumulated, the peat got buried.  Over time, the water in the peat was squeezed out from the weight of the evolving earth's surface.  The compacted plant matter, the peat, progressively carbonized under the pressure and changing temperatures and eventually became a combustible sedimentary and metamorphic rock which is affectionately referred to as coal.

There are at least four ranks of coal, which is based on the carbon content: lignite, subbituminous, bituminous and anthracite.  Some estimate that 90% of the coal in America is

bituminous (soft) coal, which is most used I) to make electricity through combustion in boilers to make steam which is used to generate power (called steam or thermal coal) and ii) to make coke for the steel industry (metallurgical or coking coal).[5]  As will be discussed further below, Debtors mine bituminous coal.

## B. The United Mine Workers Of America

The UMWA is a labor union which was formed in Columbus, Ohio on January 22, 1890 with the stated purpose of "educating all mine workers in America to realize the necessity of unity of action and purpose, in demanding and securing by lawful means the just fruits of our toil."[6]  The UMWA represents over 1650 of Debtors' approximately 4200 current active employees, which comprises 42% of Debtors' overall workforce and about 60% of Debtors hourly work force.

## C. The Bituminous Coal Operators' Association

The Bituminous Coal Operators' Association (hereinafter the "BCOA") is a multiemployer bargaining association formed by coal mine operators in the mid 1900s.  Its sole purpose is to bargain with the UMWA on behalf of its coal industry employer members.  Peabody Energy Corporation (hereinafter "Peabody") and Arch Coal, Inc. (hereinafter "Arch") have self-identified as members of the BCOA.[7]

## D. The History Of The CBAs And Retiree Benefits The 1974 Pension Plan And The 1993 Benefit Plan)

### 1. The Early Years

Turmoil in the earlier parts of the 20th century ultimately instigated President Truman to issue an Executive Order which directed Julius Krug, then Secretary of the Interior, to seize virtually all

---

[5] Only high-ranking bituminous coal has the characteristics required to be used as coking coal.

[6] Mair B. Fox,  United We Stand: The United Mine Wokers of America 1890-1990 22 (International Union, United Mine Workers of America 1990) (citing the UMWA Preamble, 1890).

[7]   Joint Ex. 181, Buckner Declaration, ¶ 45.

bituminous coal mines in the United States and to negotiate "appropriate changes in the terms and conditions of employment" of miners with the UMWA.   11 Fed. Reg. 5593 (1946).   These negotiations, held in principal between Secretary Krug and  Mr. John L. Lewis, then-president of the UMWA, yielded the Krug-Lewis Agreement, pursuant to which the previously seized coal mines reverted to private control and the National Bituminous Coal Wage Agreement of 1947 (hereinafter "1947 NBCWA") was created.  Under the 1947 NBCWA, benefit funds were created which provided for medical expenses of miners and their dependents.  The 1947 NBCWA set out the terms and conditions of employment for coal miners employed by members of the BCOA as well as companies that sign "Me Too" agreements with the UMWA.  A "Me Too" agreement is an agreement whereby an employer who is not a member of the BCOA agrees to be bound by the terms of the current NBCWA.  Every few years for the last sixty-six years, the UMWA and the BCOA renegotiate the terms of the NBCWA.

Due to disagreements over what kinds of benefits were owed to miners under the terms of the 1947 NBCWA, the UMWA and the BCOA entered into the 1950 NBCWA which established the 1950 Welfare and Retirement Fund.  The principal difference between the 1950 NBCWA and the 1947 NBCWA was that the 1950 NBCWA established a "pay-as-you-go" system and required that a "30-cents-per-ton royalty on coal produced payable by signatory operators on a 'several and not joint' basis for the duration of" the 1950 NBCWA. *Eastern Enters. v. Apfel,* 524 U.S. 498, 506-07, 118 S.Ct. 2131, 2138, 141 L.Ed.2d 451 (1998) (plurality opinion).  "The [1950] Fund operated using a fixed amount of royalties, with the trustees having the authority to establish and adjust the level of benefits provided so as to remain within the budgetary constraints." *Id.* at 507, 118 S.Ct at 2138.

## 2. The Employee Retirement Income Security Act (ERISA) And The 1974 NBCWA

The Employee Retirement Income Security Act of 1974 (hereinafter "ERISA") required pension plans to be funded on an actuarial basis.  Consequently, the 1950 NBCWA could no longer operate under a "pay-as-you-go" system.  Thus, the UMWA and the BCOA entered into the 1974

NBCWA which differed substantially from previous NBCWAs.  Generally the 1974 NBCWA substantially increased benefits and liberalized eligibility requirements for health benefits as well as pensions. The 1974 NBCWA also introduced several entirely new benefits such as lifetime health benefits for disabled mine workers, mine workers' surviving spouses and disabled children.

Specifically, the 1974 NBCWA established four separate trusts: the UMWA 1950 Pension Plan, the UMWA 1974 Pension Plan, the UMWA 1950 Benefit Plan and the UMWA 1974 Benefit Plan (hereinafter collectively the "1974 NBCWA Plans").  The 1950 Pension Plan and 1950 Benefit Plan were to provide pension and health benefits to mine workers that retired prior to January 1, 1976.  The 1974 Pension Plan and 1974 Benefit Plan were to provide pension and health benefits for active miners and those who would retire after January 1, 1976.  The BCOA members funded the 1974 NBCWA Plans by paying not only a per ton fee, but also a flat fee for every hour worked by the UMWA-represented coal miners.

As a result of the increased benefits afforded to beneficiaries and the decline in coal production, as well as contentious negotiations which included a 111-day industry-wide strike,  the 1974 NBCWA Plans quickly faced serious financial difficulties. *Davon v. Shalala,* 75 F.3d 1114, 1117-18 (7th Cir. 1996).  Consequently, the UMWA and the BCOA entered into the 1978 NBCWA which greatly impacted the 1974 Benefit Plan. *Davon,* 75 F.3d at 1118; *Holland v. Double G Coal Co.,* 898 F.Supp. 351, 353-54 (S.D. W. Va. 1995).   Under the 1978 NBCWA, signatory mine operators obtained the contractual right to provide health benefits directly to active and retired miners, rather than through the 1974 Benefit Plan.  The 1974 Benefit Plan and the 1974 Pension Plan were restructured such that (I) the 1974 Benefit Plan and the 1974 Pension Plan had the sole responsibility of funding benefits for "orphaned retirees" – retirees whose last employer went out of business or otherwise ceased contributing to the Plans; and (ii) signatory employers would guarantee all health and pension benefits during the term of the 1978 NBCWA and would be required to contribute to the 1974 Benefit Plan and 1974 Pension Plan as long as they remained

-10-

in the coal business, regardless of whether they signed a subsequent agreement.  Section (ii) is called the Evergreen Clause.[8]

Soon, the BCOA member-employers began to go out of business and signatory coal companies began to withdraw from the 1978 NBCWA.  The 1974 Benefit Plan was left with more orphaned retirees and a smaller funding base to provide for those beneficiaries. See *UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co.,* 99 F.3d 573, 576 (4th Cir. 1996), *cert. denied,* 520 U.S. 1118, 117 S.Ct. 1251, 137 L.Ed.2d 332 (1997) ("the number of employers contributing to the plans declined, the number of orphaned miners increased, and the costs of health care soared.") (citing *LVT Steel Co. v. Shalala (In re Chateaugay Corp.),* 53 F.3d 478, 483-84 (2d Cir. 1995), *cert. denied,* 516 U.S. 913, 116 S.Ct. 298, 113 L.Ed.2d 204 (1995)).  The remaining employers who signed the 1978 NBCWA were forced to deal with the increasing cost of covering the orphaned retirees.

### 3. The 1988 NBCWA; The Pittston Dispute And The Coal Commission

By 1988, it became apparent that the contribution rate specified for the 1974 Benefit Plan was not sufficient to cover its costs. In 1988, the UMWA and the BCOA entered into the 1988 NBCWA that increased the contribution rate from five cents (5¢) to eight cents (8¢) per UMWA-represented worked hour.  This rate increase also proved to be inadequate.  Nevertheless, the 1988 NBCWA also established the UMWA Cash Deferred Savings Plan which would provide additional retirement income to retirees and compensation for inexperienced miners.  The 1974

---

[8]An Evergreen Clause has been included in every subsequent agreement between the UMWA and the BCOA. The clause provides that participating employers are bound to make continuing contributions to the 1974 Pension Plan so long as the employer remains in the coal industry and that the amounts of contribution will be as specified in future agreements. "In other words, an employer who has agreed to participate... at any time-whether by signing a previous NBCWA as a member or non-member of the BCOA, or by signing a different agreement with the [UMWA] that requires the employer to contribute ... is bound by the rates set forth in a new NBCWA, even if that employer is not a BCOA member at the time the new NBCWA is executed, and even if that employer does not affirmatively sign on to the new NBCWA or a similar agreement." *Holland v. Freeman United Coal Mining Co.*, 574 F.Supp.2d 116, 120-22 (D.D.C. 2008) (holding that the coal companies were bound by the Evergreen Clause and required to contribute to the Plans under the new rate).

Benefit Plan continued to struggle.

Meanwhile, when the 1984 NBCWA expired, the Pittston Coal Group, Inc. (hereinafter "Pittston"), a substantial coal industry employer, refused to sign the 1988 NBCWA. Instead, Pittston terminated its labor agreement, ceased to make contributions to the 1974 NBCWA Plans and notified its retirees that it would no longer provide them with health benefits. In lieu of continued participation 1974 NBCWA Plans, Pittston proposed a single employer pension plan and a health plan for its employees and pensioners with deductibles and other cost containment features not provided for under the 1988 NBCWA. Pittston's actions resulted in an over 10 month strike. See *Davon,* 75 F.3d at 1118. Subsequently, Congress sprung into action.

In response to the Pittston dispute, Secretary of Labor Elizabeth Dole intervened and a mediator was appointed to facilitate a settlement. Per the settlement, the Secretary of Labor's Advisory Commission on United Mine Workers of America Retiree Health Benefits (the "Coal Commission") was created to analyze the retired coal miner health care crisis. The Coal Commission was bipartisan and was charged with assessing the financial prospects of the 1950 Benefit Plan and the 1974 Benefit Plan, and formulating recommendations to ensure their long-term viability. At that time, Robert H. Quenon, then President, Chief Executive Officer and Chairman of Peabody, served on the Coal Commission. The 1990 Coal Commission report to the Secretary of Labor observed that: "[r]etired coal miners have legitimate expectations of health care benefits for life; that was the promise they received during their working lives and that is how they planned their retirement years. That commitment should be honored." *Eastern Enterprises,* 524 U.S. at 552 n. 5, 118 S.Ct. at 2161 (citing Secretary of Labor's Advisory Commission on United Mine Workers of America Retiree Health Benefits, Coal Commission Report (1990), quoted in App. 237a, 245a–246a). Mr. Quenon joined in the recommendations and conclusions of the Coal Commission.

## 4. **The Coal Act**

In response to the Coal Commission Report, on December 16, 1993, Congress passed the Coal Industry Retiree Health Benefit Act of 1992 (hereinafter the Coal Act),[9] to ensure uninterrupted benefits to miners and their families.[10] It is worth noting that there were a number of congressional acts which predate the Coal Act.  These include: the 1891 Territorial Mine Inspection Act (which established minimum ventilation requirements at underground mines and prohibited the employment of children under the age of 12, however, inspectors had minimal power to sanction violations);[11] the Federal Coal Mine Safety Act of 1952[12] (which supplemented the 1891 Territorial Mine Inspection Act through the authorization of mine inspectors to sanction mine operators); the Federal Coal Mine Health and Safety Act of 1969[13] (which included specific procedures for the development of mandatory health and safety standards and provided compensation for miners who were permanently disabled); the Black Lung Benefits Act of 1972[14] (which to benefit from a miner must prove that (1) he suffered from pneumoconiosis, the medical term for black lung – a disease developed from the excessive inhalation of coal dust, (2) the pneumoconiosis arose out of coal mine employment, (3) the miner was totally disabled, and (4) the disability was due to pneumoconiosis);[15] the Federal Mine and Safety Act of 1977 (with the purpose of improving working conditions

---

[9]The Coal Act was amended in 2006. All references to the Coal Act and all quotes from its text herein are current as of the 2006 amendment.

[10]Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701 to 9722.

[11]1891 Territorial Mine Inspection Act, § 6, 26 Stat. 1105.

[12]Federal Coal Mine Safety Act of 1952, Pub. L. No. 82-552, 66 Stat. 692 (codified as amended at 30 U.S.C. §§ 451 - 460, 471-483).

[13]The Federal Coal Mine Heath and Safety Act of 1969, Pub. L. No. 91–173, 83 Stat. 742 (codified as amended at 30 U.S.C. §§ 901-04).

[14]Black Lung Benefits Reform Act of 1977, Pub. L. No. 95–239, 92 Stat. 95 (codified as amended in scattered sections of 26 U.S.C., 29 U.S.C. and 30 U.S.C.§§ 801-965).

[15]20 C.F.R. § 725.202(d)(2).

and preventing death and serious harm,[16] the Secretary of Labor was charged to "develop, promulgate, and revise … mandatory health [and] safety standards for [all] coal or other mines"[17] and required periodic, unannounced health and safety inspections);[18] the Surface Mining Control and Reclamation Act (hereinafter "SMCRA") of 1977[19] (an effort to restore land and water resources damaged by coal mining[20] and regulate the environmental effects of coal mining through the establishment of a 'reclamation fee' determined in part by the weight and value of coal produced).[21]

The Coal Act combined the 1950 Benefit Plan and the 1974 Benefit Plan to form the United Mine Workers of America Combined Benefit Fund (hereinafter the "Combined Fund").[22]  The Coal Act also required employers who were providing benefits individually to continue to do so for the life of all of their beneficiaries who have retired or would retire before September 30, 1994.  The Coal Act also created the UMWA 1992 Benefit Plan[23] for those UMWA-represented retirees who were not beneficiaries of the 1950 Benefit Plan or the 1974 Benefit Plan as of July 20, 1992, but would nonetheless become beneficiaries of those two Plans before February 1, 1993, as well as the retirees who might become orphaned.[24]  Because the matters before the Court do not implicate

---

[16] *North Fork Coal Corp. v. Federal Mine Safety and Health Review Comm'n,* 691 F.3d 735, 738 (6th Cir. 2012) (citing 30 U.S.C. § 801(c)).

[17] 30 U.S.C. § 811(a).

[18] Federal Mine Safety and Health Act of 1977, Pub. L. No. 95-164, 91 Stat. 1290 (codified as amended at 30 U.S.C. § 801 *et seq.*).

[19] The Surface Mining Control and Reclamation Act of 1977, Pub. L. No. 95–87, 91 Stat. 445. Congress also reiterated the need to provide health benefits to retired coal miners in the Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776 (codified as amended in various sections of 42 U.S.C.).  The Energy Policy Act was amended in 2005 to provide tax credits to companies that use clean coal technology.

[20] 30 U.S.C. § 1231(a), (c).

[21] 30 U.S.C. § 1232(a).

[22] Note the Combined Fund only concerns the 1950 and 1974 Benefit Plans. The 1950 and 1974 Pension Plans remain separate.

[23] 26 U.S.C. § 9702(a)(3)(B).

[24] 26 U.S.C. § 9712.

the Coal Act or its beneficiaries, the Court will not further delve into the intricacies of the Coal Act
and its tenants.

Since the Coal Act, Congress has taken the following action: In 2006, Congress amended
the SMCRA (which made provision of benefits to orphan retirees in the Combined Fund the
responsibility of the federal government);[25] the Mine Improvement and New Emergency Response
Act of 2006 (which provided new regulations for mine rescue teams);[26] the Pension Protection Act
of 2006 (which requires companies who have underfunded pension plans to pay higher premiums
to the Pension Benefit Guaranty Corporation)[27] and the Tax Relief and Health Care Act of 2006
(which provides additional federal funding to orphan retirees of the 1992 Benefit Plan).[28]

## 5. The Main NBCWAs (1998, 2007 And 2011)

The 1988 NBCWA was revised in 1998, 2007 and 2011.  The agreements largely remained
the same but increased the contribution rates and extended coverage.  The 1998 NBCWA covered
employees that retired before December 31, 1997 and the 2007 NBCWA covered employees that
retired before December 31, 2006.  The 2007 NBCWA expired on December 31, 2011.  The 2007
NBCWA also required employers to make an additional payment to the UMWA Cash Deferred
Savings Plan for inexperienced miners.   In June of 2011, the UMWA and the BCOA entered into
the 2011 NBCWA which covers employees that retired on or before December 31, 2010.  The 2011
NBCWA will expire on December 31, 2016.  Under the terms of the 2011 NBCWA, contributions
to the 1974 Pension Plan were set at a rate of $5.50 per UMWA-represented hour worked, and that

---

[25]Federal contributions were 25% in 2008 and were projected to increase by 25% annually thereafter.

[26]Mine Improvement and New Emergency Response Act of 2006, Pub. L. No. 109-236, 120 Stat. 493 (partially
codified in scattered sections of 29 and 30 U.S.C.).

[27]The Pension Protection Act of 2006, Pub. L. No. 109-208, 120 Stat. 780 (codified in scattered sections of
26 U.S.C.).

[28]The Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, 120 Stat. 2922 (codified at 26 U.S.C. §
1 NOTE).

rate was to increase on an annual basis throughout the life of the 2011 NBCWA.[29]

Under the 2007 NBCWA, certain eligible beneficiaries of the 1974 Pension Plan would receive annual one-time single sum payments in addition to their pension benefits from the 1974 Pension Plan.  These one-time payments would range from $455.00-$580.00.[30]  As previously discussed, the NBCWA was renegotiated and the 2011 NBCWA was created.  Pursuant to the 2011 NBCWA, these annual one-time payments from the 1974 Pension Plan would cease, and, the signatories agreed to create the 2012 Retiree Bonus Account Plan which would be funded separately to make those annual one-time payments.  No 2012 Retiree Bonus Account Plan payments were made in 2012 and none will be made in 2013 to assist with meeting the projected funding requirements.  The 2012 Retiree Bonus Account Plan is scheduled to make annual payments on November 1, 2014, November 1, 2015 and November 1, 2016 to approximately 90,000 of the estimated beneficiaries of the 1974 Pension Plan.[31]

### a. The 1974 Pension Plan

The 1974 Pension Plan provides pension benefits to approximately 93,000 eligible participants and beneficiaries.  These eligible participants are either retired or disabled UMWA-represented employees, or their eligible surviving spouse.[32]  Debtors Heritage Coal Co., Eastern Associated Coal, LLC, Apogee Coal Co., LLC, Hobet Mining, LLC and Highland Mining Company, LLC, are all obligated to contribute to the 1974 Pension Plan pursuant to the 2011 NBCWA and/or those Debtors' Individual Employer Plans which adopted Article XX of the 2011 NBCWA.  Currently,

---

[29] Joint Ex. 260.

[30] Joint Ex. 264; Stover Declaration in Support of Objection and Joinder of the United Mine Workers of America 2012 Retiree Bonus Account Trust (hereinafter "Stover 2012 Retiree Bonus Declaration"), ¶ 7. Mr. Dale Stover is the Director of Finance and General Services for the UMWA Health & Retirement Funds and this Court has admitted his Declarations and Deposition Designation into evidence without objection.

[31] Joint Ex. 264, Stover 2012 Retiree Bonus Declaration, ¶ 9.

[32] Joint Ex. 257, Stover Declaration in Support of Objection of the UMWA 1974 and 1993 Plans (hereinafter "Stover 1974/1993 Declaration"), ¶ 9.

Debtors contribute approximately $21 million dollars annually to the 1974 Pension Plan or 17% of the 1974 Pension Plan's annual revenue,[33] and it is projected that through 2016, Debtors will contribute another estimated $74 million dollars.[34]  These contributions are also governed by the previously discussed Evergreen Clause which provides in pertinent part that an employer must continue to contribute to the 1974 Pension Plan or otherwise suffer withdrawal liability.  There are diverging arguments as to whether such withdrawal liability, which is estimated to be approximately $1 billion dollars, could be paid in installments or if it must be handled as one lump sum pursuant to at least Sections 1399(c), 4201 and 4219 of ERISA.

Also of note is that a funded percentage of 80% of liabilities must be maintained for multi-employer pension plans such as the 1974 Pension Plan. If a plan is determined to have a funded percentage of less than 80% it will be deemed to be "Endangered" or "Seriously Endangered."  If the number of years to reach a projected funding deficiency equals seven (7) or less, and if the plan has less than 65% of the funding required to meet its obligations, the plan will be deemed to be in "Critical Status."  The 1974 Pension Plan is currently considered to be "Seriously Endangered" after an actuary determined on July 1, 2011 and again on July 1, 2012 that the 1974 Pension Plan funding was less than 73%.[35]  The 1974 Pension Plan's actuary has provided projections which show that come July 1, 2014, the 1974 Pension Plan will enter "Critical Status."[36]  The drastic underfunding of the 1974 Pension Plan is in large part due to the 2008-2009 collapse of the financial markets because at the end of 2006, the 1974 Plan was 93% funded.[37]

---

[33] Stover Dep. 33:19, April 16, 2013.

[34] Joint Ex. 257, Stover 1974/1993 Declaration, ¶ 17.

[35] Joint Ex. 257, Stover 1974/1993 Declaration, ¶ 13.

[36] Stover Supplemental Declaration, ¶ 4 [ECF No. 3919].

[37] Joint Ex. 257, Stover 1974/1993 Declaration, ¶ 13.

*b. The 1993 Benefit Plan*

In 1993, the UMWA and the BCOA entered into the1993 NBCWA which created the 1993

Benefit Plan.  This was an effort to provide health care benefits to orphan retirees who retired after

September 30, 1994 – individuals not covered under the Coal Act's 1992 Benefit Plan. The 1993

Benefit Plan only covered retirees of certain signatory companies who have gone out of business

and have defaulted in the provision of retiree benefits. To be eligible, retirees and their dependants'

last signatory employer must have had an obligation to contribute to the 1993 Benefit Plan and

actually have contributed.[38] The 1993 Benefit Plan was funded from employers' contributions based

on hours worked in the mines.

The 1993 Benefit Plan Agreement and Declaration of Trust, which became effective as of

December 16, 1993 and amended and restated as of July 1, 2011, makes reference to Article XX

of the 2011 NBCWA.[39] Article XX of the 2011 NBCWA provides a "General Description of the Health

and Retirement Benefits" which states that:

> [t]he parties expressly agree that the language references to "for life"
> and "until death" that are retained in this General Description are
> intended to mean that each Employer will provide, for life, only the
> benefits of its own eligible retirees who retire during the term of this
> Agreement. A retiree shall be considered to be a retiree of an
> Employer if his last signatory classified employment was with such
> Employer. The benefits and benefit levels provided by an Employer
> under its Employer Plan are established for the term of this Agree-
> ment only, and may be jointly amended or modified in any manner
> at any time after the expiration or termination of this Agreement.[40]

There are approximately 11,000 beneficiaries of the 1993 Benefit Plan.  The 1993 Benefit

Plan has two main sources of funding: transfers mandated by the SMCRA, as amended in 2006,

and employer contributions.  The SMCRA funding only benefits those retirees who enrolled into the

---

[38] Limited coverage under a separate program of benefits was provided for retirees of employers who did
not contribute substantially all amounts owed to the 1993 Benefit Plan.

[39] Joint Ex. 261.

[40] Joint Ex. 260, at p. 173.

1993 Benefit Plan before December 31, 2006. Approximately 3,000 beneficiaries were enrolled in the 1993 Benefit Plan after December 31, 2006, and therefore the benefits for those individuals depend entirely on employer contributions.[41] Debtors' current annual contribution to the 1993 Benefit Plan is approximately $3.7 million dollars or 16.2% of the annual revenue to the 1993 Benefit Plan.[42] It is projected that through 2016, Debtors are expected to contribute another estimated $12.8 million dollars.[43]

### c. The 2012 Retiree Bonus Account Plan

Debtors currently contribute approximately $4.4 million dollars annually to the 2012 Retiree Bonus Account Plan and are projected to contribute another estimated $15.3 million dollars through 2016.[44] Approximately 51,000 beneficiaries of the 1974 Pension Plan are also eligible to receive the annual payment from the 2012 Retiree Bonus Account Plan.[45] As will be discussed in more detail below, Debtors 1113/1114 Motion proposes to cease contributions to the 1993 Benefit Plan and the 2012 Retiree Bonus Account Plan. The current proposal also proposes to cease contributions to the 1974 Benefit Plan unless certain assurances are provided in writing.

### 6. The Coalfield Accountability And Retired Employee Act

Currently before Congress is the Coalfield Accountability and Retired Employee Act which if passed would amend the SMCRA to create a stream of excess funds to the 1974 Pension Plan from the revenues of the Office of Surface Mining – a system which is already in place for the Combined Fund, as well as the 1992 Benefit Plan and the 1993 Benefit Plan. The Coalfield

---

[41] Joint Ex. 257, Stover 1974/1993 Declaration, ¶ 37.

[42] Joint Ex. 257, Stover 1974/1993 Declaration, ¶ 39.

[43] Joint Ex. 257, Stover 1974/1993 Declaration, ¶ 38.

[44] Joint Ex. 264, Stover 2012 Retiree Bonus Declaration, ¶ 12.

[45] Joint Ex. 264, Stover 2012 Retiree Bonus Declaration, ¶ 13.

Accountability and Retired Employee Act would also make any retiree who loses benefits following the bankruptcy or insolvency of his or her employer eligible for the 1992 Benefit Plan.[46]

**E. The History Of Debtor Patriot Coal Corporation**

Having exhaustively discussed the history of coal miner benefits, the Court will now discuss how Debtors became liable to provide those benefits both to its current employees and the majority of retirees that will be affected by the relief requested in the 1113/1114 Motion. This inquiry begins with a discussion of how Debtor Patriot Coal Corporation became an independent corporation.

**1. The Spin-Off From Peabody**

Debtor Patriot Coal Corporation is the direct or indirect parent of each of the other ninety-eight Debtors.[47] Prior to October 31, 2007, Debtor Patriot Coal Corporation and a number of its subsidiaries were wholly owned subsidiaries of Peabody, the world's largest private-sector coal company. On October 31, 2007, Patriot was spun-off from Peabody through a dividend of all of its outstanding shares. In exchange for stock in Debtor Patriot Coal Corporation, Peabody and Peabody Holding, an indirect wholly owned subsidiary of Peabody, contributed certain mining operations to Debtor Patriot Coal Corporation, together with the retiree health care liabilities associated with those operations. Those contributed mining operations from Peabody and Peabody Holding included at least the following: Debtor Heritage Coal Company, LLC (formerly Peabody Coal Company), Debtor Eastern Associated Coal, LLC, Debtor Highland Mining Company, LLC, Debtor Colony Bay Coal Company, Debtor Mountain View Coal Company, LLC, Debtor Pine Ridge Coal Company, LLC and Debtor Rivers Edge Mining, Inc. Peabody in turn distributed the outstanding shares of Debtor Patriot Coal Corporation stock to its shareholders. As a result of the

---

[46] See February 22, 2013 Press Release: Rockefeller Defends Retired Coal Miners' Benefits, http://www.rockefeller.senate.gov/public/index.cfm/press-releases?ID=6fed7356-26cd-4955-8348-6f8f2ce 939de, last visited May 11, 2013; see also Stover Dep., 55:10-25, April 16, 2013.

[47] Joint Ex. 159, Hatfield Declaration, ¶ 15.

spin-off, Debtor Patriot Coal Corporation became a separate, public company.[48] The spin-off was set forth in various agreements, portions of which were filed with the Securities Exchange Commission on October 22, 2007.[49] Following the spin-off, Debtor Patriot Coal Corporation became the independent parent of 64 subsidiaries.

With regard to Debtor Heritage Coal Company, LLC, Peabody Holding and Debtor Patriot Coal Corporation entered into an NBCWA Individual Employers Liabilities Assumption Agreement whereby Peabody Holding agreed to pay any liabilities incurred for the provision of health care benefits for 3,100 retired miners (hereinafter the "Peabody-Assumed Group").  Without this agreement, Debtor Patriot Coal Corporation would not have been adequately capitalized at its inception.[50]

Prior to the spin-off, Peabody's retiree health care liabilities were $855.8 million dollars. Following the spin-off, Peabody's health care liabilities were reduced by $617 million dollars.[51] Also, some management at Peabody was involved with the creation of Debtor Patriot Coal Corporation, many of whom became executive members or members of Debtor Patriot Coal Corporation's Board of Directors.  These individuals are generally no longer employed at Peabody or Debtor Patriot Coal Corporation.

**2. The Acquisition Of Magnum Coal Company**

Effective December 31, 2005, Arch sold 100% of the stock of three Arch subsidiaries, Hobet Mining, Apogee Coal Company and Catenary Coal Company,[52] and the associated mining

---

[48]Joint Ex. 159, Hatfield Declaration, ¶ 16.

[49]Joint Ex. 162, Peabody Form 8-K, October 22, 2007.

[50]This Court will discuss the separately filed adversary concerning the Peabody-Assumed Group below.

[51]See Ex. E to Debtor Patriot Coal Corporation's Motion for Summary Judgement in Adversary 13-4067, Peabody Form 10-K, December 31, 2007, p. 17.

[52]Those three subsidiaries also include the following mining operations: Hobet 21, Arch of West Virginia, Samples and Campbells Creek.

operations and coal reserves of those subsidiaries, to Magnum Coal Company (hereinafter "Magnum"). All of these mining operations are located in Central Appalachia. This transaction allowed Arch to assign to Magnum only 12.3% of its assets but also, 96.7% of Arch's retiree health care liabilities.[53]

On April 2, 2008, Debtor Patriot Coal Corporation announced that it signed an agreement to purchase Magnum. Magnum stockholders were to receive 11.9 million shares of newly issued Debtor Patriot Coal Corporation common stock.[54] Prior thereto, as mentioned above, Magnum acquired substantial assets and retiree benefit liabilities from Arch. At the time of its acquisition by Debtor Patriot Coal Corporation, Magnum was one of the largest coal producers in Appalachia. A substantial portion of those mining complexes were operated by UMWA-represented labor.[55]

The acquisition of Magnum became effective on July 23, 2008 and caused Debtor Patriot Coal Corporation to assume Magnum's liabilities for health care benefits to current and former employees of Magnum and other entities associated with Arch. As such, over 90% of the health care beneficiaries who now receive post-retirement benefits from Debtors were former employees or dependents of former employees of Peabody, Arch or their subsidiaries, and never worked one day for Debtors.

### 3. Debtors' Operations

Debtors employ approximately 4,200 employees and contractors. 41% of Debtors' active employees are represented by the UMWA.[56] Over 2,900 of Debtors' employees are miners and approximately 57% of Debtors' miners are represented by the UMWA. Prior to seeking bankruptcy relief, Debtors instituted several lay-offs which were disproportionately borne by non-union miners.

---

[53] Joint Ex. 160, Amended Traynor Declaration, ¶ 15.

[54] See Joint Ex. 265; Whiting Dep. 59:9-61:4, 63:17-34:4, April 22, 2013.

[55] Joint Ex. 159, Hatfield Declaration, ¶¶ 16-17.

[56] Joint Ex. 159, Hatfield Declaration, ¶¶ 19-20.

Before those pre-bankruptcy lay-offs, approximately 50% of Debtors' miners were non-unionized and the other 50% were unionized.

Debtors mine, buy and sell coal. As of December 31, 2012, Debtors operated eleven mining complexes (groups of mines) which are located in the Illinois Basin and Appalachia regions.[57] Debtors' mining methods include underground longwall mining where cutting equipment is moved across a wall of exposed coal, underground continuous mining where machines called "continuous miners" are used to cut through underground seams of coal, and surface mining where soil and rocks, called "overburden," are removed so that the coal that is near the surface can be removed.[58] All underground coal that is mined, whether by longwall mining or continuous mining, is thereafter transported to the surface by various machines such as shuttle cars or conveyor belts. Once extracted, Debtors crush, size and wash the coal before it is sold and transported to Debtors' customers. The coal is typically transported to customers by land, rail or barge.

On November 15, 2012, Debtors and the Ohio Valley Environmental Coalition, Inc., West Virginia Highlands Conservancy, Inc. and the Sierra Club entered into an agreement to settle certain environmental litigation. As part of the proposed settlement, Debtors agreed to certain restrictions on large-scale surface mining activities.[59] Debtors' plan to decrease surface mining in the coming years.

In 2011, Debtors sold 31.1 million tons of coal, however in 2012, Debtors only sold 24.9 million tons.[60] Because of Debtors' production and labor costs, in addition to various other reasons, it is at times more economical for Debtors to buy coal from other companies to supply Debtors' customers rather than to mine coal at Debtors' mining complexes. The result is that Debtors mine

---

[57]Joint Ex. 159, Hatfield Declaration, ¶ 9; Joint Ex. 135, Schwartz Declaration, ¶ 12.

[58]Joint Ex. 159, Hatfield Declaration, ¶ 10.

[59]Joint Ex. 159, Hatfield Declaration, ¶ 10 n.4.

[60]Joint Ex. 159, Hatfield Declaration, ¶ 12.

less coal than is sold and must purchase coal to fill the gaps between the coal Debtors actually excavate and the coal Debtors need to supply their customers.[61]

Approximately three-quarters of the coal sold by Debtors in 2012 was thermal coal.[62]  The remaining coal mined by Debtors is by and large metallurgical coal.  Debtors' metallurgical coal was sold to coal brokers and coke producers, both domestic and abroad.[63]

The Appalachia and Illinois Basin Regions where Debtors principally operate is highly competitive.[64]  Many of Debtors' competitors mine in those regions as well, including Alpha Natural Resources, Inc., CONSOL Energy Inc., Alliance Resource Partners, L.P., and Peabody.[65]

## F. Causes Of Debtors' Bankruptcy Filing

## 1. <u>Retiree Benefit Obligations</u>

There are several events that catalyzed Debtors' bankruptcy filing.  Above all other reasons however are the liabilities that Debtors inherited from Peabody and Arch.  Debtors' retiree health care obligations are presently at astronomical levels.  The estimated present value of Debtors' retiree benefit obligations exceeds $1.6 billion.  Additionally, Debtors inherited below-cost coal contracts from both Peabody and Arch whereby the cost to Debtors to excavate and prepare the coal exceeds the price at which Debtors must sell the coal.  Consequently, the cost to Debtors to service some of these below-market coal contracts has contributed to the deterioration of Debtors' finances.

As of February 28, 2013, Debtors paid for or administered retiree health care benefits to approximately 21,000 individuals. Of that total, Debtors paid the health care benefits for

---

[61] Joint Ex. 159, Hatfield Declaration, ¶ 12 n.5.

[62] Joint Ex. 159, Hatfield Declaration, ¶ 12.

[63] Joint Ex. 159, Hatfield Declaration ¶ 12.

[64] Joint Ex. 159, Hatfield Declaration, ¶¶ 40-56; Joint Ex. 135, Schwartz Declaration, ¶¶ 13-22, 28-40, 42-50.

[65] Joint Ex. 159, Hatfield Declaration, ¶ 40.

approximately 8,100 retirees and dependents who receive benefits pursuant to the 2011 NBCWA as adopted by various Individual Employer Plans.  It is generally the case that Debtors' UMWA-represented retirees receive free mail-order prescription drugs, have $12.00 co-payments for visits to physicians, have a maximum out-of-pocket cost of $240.00 per family per year, and do not pay co-insurance.  In 2012, Debtors spent approximately $83 million dollars on retiree health care which derived from the 2011 NBCWA.[66]

Debtors have also financed benefits administered pursuant to the Coal Act for more than 2,300 retirees and dependents, and other benefits for approximately 1,200 non-union retirees and dependents.  As previously indicated, under the Coal Act, Debtors must contribute to the 1992 Benefit Plan.  In 2012, Debtors spent approximately $14 million dollars in satisfaction of its Coal Act health care obligations.  As of December 31, 2012, Debtors estimate the present value of its Coal Act liabilities to be approximately $134.7 million dollars.[67]  Debtors will continue to meet their Coal Act obligations and do not seek any modification thereto in Debtors' 1113/1114 Motion.  As previously mentioned, Debtors also contribute to the 1993 Benefit Plan ($3.7 million dollars in 2012) and the 2012 Retiree Bonus Account Plan ($4.4 million dollars in 2012).[68]

As for the 1974 Pension Plan, in 2007, Debtors contributed $2.00 per UMWA-represented hour worked, and presently, Debtors contribute $5.50 per hour for the same.  Debtors anticipate that this contribution rate will increase to a minimum of $12.50 per UMWA-represented hour worked in 2017 and to $21.50 per UMWA-represented hour worked in 2020. Debtors spent approximately

---

[66]Joint Ex. 159, Hatfield Declaration, ¶¶ 95-96.

[67]Joint Ex. 159, Hatfield Declaration, ¶ 95(b); Joint Ex. 97, Lucha Declaration ¶ 15 .

[68] Debtors also cite other anticipated health care related losses of revenue, namely, that because the Early Retiree Reinsurance Program exhausted its pool of funds in 2011, Debtors will no longer receive any refunds from this Program going forward.  In 2010 and 2011, Debtors received $7.6 million dollars in refunds from this Program.  Debtors also state that under the Patient Protection Affordable Care Act, Debtors will be required to cover an additional 440 dependents of employees who are under the age of 26 – an expense Debtors today estimate to cost an additional $1.5 million dollars.

$20.8 million dollars in 2012 on contributions to the 1974 Pension Plan.[69]    It is also anticipated, without certainty, that the pension obligations to the 1974 Pension Plan will increase because of the "Seriously Endangered Status" previously discussed.[70]

There is little dispute that today, Debtors must shoulder well over $1.6 billion in health care obligations for its UMWA retirees, and that the number of retirees that Debtors supports outnumber Debtors' roster of current employees at least fivefold.  Of Debtors' main competitors, only CONSOL Energy Inc. (hereinafter "CONSOL") makes similar expenditures for retiree benefits, however, CONSOL is a more diversified enterprise in that it is a larger company than Debtors, most of CONSOL's mining operation consists of longwall mining which is generally more productive and CONSOL sells both coal and natural gas and therefore, CONSOL is better insulated to withstand market volatility.  As such, when retiree benefits are measured against revenues, Debtors' Retiree Benefits costs constitute double the share of Debtors' revenues than that of its competitors.[71] These exorbitant retiree health care and pension costs have in-part precipitated Debtors' bankruptcy filing.

## 2. <u>The Decline Of The Price Of Coal</u>

Nobody disputes that in recent years, the demand and price of coal have drastically declined.   This is believed to be caused in part because of technological advances in hydraulic fracking, which is generally a more efficient means of extracting shale gas (natural gas) from the earth.  Natural gas can be used as an energy source to produce electricity in lieu of coal.  Other electricity generators have relied on renewable sources of energy such as wind.  Also, the winter of 2011-2012 was mild and as a result, consumption of electricity to heat homes was lower than that of years past.  This is also true of the 2012-2013 winter.  Generally, from January 2011 through

---

[69]Joint Ex. 97, Lucha Declaration ¶¶ 31-35.

[70]Joint Ex. 97, Lucha Declaration ¶¶ 33-34.

[71]Joint Ex. 119, Huffard Declaration ¶ 63 (where the Other Post-Employment Benefits of Debtors in relation to some of Debtors' competitors is discussed, compared and contrasted).

January 2013, the prices for thermal coal have decreased for coal produced in the Central Appalachian Region by approximately 19%, decreased by approximately 12% for coal produced in the Northern Appalachia and decreased by 16% for coal produced in the Illinois Basin.[72]

The fate for metallurgical coal was similar because of production growth in China, India and the United States, as well as other countries, which has generally slowed and consequently the demand for steel to build new infrastructure has decreased.[73]  With a lower demand for steel, there is a lower demand for coke, which is produced from metallurgical coal.[74]

The Australian Hard Coking Coal Index is the premier internationally-used indicator for metallurgical coal benchmark pricing, and it indicates that from the second quarter in 2011 through the first quarter in 2013, the price per metric ton decreased from $330.00 to $165.00.[75]  And, based on these benchmark prices, it became evident that the price to produce metallurgical coal at some of Debtors' mines exceeded the market price at which that coal could be sold.

Debtors' recent performance has been poor.  In 2012, Debtors suffered a 21% decline in coal sale revenues, a net loss of $730.6 million dollars, and negative free cash flow of $190.6 million dollars.  Debtors' net loss has more than quintupled over the past year, from $139.1 million dollars in 2011.[76]

### 3. Environmental And Operational Regulations

Additionally, the Environmental Protection Agency has promulgated air quality standards which curtail air emissions, some of which are in effect and some of which will take full effect in the upcoming years.  Both federal and state governments have implemented increased regulations on

---

[72]Joint Ex. 119, Huffard Declaration ¶ 17.

[73]Joint Ex. 119, Huffard Declaration ¶¶ 21-25.

[74] Joint Ex. 159, Hatfield Declaration, ¶ 43; Joint Ex. 135, Schwartz Declaration, ¶ 29; Joint Ex. 119, Huffard Declaration ¶ 22.

[75]Joint Ex. 119, Huffard Declaration, ¶ 24 (Graph 6).

[76]Joint Ex. 159, Hatfield Declaration, ¶ 57; Joint Ex. 119, Huffard Declaration, ¶ 73.

the permitted emissions by coal-fueled power plants for which compliance has been uniquely difficult due to the many challenges – especially financial – to reducing pollutants when coal is burned.[77]  Further, federal and state agencies have developed financial incentives that discourage the use and development of coal-fueled electricity generators and actively encourage the use of fuels other than coal.[78]

In 2012, Debtors spent approximately $43.6 million dollars on selenium treatment and related activities and $46.8 million dollars on reclamation.  Reclamation involves water treatment (other than selenium treatment which will be discussed separately) and the restoration to the surface of a coal mine to at least its pre-mining conditions.  Debtors were also required to close several mines that could not be brought into compliance with environmental requirements.

Debtors' finances were also strained by adverse decisions in various environmental lawsuits.[79]  Debtors have incurred hundreds of millions of dollars in costs to comply with new laws and regulations, and will continue to incur significant compliance costs in the future.  This is particularly exemplified by the heightened, albeit long-overdue, water quality requirements which consequently involve increased environmental compliance before mining permits are issued.  Like other coal mine operators, Debtors must now install costly water-treatment facilities at certain of their mining complexes which will likely cost hundreds of millions of dollars over the next several years to comply with these and other environmental obligations.  Mining permits have also been conditioned on Debtors' ability to maintain certain conductivity levels which reflect levels of salt, sulfides and other chemical constituents present in water.[80]  While these means justify the ends, it is worth noting that these means will nonetheless affect Debtors' financial situation.  Debtors, like

---

[77] Joint Ex. 159, Hatfield Declaration, ¶¶ 46-51; Joint Ex. 135, Schwartz Declaration, ¶¶ 23-25; Joint Ex. 119, Huffard Declaration, ¶¶ 13-15.

[78] Joint Ex. 159, Hatfield Declaration, ¶¶ 49-50.

[79] Joint Ex. 159, Hatfield Declaration, ¶¶ 73-81; Joint Ex. 135, Schwartz Declaration, ¶¶ 23-27.

[80] Joint Ex. 159, Hatfield Declaration, ¶ 75-76.

many of Debtors' competitors, have also received adverse court dispositions in environmental cases.  As a result of these lawsuits – and related court orders and consent decrees – Debtors recorded $443 million dollars in asset retirement obligations on selenium water treatment projects as of December 31, 2012.[81]

Other long overdue regulatory obligations that will negatively affect Debtors' bottom-line include the required use of self-contained self-rescuers.  In the event of an emergency, these rescuers will provide underground miners with breathable air.  Debtors are also required to install refuge shelters in underground coal mines which are intended to enable underground miners to re-equip, communicate, and/or wait for help.  Debtors must also increase the use of "rock dust" (or the like) in underground mines which can help to prevent coal dust explosions.  Debtors' compliance with all of the above, while reasonably predictable over the course of the past few years, have affected Debtors' viability.

**G. Actions Taken Pre 1113/1114 Motion**

**1. <u>Cost-Saving Actions</u>**

Debtors initially engaged the financial expertise of its advisors, Blackstone Advisory Partners L.P. (hereinafter "Blackstone") and AlixPartners Services, LLC ("Alix").  In July 2012, Blackstone and Alix, together with Debtors, created a long-term business plan for Debtors (hereinafter "July 2012 Business Plan").  At that time, it was apparent that Debtors would run out of money by the end of the summer of 2012 unless Debtors were able to secure Debtor In Possession financing.  Included in the July 2012 Business Plan were potential savings with respect to active employee labor and the efficiency of Debtors' coal mines.  As a result, in 2012, Debtors closed and idled several mines, including the Big Mountain complex, the Bluegrass complex and the Kanawha Eagle complex. which consequently decreased thermal coal production by 3.9 million tons.  It was determined that the thermal coal produced from those mines could not be sold at a

---

[81] Joint Ex. 159, Hatfield Declaration, ¶ 77.

profit.  Likewise, Debtors decreased production at their unprofitable metallurgical mines, namely the Rocklick complex and the Wells complex, and delayed expansion of Debtors' program to increase production at Debtors' more profitable metallurgical coal mines.  The net consequence was the decreased production of approximately 1.9 million tons of metallurgical coal.  Debtors also considerably decreased expenditures in 2012 for continuous miner machines, earth-moving machines, shearing machines which are used in underground longwall mining to remove coal, shuttle cars and conveyors.    Once Debtors' Chapter 11 cases were filed, Debtors also rejected or renegotiated numerous unprofitable coal supply contracts which Debtors inherited from Arch through the acquisition of Magnum and Peabody.  Those contracts required Debtors to supply coal to customers at below-market prices, and at times, prices below the cost of production.  Debtors were also able to reject unfavorable equipment leases, property leases and royalty leases.  Debtors believe that these actions resulted in considerable savings in 2012.

Debtors also discontinued the use of contractors at various mines, which resulted in laying-off nearly 640 non-union employees.[82]  Effective March 1, 2013, Debtors imposed wage reductions for many of its hourly and all of its salaried employees.  The hourly wage adjustment will affect approximately one-half of Debtors' non-union workforce.[83]  From early 2012 through early 2013, Debtors reduced the number of management personnel by 78 people which Debtors believe resulted in savings of approximately $11.3 million dollars per year.[84]  In the middle of April 2013, Debtors also settled the Motion to Modify and Terminate Certain Non-Vested Benefits for Non-Union Retiree Benefit Participants, which Debtors estimate will result in significant savings.[85]

Debtors also made the following reductions to the medical benefits available to their non-

[82]Joint Ex. 159, Hatfield Declaration, ¶¶ 83-85.

[83]Joint Ex. 159, Hatfield Declaration, ¶ 92(a).

[84]Joint Ex. 159, Hatfield Declaration, ¶ 90(a).

[85]See generally Joint Ex. 159, Hatfield Declaration, ¶ 91(c).

unionized employees: introduced employee premium contributions at 10% of monthly premium cost; increased the annual out-of-pocket maximum from $1,200.00 per person to $2,000.00 per person and from $3,600.00 per family to $4,000.00 per family; introduced working spouse coverage requirements; reduced the list of medication (the formulary) of covered drugs; implemented traditional step therapy programs to all available drug classifications; and eliminated coverage for the PPI (ulcer) drug classification.  Debtors project that these changes will result in significant savings.[86]

Debtors also made two changes to their long-term disability benefits for non-union employees.  First, the duration of long-term disability benefits for salaried employees was reduced to a maximum duration of 60 months.  Second, the long-term disability benefits were eliminated for non-union hourly employees in the Midwest and replaced with the Sickness and Accident Benefits which is already in place for the non-represented hourly employees in West Virginia with a maximum benefit of 52 weeks.[87]

Additionally, Debtors have eliminated their charitable contributions, lowered the cost of the lease at Debtors' St. Louis Headquarters and reduced the cost to outsource Debtors' information systems.  Also, since these Chapter 11 cases were filed, Debtors have not made certain interest payments on pre-petition unsecured debt.

## 2. Debtor In Possession Financing

As previously indicated, at the time of Debtors' bankruptcy filing, Debtors were set to run out of money no later than August 2012 unless Debtors were able to secure Debtor In Possession (hereinafter "DIP") financing.  The July 2012 Business Plan was created in large part to secure Debtor in Possession financing.  Blackstone, particularly Mr. Paul P. Huffard, Senior Managing Director in the Restructuring & Reorganization Group of Blackstone (hereinafter "Mr. Huffard"), was

---

[86] Joint Ex. 159, Hatfield Declaration, ¶ 91(a).

[87] Joint Ex. 159, Hatfield Declaration, ¶ 91(d).

intimately involved in the DIP Financing process, and testified to the various steps that were undertaken to create the July 2012 Business Plan. The process to create the July 2012 Business Plan began in May of 2012 with an evaluation of refinancing options at a time when Debtors were significantly underperforming based on prior projections.[88]  On a motion made July 9, 2012, and granted August 3, 2012, the Bankruptcy Court for the Southern District of New York entered the final order Authorizing Debtors to Obtain Post-Petition Financing up to the aggregate principal amount of $802,000,000.00 which consists of the First Out Facility and the Second Out Facility. Specifically, the Bankruptcy Court for the Southern District of New York found that: good cause was shown; Debtors needed to obtain the full amount of the financing to permit the orderly continuation of Debtors' operations; the terms of the financing are fair and reasonable, reflect Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration; the Financing has been negotiated in good faith and at arm's length among Debtors and the other relevant parties.[89]  The UMWA did not object to entry of the order Authorizing Debtors to Obtain Post-Petition Financing.  Since Debtors secured DIP Financing, Debtors' financial condition, as well as the coal market in general, has further deteriorated.

**H. Interaction, Document Sharing And Negotiations With The UMWA**

**1. Debtors' October 2012 Business Plan**

In October 2012, Debtors, Blackstone and Alix made adjustments to the July 2012 Business Plan to more accurately reflect changes to coal market projections for both thermal and metallurgical coal, in addition to the anticipated direction of Debtors' Chapter 11 cases (hereinafter

---

[88]1113/1114 Hr'g Tr. 30:2-21, April 30, 2012.

[89]See Final Order (I) Authorizing Debtors (A) To Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), and (B) To Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Pre-Petition Secured Lenders Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364, § 5, August 3, 2013 [ECF No. 275].

the "October 2012 Business Plan"). The October 2012 Business Plan reflects anticipated revenue through the sale of coal until 2016, as well as Debtors' anticipated costs in the form of production costs, labor costs, retiree costs and compliance costs.[90] The October 2012 Business Plan also contemplated pre-labor savings in the form of contract rejections and renegotiations, debt restructure, reductions in capital expenditures and non-union labor and retiree savings. After implementation of the pre 1113/1114 Motion savings, Debtors, Blackstone and Alix determined that in order for Debtors to be a viable going concern, and in order to obtain exit financing upon Debtors' emergence from bankruptcy, an additional $150 million dollars in annual savings would be required. These savings would be required to ensure that Debtors would have sufficient cash flow over the years to repay and refinance the exit financing. As will be laid out below, Debtors now propose to make various modifications to the CBAs of certain Debtors and to divest Debtors of the responsibility to provide Retiree Benefits and pensions.

## 2. Pre-Filing Interactions, Negotiations And Document Sharing

On Monday July 9, 2012, Mr. Bennett K. Hatfield, Debtors' current President and CEO (hereinafter "Mr. Hatfield"), contacted Mr. Cecil Roberts, International President of the UMWA (hereinafter "President Roberts"), to inform him that Debtors would be filing a bankruptcy petition and that concessions from the UMWA miners would be sought. Other high-ranking UMWA officials were also notified of Debtors' bankruptcy soon thereafter. While initially represented to President Roberts that proposals would be forthcoming soon, at an in-person meeting held on September 10, 2012, Mr. Hatfield informed President Roberts that the development of proposals was difficult and had been complicated by the deterioration of the coal market which in fact, presented challenges to Debtors' July 2012 Business Plan. When Debtors determined that they would seek $150 million dollars in annual concessions from the UMWA-represented labor force after the creation of the October 2012 Business Plan, Debtors engaged the UMWA.

---

[90] Joint Ex. 119, Huffard Declaration, ¶ 44.

To facilitate the production of information to the UMWA which would be required for the UMWA to evaluate the impending Section 1113 and 1114 proposals, Debtors created an online Data Room, to which Debtors could post relevant documents and the UMWA could access those documents. On or about October 17, 2012, after certain confidentiality agreements were executed, Debtors provided access to both the UMWA and PricewaterhouseCoopers LLP (hereinafter "PwC") which provided advisory services to the UMWA in these cases. At that time, the Data Room contained approximately 11,000 pages of material. By Thursday, December 6, 2012, 13 individuals from the UMWA, 11 individuals from PwC, and seven (7) individuals from law firms representing the UMWA, were provided access to the Data Room.

Also in October of 2012, the UMWA began to request specific information of Debtors, in the form of written and oral requests from PwC.[91] On Wednesday, October 31, 2012, PwC issued the first of multiple written requests for information from Debtors. On November 15, 2012, Debtors presented their First 1113 Proposal and First 1114 Proposal (hereinafter collectively "Original Proposals"). That same day, an initial meeting was held between Debtors and the UMWA to attempt to reach a consensual resolution to the matter. Debtors made a power-point presentation to the UMWA at that meeting which provided, among other things, an overview of the Original Proposals, Debtors' financial condition and implications of the DIP Loan, Debtors analysis of the cost-per-hour for the UMWA-represented employees in relation to Debtors' non-unionized employees, and Debtors' coal market projections.[92] This meeting lasted approximately three and one-half hours (3.5 hrs.). On December 6, 2012, Debtors provided the UMWA with a Revised Savings Summary which demonstrated the savings that Debtors anticipated from the sought Section 1113 relief.[93]

---

[91] Joint Ex.1, Robertson Declaration, ¶ 21.

[92] Joint Ex. 10.

[93] Joint Ex. 13.

Since November of 2012, Debtors and the UMWA have engaged in over 14 negotiation sessions for over 60 hours, in addition to dozens of conference calls and hundreds of e-mail exchanges. The UMWA either directly or through PwC has made more than 18 written requests for information, with additional informal requests made during conference calls, meetings and e-mail. In total, the UMWA has made more than 200 requests, more than 100 of which were requests for health care utilization data. Many of these requests were exceptionally broad, and it is clear to this Court, that many had little to do with the specifics of the Proposals but rather other potential impeding litigation. For example, the 17th Request made by PwC on behalf of the UMWA requested "all potential evidence" relating to certain potential claims against Peabody and Arch, minutes from all board meetings for Debtors Patriot Coal Corporation, extensive historical financial data including: (I) historical annual capital expenditures on an overall company basis from 2006 through 2008; (ii) historical annual Repair and Maintenance expense amounts on an overall company basis from 2006 through 2009; (iii) historical year-end property, plant, and equipment balances for the years 2006 through 2011 on a cost basis and on a net book value basis; and (iv) sample Capital Expenditure Authorizations for projects greater than $500,000.00; (v) specific support for the assertion that retirees in the VEBA will be able to avail themselves of benefits provided by Patient Protection Affordable Care Act (hereinafter "PPACA").[94] Debtors responded to the majority of the items requested in the 17th request for information throughout the course of this process and provided specific PPACA-related information.[95]

The UMWA's 18th request for information was made on April 18, 2013.[96] On April 25, 2013, Debtors and the UMWA met for the 15th time at UMWA Headquarters in Triangle, VA. At this meeting, Debtors supplied the UMWA with the Fifth 1113 Proposal. The Fifth 1113 Proposal was

---

[94] Joint Ex. 79.

[95] See Joint Ex. 80 (where PPACA is discussed).

[96] Joint Ex. 88 (regarding Debtors' response to the UMWA's request for PPACA information).

also presented to President Roberts by letter dated April 23, 2013.[97]  Debtors also sought to address many of the UMWA's questions through a question and answer session with Mr. Hatfield, a presentation from counsel for Debtors in these Chapter 11 cases and a presentation by Blackstone.  While the Court would have preferred to outline each request for information and the associated status reports, they are all in the record, and many will be discussed below in the discussion section of this Memorandum Decision and Order.

Debtors have placed over 47,500 pages of information in the Data Room that Debtors considered responsive to the UMWA requests.  The software of the Data Room is such that Debtors can monitor which documents are actually accessed by the UMWA and PwC.  It is represented to the Court that these 47,500 pages include information concerning Debtors' business plans, liquidity, assets, capital expenditures, cash management, vendors and customers, coal supply agreements, coal transportation agreements, employee and retiree benefits including lists of retirees, health utilization data, presentations made to Debtors' lenders, pension plans, environmental obligations, pre-petition and post-petition debt, operating agreements, formation agreement and health care benefits plans.[98]

Over the course of these negotiations, Debtors have made various changes to the Original Proposals, many of which appear to be tailored to particular concerns of the UMWA.  The most recent proposals made by Debtors are the Fifth 1113 Proposal and the Fifth 1114 Proposal, as will be further discussed below.

## 3. **Debtors' Business Model**

As previously discussed, under the direction of Blackstone and Alix, Debtors created the October 2012 Business Plan.  Blackstone, as testified to by Mr. Huffard, started with the July 2012 Business Plan, but later created the October 2012 Business Plan to reflect negative changes to

---

[97]Joint Ex. 75 .

[98]Joint Ex. 1, Robertson Declaration, ¶ 14.

coal market forecasts since the July 2012 Business Plan was created. Blackstone then built the Microsoft Excel infrastructure for the October 2012 Business Plan (hereinafter "Business Model"). To build the Business Model, Blackstone worked intimately with Debtors' management to develop and build-out assumptions to plug into the Business Model. Development of those assumptions to plug into the Business Model was derived from Debtors' use of Debtors' internal budgeting and planing system, Hyperion. Debtors used Hyperion to compute changes in assumptions such as production levels or tonnage from particular mines, and then plugged the Hyperion outputs into the October 2012 Business Plan and ultimately the Business Model. Debtors therefore based the Proposals on the October 2012 Business Plan and the Business Model. The Business Model was provided to the UMWA by e-mail on December 3, 2012, and it was uploaded to the Data Room that same day.[99] Debtors also immediately offered assistance to the UMWA to manipulate the Business Model and help the UMWA and PwC to become more familiar with the Business Model. Debtors explained the Business Model and its contents to the UMWA and how the figures contained therein were derived both in specially scheduled meetings about the Business Model and via telephone. Debtors also offered the UMWA both the opportunity to use the Hyperion system at Debtors' St. Louis Headquarters to run its own assumptions and scenarios and Debtors offered to run particular assumptions, as the UMWA requested, in the Hyperion system on the UMWA's behalf.[100] Specifically, on a December 12, 2012 phone call, Blackstone explained to PwC how to reflect changes in October 2012 Business Plan assumptions in the Business Model by either (I) changing specific model inputs; (ii) layering the incremental impact into the Business Model by adding new line item(s); or (iii) replacing line items with new figures derived from the new assumptions. Further, Debtors and the UMWA maintained an open dialogue concerning the requests for information at the formal negotiation sessions, during conference calls, by e-mail and at meetings that were

---

[99]Joint Ex. 19.

[100]Joint Ex. 24.

specifically scheduled to explain information provided by Debtors.

**4. Relevant Testimony**

The UMWA criticized the Business Model provided by Debtors because in the UMWA's view, it was not sufficiently dynamic. In support of this position, the UMWA offered the testimony of Mr. Perry Mandarino (hereinafter "Mr. Mandarino"). Mr. Mandarino is a Partner in the New York office of PwC and is the U.S. Business Recovery Practice Leader for PwC. He holds a Bachelor's degree in Accounting from Seton Hall University and is a Certified Public Accountant. Mr. Mandarino testified that Debtors seek a permanent solution to a temporary problem in that the coal pricing assumptions in Debtors' October 2012 Business Plan are conservative, and that Debtors will be on the road to recovery no later than 2015. As such, there is no need for concessions beyond 2015.[101] Mr. Mandarino believes that Debtors' finances should be reassessed in 2016.

Mr. Mandarino further demonstrated in open court how the Business Model was not structured to operate dynamically in that if the UMWA were to change an assumption, for example, reduce production at a particular mine, the corollary costs would not be reduced and furthermore, revenue would not be affected.[102] Debtors do not deny this however Debtors note that because of the intricate nature of the coal industry, the creation of a model with the capabilities Mr. Mandarino and the UMWA seek would prove virtually impossible and inefficient.

Mr. Mandarino testified that he would have liked to have been able to manipulate the figures in the Business Model himself and that he was not able to do so because Debtors' Business Model was not designed to sensitize operational drivers. Mr. Mandarino testified that he did not accept Debtors' offer to visit the St. Louis Headquarters and use the Hyperion system to manipulate assumptions for the Business Model because the Hyperion system is highly complex and

---

[101] Many of Mr. Mandarino's assumptions are based on conclusions made by another UMWA witness, Mr. Srivinas Akunuri, whose testimony will be discussed below.

[102] 1113/1114 Hr'g Tr. 197:3 - 198:17, May 2, 2013.

-38-

proprietary and Mr. Mandarino knew that PwC would never permit this action. Mr. Mandarino testified that he would not want to expose himself, PwC or the UMWA to the possibility of any liability for doing anything wrong to the Hyperion system. Also, Mr. Mandarino did not want to go to St. Louis Headquarters to use the Hyperion system because he did not want to disadvantage the UMWA's bargaining position by making Debtors privy to the UMWA's position on certain matters or potential assumptions the UMWA intended to proffer. Mr. Mandarino was however not concerned about Debtors' ability to see what documents were accessed by the UMWA and PwC in the Data Room which could conceivably serve the same purpose. Mr. Mandarino admits that there was a meeting held on January 24, 2013 to specifically discuss the Hyperion system but he was unable to attend. Mr. Mandarino has no reason to doubt that access to St. Louis Headquarters would have been granted to him upon his request. Mr. Mandarino also does not dispute that Debtors and Blackstone based the Proposals on the October 2012 Business Plan and the Business Model provided to the UMWA and he has no reason to believe that Debtors have concealed additional information upon which the Proposals are based.

In support of the October 2012 Business Plan and in support of Debtors' Business Model, Debtors offered the testimony of Mr. Huffard. As noted earlier, Mr. Huffard is the Senior Managing Director in the Restructuring & Reorganization Group of Blackstone. Mr. Huffard holds a Bachelor of Arts in Economics from Harvard College and a Master of Management from the Kellogg Graduate School of Management at Northwestern University. He has worked with Blackstone since 1995 in various capacities. Mr. Huffard testified that he is not an expert in coal pricing, but rather, he has considerable experience in advising distressed companies. As stated earlier, Mr. Huffard was involved in the creation of the July 2012 Business Plan as well as the October 2012 Business Plan. Mr. Huffard also testified that he is confident that Debtors would have been forced into liquidation had they not secured the DIP Financing. Mr. Huffard testified that in his experience, covenants such as those in the DIP Facility are common and that these were the best terms that

Debtors could secure at the time. Mr. Huffard testified that the DIP covenants were hotly contested in the negotiations and that the $100 million liquidity covenant was as low as Debtors could get it, which is reasonable because if Debtors' liquidity declines to $100 million, it is reasonable for the DIP financiers to reassess Debtors' financial situation.

Mr. Huffard offered testimony in support of the general causes for Debtors' Chapter 11 filings, namely the advances in natural gas, selenium litigation costs, overproduction of thermal coal in the U.S. and the slowed production in global steel due in large part to the decrease in production in China which previously consumed 45% of the world's steel.

In support of the October 2012 Business Plan, Mr. Huffard stated that it is most appropriate to focus on Debtors' cash flow rather that EBITDA because what matters is the cash that Debtors will have available after Debtors' overhead is satisfied. Mr. Huffard further testified that the October 2012 Business Plan reflects a good faith effort to predict future coal prices, and that the projections contained therein are not overly pessimistic. Mr. Huffard further testified that the Business Model provided to the UMWA was a live Microsoft Excel model of the October 2012 Business Plan for which certain formulas could have easily been entered to modify assumptions.

Mr. Huffard further testified that if the savings requested in the Proposals are not achieved, Debtors will run out of cash towards the end of 2013 or early 2014, and thereafter be forced to liquidate. In any event, the DIP financing will mature if Debtors breach the liquidity covenants of the DIP Facility and Mr. Huffard has no confidence that a replacement DIP Facility is possible. With the requested savings, Debtors will not derive a positive cash flow until 2016, irrespective of EBITDAP. Mr. Huffard does not believe that a meaningful conversation could take place about exit financing until the 1113/1114 Motion is resolved.

Mr. Huffard further testified that he performed an analysis of varied scenarios to value the potential percentages of equity that could be allocable to the UMWA in certain circumstances. Mr. Huffard's scenarios demonstrated that the value of an unsecured claim could be as low as 12% or

as high as 57%, and on this basis, Debtors decided it appropriate to propose a 35% equity stake in the reorganized Debtors, the middle of the two.

In support of Debtors' position that it supplied the UMWA with complete information, Debtors proffered the testimony of Mr. Gregory Robertson (hereinafter "Mr. Robertson") and Mr. Hatfield. Mr. Robertson is an attorney for Debtors who is admitted to practice in the Commonwealth of Virginia. Mr. Robertson testified that it was difficult to build proposals that would reach the required annual savings of $150 million suggested by Blackstone. Mr. Robertson nonetheless attended every negotiation session with the UMWA save one and to his knowledge, he believes that Debtors responded to substantially all of the UMWA requests for information and answered as best Debtors could as a whole and particularly with regard to the Peabody-Assumed Group. Mr. Robertson testified that Debtors had a robust, "all hands on deck" approach to responding to the UMWA's requests.[103] Mr. Hatfield testified that in his estimation, Debtors did all they could to streamline their operations and make practical reductions before Debtors approached the UMWA-represented labor. Mr. Hatfield testified that he dedicated considerable time and was himself involved in ensuring that the UMWA requests for information were being attended to expeditiously.

To discuss the information provided by Debtors and whether such information was sufficient, the UMWA provided the testimony of Mr. Arthur Traynor (hereinafter "Mr. Traynor"). Mr. Traynor is a Staff Attorney for the International Union, UMWA. He holds a Bachelor of Arts in Philosophy from the University of Florida and a Juris Doctorate from Indiana University School of Law. Mr. Traynor testified that Debtors did not provide enough information for the UMWA to appropriately evaluate the Proposals. Mr. Traynor believes that several information requests remain outstanding particularly with respect to the data required to value the potential liability for the Peabody-Assumed Group. Mr. Traynor also discussed the fact that it appears that Debtors have been financing the

---

[103] See Joint Ex. 1, Robertson Declaration; Joint Ex. 73, Robertson Reply Declaration; 1113/1114 Hr'g Tr. 189:2- 227:22, April 29, 2013.

Retiree Benefits for 500 members of the Peabody-Assumed Group which is the responsibility of Peabody Holding.  He also believes that Debtors' newest Proposals were made in bad faith and exhibits Debtors' tactical behavior, particularly the Fifth 1113 Proposal made April 23, 2013.  Mr. Traynor however does not believe that the Fourth UMWA Counterproposal, made on April 27, 2013, was made in bad faith.[104]

Also presented to the Court was the testimony of Mr. Seth Schwartz (hereinafter "Mr. Schwartz") in support of, and Mr. Srinivas Akunuri (hereinafter "Mr. Akunuri") in opposition to the 1113/114 Motion.  Mr. Schwartz is the President of Energy Ventures Analysis, Inc., and he specializes in analysis of energy markets including analysis and projections of coal supply, demand and market prices, management of coal procurement activities which includes negotiation of coal supply and transportation contracts, evaluation of coal mine operations and production costs such as labor costs and mine productivity, and the purchase and sale of coal properties.  Mr. Schwartz echoed the testimony of others regarding the effect of low natural gas prices on the price of coal. Consequently, Mr. Schwartz testified that coal companies must be malleable and have a flexible structure to adjust to the market demands. Mr. Schwartz also testified to other factors that affect coal prices and the overall productivity of a mine such as the geological conditions of the mines, the method of shipment (by rail, truck or barge), the federal reclamation fees associated with the mine, state workers compensation, severance taxes and special reclamation taxes.  Nevertheless, Mr. Schwartz testified that he has advised Debtors on the price of coal, and had to reduce his initial July 2012 estimates due to: excess coal production capacity in most U.S. coal basins which will reduce profit margins, reduced rates of cost inflation, lower international market prices for both thermal and metallurgical coals, increased retirements of existing U.S. coal-fired power plants due to Environmental Protection Agency regulations and the outlook for long-term U.S. natural gas prices.  As such, Mr. Schwartz believes that the prices reflected in Debtors' October 2012 Business

_____

[104]See Joint Ex. 160, Traynor Declaration; 1113/1114 Hr'g Tr. 188:11-265:24, May 1, 2013.

Plan are in effect on target or slightly optimistic in regards to the prices that will realistically be achieved due to the above. Mr. Schwartz admits that analyzing future coal prices is not exact, and in fact the coal market has changed considerably in the past few months, nevertheless it is the long-term future market that is the relevant predictor (the expected value at a point in time in the future), not the spot price (the current price that a commodity can be bought and sold in a particular place including the price one can pay today for coal to be delivered in the future), and Mr. Schwartz believes Debtors' October 2012 Business Plan is aligned with future coal prices.

Mr. Schwartz also testified that the productivity at Debtors' mines, both union and non-union alike, was comparable when factors such as the age of equipment, geological conditions, account for whether the mine was a surface, longwall or continuous mining operation, and the like. For example, with surface mines, the amount of rock that must be removed to expose the coal is important. For underground mines, the coal height and the percentage of saleable coal that is mined is important, which is often a matter of the MMBTU and the sulphur content of the coal – both of which gravely affect pricing in that the lower the sulphur content and the higher the MMBTU of the coal, the higher the market price. Moreover, other factors that are not easily controllable affect the bottom line of a mine such as the cost of fuel, power, taxes and royalties. Nevertheless, Mr. Schwartz believes Debtors' UMWA-represented mines are more expensive due to the corresponding labor obligations. Based on these factors, Mr. Schwartz testified that certain coal mined from certain mines must be sold at a minimum price, otherwise, it may be a better business decision to idle or close the mine.[105]

The UMWA countered many of Mr. Schwartz's conclusions with the testimony of Mr. Akunuri, a Valuation Principal in the Houston office of PwC. Mr. Akunuri performs valuation analyses on oil & gas and mining companies. Mr. Akunuri is not a coal expert, however he has

---

[105]See Joint Ex. 135, Schwartz Declaration; Joint Ex. 148, Schwartz Reply Declaration; 1113/1114 Hr'g Tr. 191:25-281:8, April 30, 2013.

valued coal companies in his career.   Mr. Akunuri holds a Bachelor of Commerce Degree from Osmania University, a Master of Commerce Degree from the University of Delhi and a Master of Business Administration Degree from Tulane University.   Mr. Akunuri testified that the price of natural gas will increase such that it will become more favorable for electricity producers to increase use of thermal coal because coal will become more economical.   Therefore, coal prices are not permanently depressed.   Mr. Akunuri however admits that he is unfamiliar with many of the drivers that affect both coal and natural gas prices.   For example, Mr. Akunuri was unsure why coal prices typically fall in the summer and rise in the winter while natural gas prices rise in the summer but fall in the winter.   Mr. Akunuri also admits that some points of his analysis were incorrect because he assumed the wrong MMBTU content of some coal he attempted to project future prices for and he failed to account for certain differences in federal black lung taxes for coal mined at surface versus underground mines.   Mr. Akunuri maintains however that even if those mistakes were corrected, the end result would remain that from an economics perspective, the price of coal will recover as the price of natural gas also increases.[106]

## I. The Proposals

As previously mentioned, on November 15, 2012, Debtors made their Original Proposals.[107] On January 8, 2013, the UMWA made its First Counterproposal.[108]   On January 17, 2013, Debtors provided the Second 1113 Proposal and the Second 1114 Proposal (hereinafter collectively the "Second Proposals").[109]   On February 5, 2013, the UMWA made its Second Counterproposal.[110] On February 19, 2013, Debtors provided the Third 1113 Proposal and the Third 1114 Proposal

---

[106] See Joint Ex. 204, Akunuri Declaration; 1113/1114 Hr'g 281:16- 340:8, May 1, 2013.

[107] Joint Exs. 5 and 6.

[108] Joint Ex. 49.

[109] Joint Ex. 4; Joint Ex. 54 (letter where Second Proposals are discussed).

[110] Joint Ex. 59.

(hereinafter collectively the "Third Proposals").[111]   On February 27, 2013, Debtors made further revisions to the 1114 Proposal in response to certain points raised by the UMWA, and provided the Fourth 1114 Proposal.[112]   The Third 1113 Proposal and Fourth 1114 Proposal were current at the time the 1113/1114 Motion was filed.   The UMWA made a Third Counterproposal on March 27, 2013.[113]   On April 10, 2013, Debtors provided the Fourth 1113 Proposal and the Fifth 1114 Proposal,[114] and on April 23, 2013, Debtors provided the Fifth 1113 Proposal.[115]   On April 27, 2013, the UMWA provided its Fourth Counterproposal.[116]

## 1. **The Fifth 1113 Proposal**

The Debtors that are seeking the relief requested under Section 1113 are: Debtor Heritage Coal Company, LLC, Debtor Eastern Associated Coal, LLC, Debtor Apogee Coal Company, LLC, Debtor Hobet Mining, LLC, Debtor Highland Mining Company, LLC, Debtor Gateway Eagle Coal Company, LLC, Debtor Colony Bay Coal Company, Debtor Mountain View Coal Company, LLC, Debtor Pine Ridge Coal Company, LLC and Debtor Rivers Edge Mining Inc. (hereinafter collectively the "Obligor Debtors").   At the outset, the Court notes that the Fifth 1113 Proposal is essentially the same as the Fourth 1113 Proposal, with the caveat that certain actions will not take place on the condition of actions by the UMWA 1974 Pension Plan or the Trustees that make decisions for the 1974 Pension Plan (hereinafter "UMWA Funds") and the UMWA taking place.   While the specific terms of each modification varies, the Fourth 1113 Proposal proposed that modification of the CBAs become effective June 1, 2013, two months later than originally proposed.   Second, to avoid an

---

[111]Joint Ex. 3.

[112]Joint Ex. 2.

[113]Joint Ex. 83.

[114]Joint Ex. 74.

[115]Joint Ex. 75 (with transmittal letter from Mr. Hatfield to President Roberts).

[116]Joint Ex. 290.

unsecured claim for the 1974 Pension Plan in a gross amount that would be dilutive to the unsecured claims pool, Debtors promised to commit to a payment stream that was acceptable to both Debtors and the 1974 Pension Plan or that otherwise conformed to federal law.[117] Third, the Fourth 1113 Proposal seeks to generally reduce wages and benefits to levels that Debtors provide to non-union employees.  These wage and benefit reductions include, among other things: adjustments to both wage increases and wage rates whereby certain 2013 and future scheduled wage increases will be eliminated or reduced; adjustments to overtime, double time, triple time and premium pay; elimination of shift differential payments; reduction of Debtors' pension contributions to levels commensurate with Debtors' pension contributions made on behalf of non-union employees; elimination of the 20-Year Service Payment which is a bonus paid to employees with 20 years of mining service; elimination of 2012 Retiree Bonus Account Plan contributions; elimination of New Inexperienced Miner Payments; contributions to a 401(k) Plan or Similar Plan equal to 6 % of gross hourly wages for each miner;[118] reduction in the number of paid holidays from 11 to 8 per year;[119] reduction in the number of regular vacation days, floating vacation days and graduated vacation days; reduction of the number of sick days per year;[120] changes to NBCWA health care coverage from its current state where UMWA-represented employees make no contributions to premiums, have no deductibles and pay nothing for mail-order prescription drugs to a "90/10" Plan – the same plan provided to Debtors' salaried and non-union hourly employees – which includes co-payments, deductibles and other forms of cost sharing; reduction of available extended health care to laid-off UMWA-represented miners from the balance of the lay-off month

---

[117]Joint Ex. 73, Robertson Reply Declaration, ¶ 32.

[118]As will be noted, this component is altered by the Fifth 1113 Proposal.

[119]Unionized employees previously enjoyed John L. Lewis Day (April 1) in honor of the former UMWA president and each employee's own birthday as a paid holiday.

[120]Certain experienced miners have as many as 47 days off per year under the CBAs (including holidays) or 36 days per year (excluding holidays).  These individuals however are small in number.

plus up to 12 months of continuing coverage to 60 calendar days after a lay-off; elimination of 1993 Benefit Plan contributions; modifications to work-rules which involves increased flexibility during shift transitions and a more stringent attendance policy;[121] eliminate the requirement of a full-time helper on continuous mining machines and roof bolters; permit management to assign helpers at management's discretion and the use of contractors when needed for certain work and provide that UMWA-represented employees will receive wage increases if similarly-situated non-union employees receive increases above the UMWA wage level.

The Fifth 1113 Proposal includes all of the above, but adds two main caveats.  Debtors agreed that the Obligor Debtors that currently contribute to the 1974 Pension Plan would not withdraw from the 1974 Pension Plan and therefore would not delete Article XX of their Individual Employer Plans if: (1) the UMWA agreed not to increase the Obligor Debtors' contribution rates before January 1, 2017; and (2) the 1974 Pension Plan agrees to allow the Obligor Debtors to (a) withdraw from the 1974 Pension Plan on or after December 31, 2016 if contribution rates increase above a stated threshold and (b) pay any resulting withdrawal liability in annual installments.  This modification would benefit the UMWA because the 1974 Pension Plan would not receive an unsecured claim in the full present value of Debtors' obligations to the 1974 Pension Plan, thereby, the unsecured creditor pool will not be diluted.  Further, this provision would benefit the 1974 Pension Plan because it would receive a continued source of funding.  Debtors would also benefit from this provision because it would eliminate the uncertainty that threatens Debtors' ability to secure exit financing and that threatens Debtors' ability to compete in the long-term concerning the potential claim of the 1974 Pension Plan which all agree will be in the hundreds of millions of

---

[121] Mr. Lucha testified that under the current attendance policy, in the event of three (3) unexcused absences in 30 days or six (6) unexcused absences in 180 days, the employee will go into a probationary program whereby they need to work 180 days without any absences, and if the employee fails to do this, they will go into a new phase where they need to go 180 days without unexcused absences, and if they employee fails at that time, they may be terminated. See 1113/1114 Hr'g Tr. 354:3-17, April 30, 2013.

dollars.[122]  Also of note is that the Fifth 1113 Proposal adds that unless Debtors are given the above

described assurances in writing concerning the 1974 Pension Plan, Debtors will contribute 6% of

each dollar earned in wages to the 401(k) Plan or similar plan, or if Article XX remains and Debtors

do not withdraw, only 3% of each dollar earned in wages will be contributed to the 401(k) Plan or

similar plan.

## 2. The Fifth 1114 Proposal

The Fifth Section 1114 Proposal provides that Debtors would cease to provide retiree

benefits to its retirees and instead would form a UMWA Retiree Healthcare Trust (hereinafter

"Trust")  which would be structured as a Voluntary Employee Benefits Association (hereinafter a

"VEBA").   A VEBA is a trust fund established under federal tax law for the purpose of providing

health care or other benefits to employees or retirees, the primary advantage of which is that the

investment earnings on assets that accumulate in the VEBA are generally tax-free.  The Trust

would be established and administered by the UMWA Funds, and all decisions regarding the use

of the funds in the VEBA as well as eligibility, administration, participation, program design and

benefit levels would be made by the UMWA Funds.  If the UMWA Funds refuse to perform this

obligation, the responsibility would fall on the UMWA.  Debtors propose to fund the VEBA with an

initial capital contribution of $15 million dollars.  Debtors would also provide the UMWA with a direct

35% equity stake in the reorganized Debtors, which could be monetized in whole or in part, as the

UMWA deems appropriate, the proceeds of which would be used to fund the VEBA.  Prior iterations

of the 1114 Proposal involved granting the UMWA an unsecured claim that could be sold, however,

an unsecured claim was less favored for several reasons.

The Fifth Proposal also suggests that the VEBA will be created and that Debtors would fund

the retiree benefits through the VEBA as of July 1, 2013.  Debtors however would agree to extend

the transition date of the VEBA to January 1, 2014 and thereby permit the retirees to receive their

---

[122]Joint Ex. 73, Robertson Reply Decl. ¶¶ 40-41.

current level of benefits until that date if the UMWA consents to loan the funds necessary, to a maximum amount of $21 million dollars (based on Debtors' estimate that from July 1, 2013 through January 1, 2014, the retiree benefits will cost a total of $36 million dollars) to the Trust.  During that time, the 35% equity stake could be monetized, the VEBA established and decisions concerning the comprehensiveness of benefits could be made.  Debtors have offered to act as a broker-of-sorts for the sale of the 35% equity and have introduced at least one potential buyer to the UMWA.  After the sale of the equity, the UMWA would be repaid for the up to $21 million loan and the VEBA would potentially be funded with hundreds of millions of dollars, depending on the share of the equity stake that the UMWA decides to sell.  Additionally, the Fifth 1114 Proposal proposes a profit-sharing contribution from the Obligor Debtors, in addition to royalty contributions for every ton of coal produced at all existing Obligor Debtors' mining complexes, for each ton mined above the projections in the October 2012 Business Plan.  The Fifth 1114 Proposal further purports to create a Litigation Trust to pursue claims or causes of action for or on behalf of Debtors against at least Peabody, and the Litigation Trust will be funded by a contribution of $2 million dollars to be made upon Debtors' emergence from bankruptcy.

The Fifth 1114 Proposal does not propose to change the Retiree Benefits.  It is understood that due revision to the retiree benefit levels would be required to appropriately reflect the finite funding and limited resources of the contemplated VEBA.  Under the Fifth 1114 Proposal, it will be incumbent on either the UMWA Funds or the UMWA to create Retiree Benefit Plans that are narrowly tailored to the needs of the beneficiaries.

### 3. Testimony Regarding The Proposals

In support of the Proposals, Debtors offered Mr. Thomas Terry (hereinafter "Mr. Terry"), the President of TTerry Consulting LLC.  Mr. Terry holds a Bachelor's Degree in Math and Physics from Tufts University and a Masters of Actuarial Science from the University of Michigan.  He is also the president-elect of the American Academy of Actuaries and vice chair of the Pensions and Employee

Benefits Committee of the International Actuarial Association.  He has more than 35 years of experience in researching and consulting on the design and financing of employee benefit programs.

Mr. Terry testified that he has examined Debtors' Fourth 1113 Proposal and Fifth 1113 Proposal and determined that the proposed health coverage will be at least as generous as the norm in the United States and more than generous than the average large U.S. company because of the cost-sharing features of the proposed plan.  Mr. Terry understands that the Fifth 1113 Proposal generally reflects the health care levels offered to Debtors' non-union employees, and he believes that the comprehensiveness and generosity of the proposed modifications are in line with the coal mining industry despite Mr. Terry's broad analysis across all industries.  Mr. Terry relied on his experience for this conclusion.

Mr. Terry's evaluation and comparison was not limited to the health care coverage of only coal mining companies.  Mr. Terry further noted that only 20% of American employers provide full coverage for employees, and this will likely decrease in the future.  Mr. Terry further testified that 51% of American employers offer premium support which will also likely decrease in the future.  Mr. Terry also testified that the PPACA, which comes in effect in January of 2014 will likely offer some relief for Debtors' current employees, though he was uncertain as to the actual costs of the PPACA as well as the implications of exchanges[123] under the PPACA.  Mr. Terry however, notes that some of Debtors' employees will have coverage options under the PPACA and Medicare.  Mr. Terry insists that the proposed health coverage for active employees remains comprehensive and appropriately tailored to the health care needs of the employees.

In relation to the Fifth 1114 Proposal, Mr. Terry admitted that he made no analysis of the

---

[123]Health insurance exchanges are government-regulated and standardized health care plans which must be fully certified and operational by January 1, 2014. The federal government contemplates a health insurance marketplace or "exchange" where individuals and small business can buy affordable and qualified health benefit plans.

comprehensiveness that would be required or most appropriate in relation to the estimated funds that will be available to the VEBA because such an analysis is beyond the scope of his retention by Debtors.  Mr. Terry was however adamant that the flexibility of a VEBA will offer the Trustees the ability to manage and control the retiree health benefits through structuring the comprehensive-ness of the new retiree benefit levels while giving due credence to the appropriate level of premium sharing.  Mr. Terry was also confident that if the UMWA Funds administered the VEBA, there would be no damage to the purchasing power of the UMWA Funds to negotiate discounts with insurance providers in light of the potential amount of business that flows with the VEBA, however, admittedly, this conclusion was based on Mr. Terry's assumption that a larger group generally possesses greater market power.[124]

Mr. Terry also testified that he did not believe it likely that there would be a "spiral down" where if the relief is granted, premiums will increase, thereby causing some participants to decline medical coverage and therefore, the entire size of the insured group will decrease, which might therefore cause premiums to increase again until the entire plan withers away.[125] Rather, Mr. Terry testified that he believes it is more likely that there will be a "spiral up" where lost participants will only leave for coverage that those retirees believe to be 'better' and therefore, there will be more money in the VEBA for those who remain.  Mr. Terry believes this outcome will be more likely in light of the PPACA, Medicare and Medicaid.[126] Mr. Terry nonetheless insisted that the greatest benefit of the VEBA is that the retirees would continue to have access to health care, a benefit that more than half of America's retirees do not enjoy.

Debtors also offered the testimony of Dale F. Lucha (hereinafter "Mr. Lucha"), Vice President of Human Resources of Debtor Patriot Coal Services, LLC, a position he has held since

---

[124]Terry Dep. 142:20-143:20, April 11, 2013.

[125]1113/1114 Hr'g Tr. 321:9-21, April 30, 2013.

[126]1113/1114 Hr'g Tr. 332:5-333:21, April 30, 2013.

July 2008.  He was previously Vice President of Human Resources of Magnum, Manager of Human Resources of Arch of West Virginia, Manager of Safety and Labor Relations of Ashland Coal, Inc., and Safety and Labor Relations Specialist of Debtor Hobet Mining LLC.  He holds a Bachelor of Arts Degree from Marshall University.  Mr. Lucha testified about the savings that will inure from the Proposals.  Mr. Lucha, together with Mr. Hatfield, calculated these savings with the help of Mercer, Debtors' health care consultant.

Mr. Lucha first testified generally that certain financially unquantifiable work-rule changes are still necessary because they will permit Debtors' mining operations to be more efficient.  The ability for Debtors to bridge certain gaps as they come will contribute to the overall efficiency of the mining operations. So too, Mr. Lucha admits that while employees who miss work are not paid, absenteeism nonetheless negatively affects the overall operations of Debtors because they have to pay other workers overtime, will need to bring in extra people and some teams are forced to operate with less able bodies.  Mr. Lucha further testified that the elimination of approximately 10 jobs across Debtors' combined operations for helpers and roofers was appropriate because Debtors will be using proximity devices at all of Debtors' mining operations, though Debtors only use proximity devices at the Blue Creek operation – a non-union, continuous mining operation.[127]

In response to Mr. Terry and Mr. Lucha's  testimony, the UMWA offered the testimony of Mr. Elliott I. Cobin (hereinafter "Mr. Cobin"), a Director in the Global Human Resources Services group at PwC.  He holds a Bachelor's Degree in Math from Queens College of the City University of New York and a Masters Degree in Math from the University of Illinois.  He is also an Associate of the Society of Actuaries.  Mr. Cobin has over 30 years experience in all areas of health care benefits including pricing, design, funding and accounting.  Mr. Cobin estimates that the Retiree Benefits contemplated by the Fifth 1114 Proposal should be valued at approximately $1.8 billion

---

[127]See Joint Ex. 97, Lucha Declaration; Joint Ex. 112, Lucha Reply Declaration; 1113/1114 Hr'g Tr. 340:7-382:3, April 30, 2013.

based on certain medical trend assumptions which are based on the Thomas E. Getzen model –
a model used to predict long-term medical cost trends. This larger number therefore is not based
on an assumption that Debtors have undervalued the cost of services to be provided or how sick
the retirees will be, but rather differing assumptions regarding medical cost trends which account
for certain factors such as the economy and how much disposable income people have. The
Getzen model was created approximately five years ago, however the Getzen model was created
as a teaching tool and is not a standard actuarial model used in practice in the industry.[128]

Mr. Cobin also testified that he does not believe it is fair to compare coal miner's health care
to employees in another industry because coal miners need more health care than typical
employees. Further, Mr. Cobin criticizes the VEBA for not having a "true-up" on medical
assumption trends to adjust their previous projections at various intervals.[129]

### 4. The UMWA's Fourth Counterproposal

On April 27, 2013, the UMWA submitted the Fourth Counterproposal which included the
following main highlights:

> 1) the UMWA would be a co-proponent of any Plan of Reorganiza-
> tion, otherwise, the Counterproposal, if approved would cease to be
> effective;
> 2) Debtors may not increase the compensation of any employee,
> save to comply with federal and state laws, without the express
> consent of the UMWA for the duration of the requested concessions;
> 3) the UMWA, at its sole election, may reopen the Agreement on
> December 31, 2016, after giving Debtors at least one month's notice;
> 4) Debtors shall submit quarterly financial reports to the UMWA (or
> at the same pace Debtors must supply financial reports to Debtors'
> lenders);
> 5) Debtors shall give the UMWA a 57% equity stake in the reorga-
> nized Debtors; and
> 6) Debtors shall give the UMWA an annual cash payment equal to
> 7.5% of EBITDA for each immediately preceding year subject to

---

[128] Joint Ex. 252.

[129] See Joint Ex. 235, Cobin Declaration; 1113/1114 Hr'g Tr. 82:23-139:20, May 2, 2013.

certain minimum and maximum amounts.[130]

In support of the UMWA's overall position in these proceedings, the UMWA presented Mr. Michael Buckner (hereinafter "Mr. Buckner"), a consultant with the UMWA. Mr. Buckner has enjoyed an extensive career with the UMWA, which began in 1979 as a Legislative Director for the UMWA, and later as the Director of Research for the UMWA. Mr. Buckner generally testified that while it may appear as though the UMWA mines are more costly to Debtors, in his opinion, those mines are more productive. Mr. Buckner does not profess to be an expert of any sort, but rather, his testimony in essence echoed that of other witnesses who are more apt to comment.[131]

**J. Peripheral Matters**

Debtors and the Official Committee of Unsecured Creditors have begun an investigation into potential claims concerning the spin-off of Debtor Patriot Coal Corporation and its affiliates from Peabody, as well as the transactions concerning Magnum. Debtors and the Official Committee of Unsecured Creditors are investigating whether these transactions give rise to fraudulent transfer claims. This Court has recently defined the scope of the Rule 2004 Exam of Peabody that Debtors and the Official Committee of Unsecured Creditors can take.

As previously indicated, Peabody has paid for the retiree health care of the Peabody-Assumed Group, or at least for approximately 2,600 of the 3,100 members of the Peabody-Assumed Group.[132] Debtors have commenced an adversary in which Debtors seek declaratory judgment that a modification of the benefits of retirees of Debtor Heritage Coal Company LLC (hereinafter "Heritage") or Debtor Eastern Associated, LLC under Section 1114 does not relieve Peabody Holding of its obligation to pay for pension and health care benefits of the Peabody-

---

[130]Joint Ex. 290.

[131]Joint Ex. 181, Buckner Declaration; 1113/1114 Hr'g Tr. 17:25-81:11, May 2, 2013.

[132]See also Joint Exs. 266 and 267 (where ALCOA obligations to finance Squaw Creek retirees is discussed).

Assumed Group as currently provided pursuant to the Heritage Individual Employer Plan and the

Assumption Agreement. By separate order entered simultaneously, this Court has denied Debtors'

request for declaratory judgment and determined that based on the contractual language, this Court

cannot declare that the relief sought by Debtors under Section 1114 will not affect Peabody

Holding's obligation to fund retiree benefits for the Peabody-Assumed Group.

### III. JURISDICTION

This Court has jurisdiction of this matter pursuant 28 U.S.C. §§ 151, 157 and 1334 (2012)

and Local Rule 81-9.01(B) of the United States District Court for the Eastern District of Missouri.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) (2012). Venue is proper in this District

under 28 U.S.C. § 1409(a) (2012).

### IV. CONCLUSIONS OF LAW AND DISCUSSION

**A. The Law**

Section 1113 provides, in relevant part, that a debtor in possession may assume or reject

a collective bargaining agreement if:

> [s]ubsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession ... shall –
>
> (A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and
>
> (B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

11 U.S.C. § 1113(a), (b)(1) (2012). The Bankruptcy Code further requires that the debtor "meet,

at reasonable times, with the authorized representative to confer in good faith in attempting to reach

mutually satisfactory modifications of such agreement." 11 U.S.C. § 1113(b)(2) (2012). Section

1113(c) provides that:

> [t]he court shall approve an application for rejection of a collective bargaining agreement only if the court finds that--
> (1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);
> (2) the authorized representative of the employees has refused to accept such proposal without good cause; and
> (3) the balance of the equities clearly favors rejection of such agreement.

11 U.S.C. § 1113(c) (2012).

Section 1114(e) provides in relevant part that: "[n]otwithstanding any other provision of this title, the [debtor] shall timely pay and shall not modify any retiree benefits" unless the court, on the motion of the [debtor] or authorized representative of the retirees, orders, or the debtor and the authorized representative agree to, the modification of such benefits. 11 U.S.C. § 1114(e) (2012).

Section 1114(b) defines the "authorized representative" as the person designated by a labor organization as the authorized representative of persons "receiving any retiree benefits covered by a collective bargaining agreement." 11 U.S.C. § 1114(b) (2012). For purposes of Section 1114, "retiree benefits" are defined as:

> payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title.

11 U.S.C. § 1114(a) (2012). Section 1114(f)(1) provides that a debtor, after filing the bankruptcy petition but prior to filling a motion to modify retiree benefits, shall:

> (A) make a proposal to the authorized representative of the retirees, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and
>
> (B) provide, subject to subsection (k)(3), the representative of the

retirees with such relevant information as is necessary to evaluate
the proposal.

11 U.S.C. § 1114(f)(1) (2012).  The debtor is also required to meet with the authorized representa-

tive of the union at reasonable times to confer in good faith in an attempt to "reach mutually

satisfactory modifications to such retiree benefits." 11 U.S.C. § 1114(f)(2) (2012).

Pursuant to Section 1114(g), a court shall enter an order that permits the modification of

retiree benefits if the court finds that:

> (1) the [debtor] has, prior to the hearing, made a proposal that fulfills
> the requirements of subsection (f);
> (2) the authorized representative of the retirees has refused to
> accept such proposal without good cause; and
> (3) such modification is necessary to permit the reorganization of the
> debtor and assures that all creditors, the debtor, and all of the
> affected parties are treated fairly and equitably, and is clearly favored
> by the balance of the equities.

11 U.S.C. § 1114(g).  Section 1114 together with Section 1129(a)(13) provide for a means to

facilitate the reorganization of a debtor while also providing for some measure beyond the 1114

proceeding for the procedural and substantive protections for retiree benefits during a Chapter 11

proceeding. *IUE-CWA v. Visteon Corp. (In re Visteon Corp.),* 612 F.3d 210, 216-17 (3d Cir. 2010).

For court approval of a motion to reject and modify a CBA under Section 1113 or to modify

retiree benefits under Section 1114, the debtor must meet the following requirements:

> 1. The debtor in possession must make a proposal to the Union to
> modify the collective bargaining agreement.
> 2. The proposal must be based on the most complete and reliable
> information available at the time of the proposal.
> 3. The proposed modifications must be necessary to permit the
> reorganization of the debtor.
> 4. The proposed modifications must assure that all creditors, the
> debtor and all of the affected parties are treated fairly and equitably.
> 5. The debtor must provide to the Union such relevant information as
> is necessary to evaluate the proposal.
> 6. Between the time of the making of the proposal and the time of the
> hearing on approval of the rejection of the existing collective
> bargaining agreement, the debtor must meet at reasonable times
> with the Union.
> 7. At the meetings the debtor must confer in good faith in attempting

to reach mutually satisfactory modifications of the collective bargain-
ing agreement.
8. The Union must have refused to accept the proposal without good
cause.
9. The balance of the equities must clearly favor rejection of the
collective bargaining agreement.

*In re American Provision Co.,* 44 B.R. 907, 909 (Bankr. D. Minn. 1984); *In re Family Snacks, Inc.,*

257 B.R. 884, 892 (B.A.P. 8th Cir. 2001) (citation omitted); *In re Valley Steel Products Co.,* 142 B.R.

337, 340-41 (Bankr. E.D. Mo. 1992).  Debtors must meet the requirements of Section 1113 and

1114 by a preponderance of the evidence.  *See In re Indiana Grocery Co., Inc.,* 136 B.R. 182, 191

(Bankr. S.D. Ind. 1990); *In re American Provision Co.,* 44 B.R. at 909; *In re Pinnacle Airlines Corp.,*

483 B.R. 381, 406 (Bankr. S.D.N.Y. 2012).  As a practical matter, once the debtors have made their

*prima facie* case, the burden shifts to the union to show that the debtor did not supply sufficient

information, that the debtor did not bargain in good faith in addition to demonstrating that the union

had good cause to refuse the proposal.  *In re American Provision Co.,* 44 B.R. at 909; *see In re Mile*

*Hi Metal Sys., Inc.,* 899 F.2d 887, 891-92 (10th Cir. 1990); *In re Blue Diamond Coal Co.,* 131 B.R.

633, 643 (Bankr. E.D. Tenn. 1991).  Failure to meet any of these requirements is sufficient for the

court to deny a debtors' motion to reject the CBA and/or to modify retiree benefits.  *In re Garofalo's*

*Finer Foods, Inc.,* 117 B.R. 363, 370 (Bankr. N.D.Ill. 1990); *see also In re National Forge Co.,* 279

B.R. 493, 500 (Bankr. W.D. Pa. 2002).  "Congress has not authorized the Court to decide a Section

1113 motion by acting as a sort of super-arbiter choosing between competing proposals.  The Court

is required to focus on the debtor's proposal and grant or deny the motion based upon its

conclusions as to whether the debtor's proposal meets the statutory criteria." *In re AMR Corp.,* 477

B.R. 384, 414 (Bankr. S.D.N.Y. 2012) (citing *In re Delta Air Lines, Inc. ("Delta II"),* 359 B.R. 468, 488

(Bankr. S.D.N.Y. 2006)).

**B. Objection By The UMWA To The Proposals Made After The 1113/1114 Motion Was Filed**

At the outset, the Court ruled on the record that it would consider all pre-hearing Proposals.

-58-

In so doing, the Court overruled the UMWA's objection that the Court should only consider the Proposals that predate the filing of the 1113/1114 Motion because evaluation of a moving target would be difficult for the Court. While the Court appreciates the UMWA's concern, the reality is that Sections 1113 and 1114 of the Bankruptcy Code contemplate that the Court will consider proposals up and until the commencement of the hearing. The express language of Sections 1113(b)(2) and 1114(f)(2) provide that negotiations must occur "during the period beginning on the date of the making [of the initial] proposal . . . and **ending on the date of the hearing.**" 11 U.S.C. §§ 1113(b)(2), 1114(f)(2) (emphasis added); *see also* 7 Collier on Bankruptcy ¶ 1113.04[1][a] (2013) ("[t]he requirement that the [debtor] bargain with respect to its proposal [prior to the hearing] suggests that Congress was aware of the fact that the [debtor's] initial proposal might be changed pursuant to the collective bargaining process") (citations omitted). Furthermore, Debtors made the Fourth 1113 Proposal and the Fifth 1114 Proposal on April 10, 2013, more than 14 days before the commencement of the hearing. The Fifth 1113 Proposal is, in effect, the Fourth 1113 Proposal with certain caveats whereby certain actions will be stayed if other parties agree to various terms. Therefore, it would be nonsensical for this Court to have required Debtors to withdraw and refile the 1113/1114 Motion on April 10, 2013 in order for this Court to consider the post-filing Proposals. Thus, before the Court is Debtors' Fifth 1113 Proposal, Fifth 1114 Proposal and for limited purposes, the UMWA's Fourth Counterproposal.

## C. Application Of The Law

Based on the evidence before the Court, discussion of many of the *American Provision* factors is best presented if some factors are discussed simultaneously. As such, the Court will discuss the *American Provision* factors in the following order: 1. Proposals Made to the Union; 2. Based on the Most Complete and Reliable Information Available at the Time of the Proposal, and, 5. Debtor Must Provide to the Union Such Relevant Information as is Necessary to Evaluate the Proposal; 3. Modifications are Necessary; 4. Modifications Assure That All Creditors, Debtor and

All of the Affected Parties Are Treated Fairly and Equitably; 6. Meeting at Reasonable Times, and, 7. Confer in Good Faith In Attempt to Reach a Mutually Satisfactory Modification; 8. Union Must Have Refused to Accept the Proposal Without Good Cause; and 9. Balance of the Equities Must Clearly Favor Rejection.

**1. Proposals Made To The Union**

There is no dispute that proposals were made by Debtors to the UMWA.  The Fifth 1113 Proposal was made on April 23, 2013.  The Fifth 1114 Proposal was made on April 10, 2013.  The prior iterations of the Proposals were made as follows: the Original Proposals were made on November 15, 2013;[133] the UMWA's First Counterproposal was made on January 8, 2013;[134] the Second Proposals were made on January 17, 2013;[135] the Second UMWA Counterproposal was made on February 5, 2013;[136] the Third Proposals made on February 19, 2013;[137] the Fourth 1114 Proposal was made on February 27, 2013;[138] the Third UMWA Counterproposal was made on March 27, 2013;[139] the Fourth 1113 Proposal and Fifth 1114 Proposal were made on April 10, 2013;[140] the Fifth 1113 Proposal was made on April 23, 2013[141] and the Fourth Counterproposal was made by the UMWA on April 27, 2013.[142]  The first factor is satisfied.

---

[133] Joint Exs. 5 and 6.

[134] Joint Ex. 49.

[135] Joint Ex. 4; Joint Ex. 54 (letter where second proposal is discussed).

[136] Joint Ex. 59.

[137] Joint Ex. 3.

[138] Joint Ex. 2.

[139] Joint Ex. 83.

[140] Joint Ex. 74.

[141] Joint Ex. 75 (with transmittal letter from Mr. Hatfield to President Roberts).

[142] Joint Ex. 290.

**2. Based On The Most Complete And Reliable Information Available At The Time Of The Proposal**, and, **5. Debtor Must Provide To The Union Such Relevant Information As Is Necessary To Evaluate The Proposal**

The second *American Provision* factor requires that a debtor base its proposals on the most complete and reliable information available at the time the proposals are made. The fifth *American Provision* factor requires that a debtor provide to the union the relevant information that is necessary to evaluate the proposals. The second and fifth requirements differ in that the second requirement dictates that the proposal be based on certain information while the fifth requirement dictates that a debtor disclose the necessary information to the union. *American Provision,* 44 B.R. at 909, n.2.

A debtor's proposal must be "firmly grounded in the historical reality of operational economics, an unvarnished evaluation of [the debtor's] current straits, and a thorough analysis of all of the incidents of income and expense that would bear on its ability to maintain a going concern in the future." *In re Mesaba Aviation, Inc. ("Mesaba I"),* 341 B.R. 693, 712 (Bankr. D. Minn. 2006)*, rev'd on other grounds,* 350 B.R. 435 (D. Minn. 2006). The debtor's business plan must serve as the basis for what concessions of the union the debtor deems to be necessary. *In re AMR Corp.,* 477 B.R. at 416. As such, the debtor must provide the information upon which its business plan is built to demonstrate the underlying factual support for the projections contained in that business plan as well as the overall objectivity of the bases for the proposed modifications. *Id.* at 417; *Mesaba I,* 341 B.R. at 722-24. "The requirement essentially bars a debtor-in-possession from making a proposal that is cursory or arbitrary, or one where the specific terms are result-driven in isolation rather than process-derived and based on actual experience." *Mesaba I*, 341 B.R. at 714; see also *In re Karykeion,* 435 B.R. 663, 677 (Bankr. C.D. Cal. 2010) (quotation omitted).

The data provided by the debtors should reflect an honest effort to compile all data, with no deliberately concealed mistakes. *Ass'n of Flight Attendants - CWA, AFL-CIO v. Mesaba Aviation, ("Mesaba II"),* 350 B.R. 435, 454 (D. Minn. 2006) (citation omitted). The information that the debtor

-61-

is required to gather and provide to the union should exclude "hopeful wishes, mere possibilities and speculation." *In re Karykeion, Inc.,* 435 B.R. at 678.  Evaluation of whether the debtor has provided complete and reliable information goes to the comprehensiveness of the underlying factual support for a debtor's projections under § 1113(a) - its breadth, depth, and objective credibility.  *Id.* at 677.  "[T]he breadth and depth of the requisite information will vary with the circumstances, including the size and complicacy of the debtor's business and work force; the complexity of the wage and benefit structure under the collective bargaining agreement; and the extent and severity of modifications that the debtor is proposing." *In re AMR Corp.,* 477 B.R. at 409, 439 (citing *Mesaba I,* 341 B.R. at 714).

Where analysis and projections are required to evaluate a 1113 proposal, the debtor must provide the union with a dynamic model – a working copy or electronic copy of a model – which the union can use to change inputs and evaluate diverging data; failure to do so evidences bad faith on the part of the debtors. *Mesaba I,* 341 B.R. at 717.  "The parties can only do what is possible" and common sense dictates that a court can only impose requirements that are consistent with reality in evaluating what information was provided as well as the relevancy of that information." *Pinnacle*, 483 B.R. at 411.

A debtor's failure to perform analyses for the union that otherwise do not exist and that the debtor has not performed for itself cannot reasonably be a basis for a court to conclude that the debtor did not provide the union with necessary information to evaluate the proposal. *In re AMR Corp.,* 477 B.R. at 441.  Section 1113 only mandates the production of data that exists, and generally, a debtor is not required to perform further analyses nor is it required to create financial data that it otherwise does not need. *Id.*  "[A] debtor can only be required to provide information that is within the debtor's power to provide." *Pinnacle*, 483 B.R. at 411.  "Ultimately, '[t]he debtor is simply required to gather the most complete information available at the time and to base its proposal on the information it considers reliable.'" *In re AMR Corp.,* 477 B.R. at 415 (citing *In re*

*Karykeion,* 435 B.R. at 678).

"Once the debtor shows what information it provided the Union, '[i]t is then incumbent upon the Union to produce evidence that the information provided was not the relevant information which was necessary for it to evaluate the proposal.'" *In re Appletree Markets, Inc.,* 155 B.R. 431, 438 (S.D. Tex. 1993) (citing *In re American Provision Co.,* 44 B.R. at 909-910); *Mesaba I,* 341 B.R. at 704 (The burden of production of evidence shifts to the respondent union for procedural elements such as whether the available information upon which the proposal was made was reliable and relevant). A debtor is not required to delay filing a motion under Sections 1113 or 1114 for purposes of information gathering or sharing, rather, the expedited timeline from filing of the motion to when the court must rule underscores the urgency with which Congress intends all parties to expeditiously navigate the Section 1113 and 1114 process. *See In re AMR Corp.,* 477 B.R. at 413.

The UMWA argues that Debtors have not provided the most complete and reliable information available at the time the Proposals, particularly the Fourth and Fifth 1113 Proposals and the Fifth 1114 Proposal, were made and that the UMWA did not have the necessary and relevant information to evaluate the Proposals. First, the UMWA objects that several information requests remain outstanding and that those outstanding requests are material to the UMWA's ability to evaluate the Proposals. Specifically, with regard to the 35% equity stake, the UMWA argues that to evaluate the Proposals, it needs more information concerning the governance rights associated with the equity stake, which other parties will also have an equity stake in the reorganized Debtors and the amount of equity in the reorganized Debtors those interests will have. Next, the UMWA argues that the Business Model provided by Debtors was not dynamic in that the UMWA and PwC were unable to change inputs and see the effect of changes in certain assumptions. Therefore, the UMWA argues that the Business Model was not sufficiently dynamic and therefore Debtors' 1113/1114 Motion should be denied.

At the outset, as of April 22, 2013, there was some disconnect concerning whether certain

requests for documents were satisfied by Debtors in that Debtors believed that certain items were answered to the full capacity possible, while the UMWA continued to request additional information. This Court has reviewed every UMWA request for documents and information that has been placed on the record and concludes that some of the UMWA's requests were overly broad, irrelevant to the specific questions of this 1113/1114 Motion and at times sought information which does not exist. This Court has also reviewed the various status reports concerning the UMWA requests and likewise concludes that the UMWA has been provided with more than enough information to evaluate the Proposals as a whole. While Sections 1113 and 1114 contemplate an expedited process, Debtors have been providing information to the UMWA since November of 2012. The record demonstrates that Debtors have indeed provided the UMWA with over 47,500 documents to date. The vast majority of these documents were uploaded to the Data Room in response to requests made by the UMWA.

Debtors provided the UMWA with the Business Model by e-mail and uploaded it to the Data Room on December 3, 2012. The Business Model which expresses Debtors' October 2012 Business Plan in a Microsoft Excel spreadsheet was the full financial model that Blackstone created for Debtors. This Business Model reflects the full functionality that Debtors built to date, and it was designed to present Debtors' five-year financial forecast to third-parties as contained in Debtors' October 2012 Business Plan and to sensitize operational drivers to the extent possible.[143]

The evidence and testimony presented has clearly demonstrated to this Court that slight changes to the properties of coal – for example sulphur content and MMBTU content – will have a major impact on the market price of that coal. So too, where the coal is mined, where the coal is going and how the coal is transported, the particular needs of the customer and the expense required to mix or blend various coals to meet those needs, as well as the geological conditions of the various mines, are all important factors that gravely impact the market value of coal. Based on

---

[143] Joint Ex. 19; see also Ex. E to Mandarino Declaration.

the representations made to this Court, particularly during the redirect of Mr. Mandarino, it is clear that in the UMWA's view, Debtors should be required to provide a business model where all of these factors could be manipulated by PwC. This is completely unrealistic and well beyond the requirements of the statute.

Mr. Mandarino demonstrated the computation capabilities of the Business Model when he identified that for a particular Debtor mining operation, the Business Model reflects that in December of 2012, that Debtor sold X tons of coal for Y dollars. Mr. Mandarino demonstrated that the X and Y numbers were hardcoded numbers in that they were manually input into the Business Model and were not the result of a formula which calculated X and Y based on information located elsewhere in the Business Model. For example, Y does not reflect tons mined multiplied by a certain assumed dollar amount reflective of the anticipated market value of that coal. Therefore, if the amount of tons sold were increased, coal sales would remain Y in the Business Model, and the EBITDA for that year as reflected elsewhere in the Business Model would remain the same.[144] Mr. Mandarino went on to demonstrate that elsewhere in the Business Model, formulas were input in the Excel cells whereby an increase of one cost would affect Debtors' total costs elsewhere, and the like.

The Court acknowledges Mr. Mandarino's presentation, however, this is of little consequence. An increase in tonnage at a particular mining complex does not mean that a particular new number can simply be multiplied by a fixed dollar amount. The entire record of this case demonstrates that nothing about mining, pricing and selling coal is that simple. Rather, there would need to be extensive formulaic calculations built into any such model to account for the myriad of factors that <u>MUST</u> be considered in determining how tons mined affects revenues. Moreover, there would need to be an account for whether that particular coal is subject to a sales contract in which the sales price of the coal is already fixed.

---

[144]See 1113/1114 Hr'g Tr. 197:3-198:17, May 2, 2013.

Debtors provided the UMWA with the next best thing to meet the UMWA's request, access to Debtors' proprietary business accounting forecasting system – Hyperion – which is the same system used by Debtors to obtain the assumptions included in the Business Model. Debtors offered the UMWA and PwC the opportunity to come to Debtors' St. Louis Headquarters to make any assumptions it desired in the Hyperion system which would drill down on those assumptions and provide results. Debtors further assured the UMWA that it would provide staff to assist the UMWA with creating its desired assumptions. Debtors also offered, and on at least one occasion did, run assumptions at the request of the UMWA.

Mr. Mandarino testified that Hyperion is a complex, very well regarded accounting software IT system. Given the high proprietary component of the Hyperion system and its capabilities, Mr. Mandarino believes that it would be poor internal control for a company to let any outsider manipulate the system, even if supervised. And for that reason, he would feel uncomfortable going to Debtors' Headquarters to manipulate the numbers. Mr. Mandarino further stated that he would not want to risk damaging the system or being accused of damaging the system. Moreover, going to St. Louis Headquarters would not offer Mr. Mandarino the opportunity to sit at a table with his client and make numerous changes during a bargaining session. Finally, Mr. Mandarino acknowledged that Debtors offered to manipulate the numbers in Hyperion on behalf of the UMWA, inputting any assumptions requested by the UMWA however, Mr. Mandarino did not want to take advantage of this opportunity because then Debtors would be privy to the UMWA's "thinking" and the general tone of contemplated counterproposals, which would put the UMWA at a bargaining disadvantage.[145]

As such, it appears that the UMWA unreasonably expects that the capabilities of the highly proprietary, highly regarded Hyperion system, which should be highly internally regulated by Debtors such that it would be inappropriate to give the UMWA access, should nonetheless have

_____

[145] 1113/1114 Hr'g Tr. 199:21- 200:25, May 2, 2013.

been reproduced in an Excel spreadsheet that the UMWA could manipulate at its leisure. This is entirely untenable and well beyond what is required of the Bankruptcy Code. Debtors were required to share existing information with the UMWA and the information upon which Debtors based the Proposals. Debtors have done so in that the Business Model provided to the UMWA was the same Business Model upon which Debtors relied and Debtors offered the UMWA access to the same process undertaken by Debtors to derive the hardcoded numbers contained in the Business Model, use of the Hyperion system. The UMWA's decision not to engage in the same two-step process as Debtors was the UMWA's choice.

To that end, the UMWA's other requests for information are beyond the realm of what is known today. There is no dispute that the UMWA is entitled to a significant unsecured claim in these cases. While the Fourth 1114 Proposal contemplated the monetization of said claim, the Fifth 1114 Proposal instead contemplates that the UMWA will have a 35% equity stake in the reorganized Debtors which will be monetized to fund the VEBA. There is also no dispute that the 35% equity stake is derived based on a balance of probabilities of what the UMWA's unsecured claim could be under certain scenarios, and what percentage of the reorganized Debtors would appropriately reflect that amount. There are numerous factors that this Court has yet to determine that could gravely affect the actual dollar amount of the unsecured claim to which the UMWA is entitled. The most obvious of those decisions will be whether Debtors will be substantively consolidated, whether inter-debtor claims will be disallowed and the terms of any confirmed plan. Moreover, this case has been riddled with the sale and transfer of claims. Therefore, more information about who else will hold a stake in the reorganized Debtors is simply unavailable with any degree of certainty at this time.

Further, it was represented to this Court that at meetings held on April 24, 25 and 26, 2013 Debtors, particularly Mr. Hatfield, Bankruptcy Counsel to Debtors and Blackstone, made presentations to the UMWA in hopes to address specific questions and concerns about the 35%

equity stake. The certainty that the UMWA requests simply does not and cannot exist in cases like these, where so many variables are at play.

The UMWA also complains that it did not have sufficient information about the Peabody-Assumed Group to assess the Proposal in that some requested information remains outstanding. This information is important because inclusion of the Peabody-Assumed Group as beneficiaries of the VEBA could drastically affect the financial structure of the VEBA and thus affects the UMWA's challenge to Debtors' Fifth 1114 Proposal.

Throughout the course of Debtors' existence, there has been some confusion about the Peabody-Assumed Group and who is included in this group. Mr. Traynor testified that he believes the UMWA's requests for information regarding the Peabody-Assumed Group remain outstanding. Specifically, there was considerable testimony about request number 6 of Joint Exhibit 9 and whether Debtors completed it.

The standard for what documents Debtors must produce is not that Debtors must make sure that every scintilla of its records that may directly or tangentially respond to a request for information be proffered. If that were the standard, of course, a debtors' motion under Sections 1113 and 1114 would almost always be defeated, especially like here, where Debtors have a vast operation. The question is whether there is *sufficient information* for the UMWA to evaluate the Proposals. This Court has reviewed Joint Exhibits 169-171 in addition to the record of the related adversary concerning the Peabody-Assumed Group, and the record in this case as a whole where the subject of the Peabody-Assumed Group has risen. The record indicates that based on the information provided which concerns the Peabody-Assumed Group, the UMWA could have made an educated estimation of a range for the annual cost for the benefits used by the Peabody-Assumed Group, within a reasonable degree of certainty insofar as anything in these cases is certain. Based on such range, the UMWA would therefore be reasonably informed on what impact inclusion of those individuals in the requested relief would have on the VEBA. Debtors could not have provided more

information about the Peabody-Assumed Group for various reasons, the most prevalent being that Debtors cannot supply that which does not exist.   And, because the subject of the Peabody-Assumed Group was put to this Court's determination, ultimately, Debtors could not tell the UMWA how this Court would rule on the matter.

At this stage in Debtors' bankruptcy, precision is a fantasy.   Everyone is relegated to quantified estimation, best guesses, ranges under varied assumptions, and in the case of the Court, an evaluation of the preponderance of the evidence.   This Court has attentively reviewed the following: UMWA Information Request, dated October 31, 2012;[146] Status Report dated December 19, 2012, in response to the UMWA's October 31, 2012 Information Request (with transmittal e-mail from Joseph Mazzotti of Alix to Adam Rosen of PwC), dated December 19, 2012, in which among other things, the UMWA requested a full and complete census showing each individual union employee, each employee indicator, their date of birth, date of hire, base salary and other compensation, hours worked, overtime hours, wage rate, job grade, current severance eligibility and other information on each beneficiary;[147] the November 15, 2012 Presentation to the UMWA;[148] a letter from Mr. Hatfield to President Roberts, dated November 15, 2012;[149] the Revised Original Savings Summary, dated December 6, 2012;[150] the UMWA Information Request sent by PwC as an "Initial High Priority Diligence Request List," dated November 19, 2012;[151] a letter from President Roberts to Mr. Hatfield, dated November 20, 2012;[152] Status Report in Response to PwC's October

---

[146] Joint Ex. 8 .

[147] Joint Ex. 9.

[148] Joint Ex. 10.

[149] Joint Ex. 11.

[150] Joint Ex. 13 .

[151] Joint Ex. 14 .

[152] Joint Ex. 15 .

31, 2012 Information Request (with transmittal e-mail from Kenneth Hiltz of Alix to Mr. Rosen), dated November 21, 2012;[153] e-mail from Mr. Rosen to Mr. Hiltz responding to questions regarding the prior information request, dated November 26, 2012;[154] e-mail from Elliot Moskowitz of Davis Polk & Wardell LLP to Mr. Rosen regarding the "functioning version of the business plan" where Mr. Moskowitz attaches the dynamic version of Debtors' model that Blackstone created for Debtors, dated December 3, 2012;[155] updated Debtors' Status Report in Response to PwC's October 31, 2012 Information Request (with transmittal e-mail from Mr. Hiltz to Mr. Rosen and the UMWA), dated November 28, 2012;[156] UMWA Information Request entitled "1113 Proposal Request List," dated November 30, 2012;[157] a letter from President Roberts to Mr. Hatfield, sent by facsimile, dated November 30, 2012, in which President Roberts indicates among other things that the UMWA needs a "dynamic business model that contains all supporting schedules and underlying assumptions";[158] e-mail from Mr. Mazzotti to Mr. Rosen dated December 3, 2012, discussing the November 30, 2012 UMWA Information Request and offering some explanation of wage rate classifications;[159] e-mail from Mr. Hiltz to Mr. Rosen, dated December 4, 2012, informing PwC that Debtors believe that the UMWA's October 31, 2012 and November 19, 2012 data requests would be responded to in full that week and requesting confirmation that no requests remained

---

[153] Joint Ex. 17.

[154] Joint Ex. 18.

[155] Joint Ex. 19; Exhibit E to Mandarino Declaration.

[156] Joint Ex. 20.

[157] Joint Ex. 21.

[158] Joint Ex. 22.

[159] Joint Ex. 23.

outstanding;[160] e-mail from Mr. Rosen to Mr. Hiltz dated December 4, 2012;[161] e-mail from Mr. Moskowitz to Mr. Rosen, dated December 4, 2012;[162] e-mail from Mr. Traynor, Staff Attorney for International Union, United Mine Workers of America to Mr. Moskowitz, dated December 4, 2012, responding to the comments made in the previous e-mail from Mr. Moskowitz to Mr. Rosen on which Mr. Traynor was copied;[163] e-mail from Mr. Moskowitz to Mr. Traynor, dated December 4, 2012;[164] e-mail from Mr. Moskowitz to Mr. Traynor, dated December 5, 2012;[165] PwC Status Reports (with transmittal e-mail from Mr. Rosen to Mr.Hiltz) which indicates that all items except one were either complete or partially complete, dated December 6, 2012;[166] Debtors' December 6, 2012 Status Reports (with December 7, 2012 transmittal e-mail from Mr. Mazzoti to Mr. Rosen);[167] a letter from Mr. Hatfield to President Roberts, dated December 7, 2012, responding to President Robert's November 30, 2012 letter found at Joint Exhibit 22;[168] UMWA Information Request, dated December 10, 2012;[169] e-mail from Frederick Perillo of The Previant Law Firm to Mr. Moskowitz, dated December 10, 2012 discussing the relevancy of insolvency opinions;[170] a letter from President Roberts to Mr. Hatfield transmitted by facsimile, dated December 11, 2012;[171] Debtors'

---

[160] Joint Ex. 24.

[161] Joint Ex. 25.

[162] Joint Ex. 26.

[163] Joint Ex. 27.

[164] Joint Ex. 28.

[165] Joint Ex. 29.

[166] Joint Ex. 30.

[167] Joint Ex. 31.

[168] Joint Ex. 32.

[169] Joint Ex. 33.

[170] Joint Ex. 34.

[171] Joint Ex. 35.

December 11, 2012 Status Report (with transmittal e-mail from Mr. Mazzotti to Mr. Rosen), dated December 11, 2012;[172] e-mail from Mr. Moskowitz to Mr. Perillo, dated December 12, 2012, discussing how any claims against Peabody should be factored into whether Debtors' 1113 and 1114 Proposals are necessary;[173] UMWA Information Request, dated December 12, 2012;[174] e-mail from Mr. Perillo to Mr. Moskowitz, dated December 13, 2012, discussing potential fraudulent conveyance claims against Peabody;[175] UMWA Information Request, dated December 14, 2012;[176] e-mail from Mr. Moskowitz to Mr. Perillo, dated December 16, 2012;[177] e-mail from Mr. Perillo to Mr. Moskowitz, dated December 17, 2012;[178] e-mail from Mr. Moskowitz to Mr. Perillo, dated December 17, 2012;[179] a letter from Mr. Hatfield to President Roberts, dated December 17, 2012;[180] e-mail from Mr. Rosen to Mr. Mazzotti, dated December 21, 2012, clarifying information requests and discussing Debtors' business model;[181] a letter from President Roberts to Mr. Hatfield, sent by facsimile, dated December 21, 2012, sent in response to Mr. Hatfield's December 17 letter found at Joint Exhibit 44;[182] a letter from Mr. Hatfield to President Roberts, dated December 28, 2012, sent

---

[172] Joint Ex. 36.

[173] Joint Ex. 37.

[174] Joint Ex. 38.

[175] Joint Ex. 39.

[176] Joint Ex. 40.

[177] Joint Ex. 41.

[178] Joint Ex. 42.

[179] Joint Ex. 43.

[180] Joint Ex. 44.

[181] Joint Ex. 45.

[182] Joint Ex. 46.

in response to President Roberts' December 21, 2012 letter;[183] PwC's Updated December 12, 2012 Status Reports (with transmittal e-mail from Mr. Rosen to Mr. Mazzotti), dated January 2, 2013, indicating that PwC was reviewing responsive information uploaded into the Data Room and that Debtors will be notified if there are remaining questions, and also requesting additional information responsive to other items;[184] Debtors' January 4, 2013 Status Report in Response to PwC's Request for Information dated December 12, 2012 (with transmittal e-mail from Mr. Mazzotti to Mr. Rosen) dated January 4, 2013 where all items are marked by Debtors as complete or complete with an explanation as to why Debtors cannot provide further information;[185] First UMWA Counterproposal, dated January 8, 2013;[186] Debtors' Request for Data, dated January 11, 2013, in which Debtors request support for the UMWA's January 8, 2013 First Counterproposal;[187] the January 15, 2013 e-mail from Brian Sanson of the UMWA to Dale Lucha of Debtor Patriot Coal Services, LLC to which Mr. Traynor testified that the e-mail reduces to writing some previously made oral requests for information about health care utilization data by the UMWA;[188] Debtors' Status Report of the UMWA's January 15, 2013 Request for Healthcare Utilization data;[189] Debtors' January 16, 2013 Status Report in response to the UMWA's oral information requests dated January 8, 2013 (with transmittal e-mail from Mr. Mazzotti to Mr. Rosen), dated January 16, 2013;[190]

---

[183] Joint Ex. 47.

[184] Joint Ex. 48.

[185] Joint Ex. 77.

[186] Joint Ex. 49.

[187] Joint Ex. 50.

[188] Joint Ex. 51.

[189] Joint Ex. 52.

[190] Joint Ex. 53.

a letter from Mr. Hatfield to President Roberts, dated January 17, 2013;[191] Debtors' January 30,

2013 Status Report in response to the UMWA's oral information requests dated January 18, 2013

(with transmittal e-mail from Mr. Mazzotti to Mr. Rosen), dated January 30, 2013;[192] Debtors' Status

Report, dated February 27, 2013;[193] Letter from President Roberts to Mr. Hatfield dated January

30, 2013, transmitted by facsimile;[194] Debtors' Status Report in Response to UMWA's Oral

Requests for Information dated January 31, 2013 (with transmittal e-mail from Mr. Mazzotti to Mr.

Rosen, dated February 4, 2013);[195] Second UMWA Counterproposal, dated February 5, 2013;[196]

Debtors' Status Report concerning Debtors' January 11, 2013 requests for information from PwC

(with transmittal e-mail from Mr. Mazzotti to Mr. Rosen), dated February 8, 2013;[197] a letter from Mr.

Hatfield to President Roberts, dated February 8, 2013 discussing why the UMWA's suggestion for

increased production is impractical, acknowledgment of Debtors' use of the Hyperion accounting

system and outlining (a) the offers made to the UMWA for Debtors to run revised assumptions on

cost, pricing or other factors as directed by the UMWA, (b) the Blackstone model that was already

provided which Mr. Hatfield describes as 'modular', (c) full access to the Hyperion system at St.

Louis Headquarters;[198] Debtors' February 14, 2013 Status Report for UMWA's requests to date

(with transmittal e-mail from Mr. Mazzotti to Mr. Rosen), dated February 14, 2013;[199] the UMWA

---

[191] Joint Ex. 54.

[192] Joint Ex. 55.

[193] Joint Ex. 56.

[194] Joint Ex. 57.

[195] Joint Ex. 58.

[196] Joint Ex. 59.

[197] Joint Ex. 60.

[198] Joint Ex. 61.

[199] Joint Ex. 62.

February 12, 2013 Information Request, dated February 14, 2013;[200] the letter from Mr. Hatfield to

President Roberts, dated February 19, 2013;[201] PwC Status Report on Debtors' January 11, 2013

request for information (with transmittal e-mail from Mr. Rosen to Mr. Mazzotti), dated February 26,

2013, in which the UMWA states that it has substantially completed Debtors' request;[202] Letter from

Mr. Hatfield to President Roberts, dated February 27, 2013, indicating that he would deliver the

Third 1114 Proposal to incorporate some concerns raised by the UMWA;[203] the UMWA Information

Request, dated February 27, 2013;[204] Debtors' March 8, 2013 Status Report on the UMWA's

document requests to date, indicating which items were still in progress, which items were

addressed through posting documents to the Data Room or in conference calls, as well as reasons

why Debtors provided all information in its possession that was received from third parties (i.e.

CareMark);[205]  Letter from President Roberts to Mr. Hatfield, dated February 28, 2013, regarding

Mr. Hatfield's February 19, 2013 letter found at Joint Exhibit 64, in which President Roberts

describes the Second UMWA Counterproposal as historically unprecedented;[206] Debtors' March

1, 2013 Status Report in response to PwC's February 27, 2013 Request for Information (with

transmittal e-mail from Mr. Mazzotti to Mr. Rosen);[207] PwC Status Report regarding Debtors'

January 11, 2013 information request (with transmittal e-mail from Mr. Rosen to Mr. Mazzotti),

---

[200] Joint Ex. 63.

[201] Joint Ex. 64.

[202] Joint Ex. 65.

[203] Joint Ex. 66.

[204] Joint Ex. 67.

[205] Joint Ex. 68.

[206] Joint Ex. 69.

[207] Joint Ex. 70.

dated March 8, 2013;[208] a letter from Mr. Hatfield to President Roberts, dated March 13, 2013,

regarding President Roberts' February 28, 2013 letter;[209] Debtors' March 14, 2013 status report for

UMWA Information Requests to date (with transmittal e-mail from Mr. Mazzotti to Mr. Rosen) dated

March 15, 2013), in which most items are described as partially complete;[210] the UMWA March 19,

2013 Request for Data on Debtors' Capital Expenditure Forecast Budget;[211] the UMWA's Request

for Information dated March 19, 2013;[212] the letter dated March 25, 2013 from Eric Waller, Debtors'

counsel, to Mr. Traynor;[213] an e-mail from Mr. Hatfield to Mr. Traynor dated Wednesday, March 27,

2013, in which Mr. Hatfield requests an update as to whether the UMWA intended to make another

counterproposal;[214] the UMWA Third Counterproposals dated March 27, 2013;[215] a letter from

President Roberts to Mr. Hatfield dated March 27, 2013, in which President Roberts indicates,

among other things,  that he believes Debtors' financial troubles are temporary, certain expenses

are overestimated, and that Debtors need to seek renegotiation or replacement of the DIP Lending

facilities;[216] Debtors' March 29, 2012 Status Report on its request for information from the UMWA

(with transmittal e-mail from Mr. Mazzotti to Mr. Rosen) in which most items are either partially

---

[208]Joint Ex. 71 .

[209]Joint Ex. 72 .

[210]Joint Ex. 76 .

[211]Joint Ex. 78 .

[212]Joint Ex. 79.

[213]Joint Ex. 81 .

[214]Joint Ex. 82 .

[215]Joint Ex. 83 .

[216]Joint Ex. 84 .

complete or open;[217] a letter from Mr. Hatfield to President Roberts, dated April 10, 2013;[218] UMWA Information Request, dated April 18, 2013, in which information is requested about the Fifth 1114 Proposal;[219] e-mail from Mr. Rosen to Adam Schlesinger of Blackstone, dated April 20, 2013 in response to an e-mail sent on April 19, 2013 from Mr. Schlesinger requesting additional information concerning the UMWA's conclusions about potential Debtors savings, to which Mr. Rosen responded that the information was already provided but that he and Mr. Mandarino would be happy to discuss those conclusions further by telephone;[220] Information provided concerning the Peabody-Assumed Group;[221] Additional Information provided concerning the Peabody-Assumed Group;[222] a letter regarding Coal Act Security Obligations and fees discussing certain agreements concerning the financing of benefits for the Peabody-Assumed Group;[223] the March 4, 2013 Presentation by Debtors and Blackstone to the UMWA;[224] the UMWA and PwC's Discussion Materials;[225] Debtors' April 22, 2013 Status Report in Response to the UMWA's Request for Information (with transmittal e-mail from Mr. Mazzotti to Mr. Rosen) in which substantially all items are marked as complete, except those which are marked as "to be addressed during the 4/25/13 meeting";[226] Status Update from the UMWA's perspective dated April 22, 2013 (with transmittal e-

---

[217] Joint Ex. 85.

[218] Joint Ex. 86.

[219] Joint Ex. 88.

[220] Joint Ex. 89.

[221] Joint Ex. 169.

[222] Joint Ex. 170.

[223] Joint Exs. 171 and 267.

[224] Joint Ex. 174.

[225] Joint Ex. 175.

[226] Joint Ex. 291.

mail from Mr. Rosen to Mr. Mazzotti dated April 24, 2013), in which most items are listed as "open"

or the UMWA requests a response in advance of April 25, 2013,[227] and Debtors' Response to the

UMWA Status Report received April 24, 2013, found in Joint Exhibit 292 (with transmittal e-mail

from Mr. Mazzotti to Mr. Rosen dated May 2, 2013), which Debtors indicated either that (a) all items

are complete based on data that has been placed in the Data Room, (b) stated grounds as to why

the information provided by Debtors was complete, © the matter was discussed in a negotiation

session or a telephone call, and (d) that the UMWA's questions about what corporate governance

rights would be associated with the direct 35% equity stake was addressed during the April 25,

2013 meetings where it was explained that "standard governance rights are contemplated by the

proposal."[228]   Based on this Court's focused review of the items specifically identified, in addition

to the record as whole, this Court concludes that by a preponderance of the evidence, Debtors have

satisfied the second and fifth factors.

**3. <u>Modifications Are Necessary</u>**

*<u>a. The Appropriate Necessity Standard</u>*

To satisfy the third element, there are two competing interpretations of the standard for a

court to determine whether a modification is "necessary."   The Third Circuit has interpreted

"necessary" to mean "necessary to prevent liquidation" while the Second Circuit has interpreted

"necessary" to mean whether the likelihood of a successful reorganization is increased by rejection

of the CBA and/or the retiree benefits.   *Compare Wheeling-Pittsburgh Steel Corp. v. United*

*Steelworkers of America,* 791 F.2d 1074 (3d Cir. 1986) and *Truck Drivers Local 807 v. Carey*

*Transp., Inc.,* 816 F.2d 82 (2d Cir. 1987).   Practical consideration of Sections 1113 and 1114 within

the context of Chapter 11 in which a debtor seeks to reorganize causes the Court to conclude that

the proper interpretation of the term "necessary" is that the modifications must be essential or

---

[227] Joint Ex. 292 .

[228] Joint Ex. 293 .

-78-

necessary to prevent liquidation and ultimately for the debtor to successfully reorganize and emerge from bankruptcy as a viable company, the standard adopted in *Carey Transportation. In re Family Snacks, Inc.,* 257 B.R. at 896-97 (defining "necessary" as "necessary to accommodate the confirmation of a chapter 11 plan" where the debtor proposed a liquidating Chapter 11 plan); *In re Valley Steel Products Co., Inc.,* 142 B.R. at 341; *Mesaba II,* 350 B.R. at 449 (citing *In re Mile Hi Metal Sys., Inc.,* 899 F.2d at 893).

### b. Necessary For Successful Emergence From Bankruptcy

"[A] debtor's proposed modifications are considered necessary if they have a significant impact on the debtor's operations and are required for the debtor to successfully reorganize and compete in the marketplace upon emergence from Chapter 11." *In re Northwest Airlines Corp.,* 346 B.R. 307, 321 (Bankr. S.D.N.Y. 2006) (citations omitted); *Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am., UAW v. Gatke Corp ("Gatke Corp."),* 151 B.R. 211, 213 (N.D. Ind.1991) (the "Second Circuit's longer term focus, which encompasses the ultimate success of reorganization rather than merely the avoidance of immediate liquidation, is more consistent with the statute"); *Mile Hi Metal Sys.,* 899 F.2d at 892–93; *In re Walway Co.,* 69 B.R. 967, 973 (Bankr. E.D. Mich.1987). "To determine whether a debtor's proposed modifications to a CBA are necessary, a court must focus on the total impact of the changes in the debtor's ability to reorganize, not on whether any single proposed change will achieve that result." *In re Appletree Markets, Inc.,* 155 B.R. at 441*; In re Northwest Airlines Corp.,* 346 B.R. at 321 ("a debtor need only make a showing as to the overall necessity of the proposal, rather than prove that each element of the proposal is necessary"); *In re Appletree Markets, Inc.,* 155 B.R. at 441 (citing *In re Royal Composing Room, Inc.,* 848 F.2d 345, 348-49 (2d Cir. 1988)).  If a debtor were required to prove the necessity of each element of its proposal, a union could defeat the motion by singling out any element of the proposal as unnecessary where an alternative could be reasonably substituted. *Royal Composing Room, Inc.,* 848 F.2d at 348.

The debtor's proposed changes must be justified by either the debtor's business plan or by industry practice. "It is self-evident that a debtor's long-term ability to compete in the marketplace for its product is essential for the viability of any reorganization...[and] rejection [may be necessary] when a debtor's labor costs are higher than those of its competitors and where the debtor faces 'enormous competitive pressure.'" *In re AMR Corp.,* 477 B.R. at 407 (citations omitted). The court cannot limit its evaluation to the debtor's short term viability because the court must evaluate the debtor's ability to compete – "at least in cases (like this one) where the debtor lacks the ability to charge its customers or its contract counterparties whatever the debtor's costs require, and the debtor's ability to survive depends on its ability to compete." *Pinnacle*, 483 B.R. at 407.

The debtor's business plan must serve as the basis for what concessions of the union the debtor deems to be necessary. *In re AMR Corp.,* 477 B.R. at 416. The court should also look to whether the debtor has exhausted its other cost-cutting measures prior to seeking the modifica- tions. *See In re Horsehead Indus., Inc.,* 300 B.R. 573, 586 (Bankr. S.D.N.Y. 2003). A debtor should strive to demonstrate the necessity of concessions in both the short-term and the long-term in that the court must look to the debtor's ultimate future and do its best to pin-point what the debtor needs to attain financial health. *Pinnacle*, 483 B.R. at 406-407 (citing *Delta II,* 359 B.R. at 477). A debtor is not required to prove that the modifications are necessary to make the debtor more attractive to a purchaser when the evidence demonstrates that such cuts to labor costs are needed for the debtor to continue as a going concern, whether under present ownership or with new investors. *In re Horsehead Indus., Inc.,* 300 B.R. at 587 (citing *Maxwell Newspapers, Inc.*, 981 F.2d 85, 91 (2d Cir. 1992)). The debtor cannot propose changes that go beyond the "demonstrated necessity." *In re Pinnacle*, 483 B.R. at 406. "A debtor may not overreach under the guise of proposing necessary modifications. *Id.* (citing *In re Mile Hi Metal Sys.,* 899 F.2d at 893).

In considering the total impact of the proposed changes, the court may look at whether non- economic changes are designed to permit the debtor's successful reorganization. *In re Northwest*

-80-

*Airlines Corp.,* 346 B.R. at 322 (citing *Carey Transp.,* 816 F.2d at 86) (where the rejection of a CBA was approved based on proposals that included non-economic changes); *In re Appletree Markets, Inc.,* 155 B.R. at 441; *Gatke Corp.,* 151 B.R. at 214). "[N]on-economic modifications that have a significant economic impact on the debtor's financial operations can be necessary to the debtor's reorganization." *In re Northwest Airlines Corp.,* 346 B.R. at 322; *see also In re Hoffman Bros. Packing Co.,* 173 B.R. 177, 187-88 (B.A.P. 9th Cir. 1994) (where the court approved a proposal with non-economic changes that related to the economic benefit to the debtor).

Many courts view snap-back provisions, where the CBA concessions are only temporary to aid the debtor to return to viability, favorably because any profit made that is not necessary for the reorganization is returned to the employees who made the concessions. *In re Indiana Grocery Co., Inc.,* 136 B.R. at 192; *see also Wheeling-Pittsburgh Steel,* 791 F.2d at 1090-91 (modification was not necessary to permit the debtor's reorganization because it did not include a snap-back provision); *but see Mesaba II,* 350 B.R. at 458-59 ("A debtor is not always required to include a snap-back provision in its Section 1113 proposal. . . [b]ut must at least consider the possibility of including a snap-back provision in its proposals." (citations omitted)); *In re Express Freight Lines, Inc.,* 119 B.R. 1006, 1017 (Bankr. E.D. Wisc. 1990) (absence of a snap-back provision in the proposed modification is an element of unfairness, though a snap-back provision is not necessary).

There is no dispute that for Debtors' survival, concessions are necessary. Debtors' obligations for Retiree Benefits consume double Debtors' revenue in relation to Debtors' competitors. Debtors also face considerable expense and inhibitors to Debtors' productivity if the current CBAs remain in place such that Debtors will be incapable of competing in the coal market.

The UMWA objects first that Debtors seek a permanent solution to a temporary problem, and that concessions are not necessary beyond 2015. The UMWA agrees that a snap-back is not appropriate in this case, however, the UMWA believes that the relief should be limited in that the UMWA should, at its sole election after some notice to Debtors, be able to reopen negotiations of

a new CBA which would become effective on or about January 1, 2017.  The UMWA argues that Debtors' financial projections are only until 2016, therefore, Debtors have not met their burden that the CBA modifications must remain in effect until December 31, 2018 because Debtors have not proven that they will be in financial straits after 2016.

The UMWA further argues that Debtors' various concessions are not "necessary" because they are not linked to cash savings, or at least Debtors have not demonstrated how certain concessions are linked to cash savings. The UMWA accuses Debtors of cherry-picking the work environment that is most suitable to Debtors, particularly since many work-rule changes are not quantifiable.

The UMWA further argues that Debtors have overstated their expenses, particularly their capital expenditures which if adjusted appropriately, the sought after dollar amount of necessary savings would be reduced. The UMWA has identified what it believes to be cash saving opportunities that Debtors can employ which will consequently reduce the amount of concessions necessary.

The record is clear that Debtors implemented significant cash savings prior to approaching the UMWA in the form of contract rejections and renegotiations, debt restructure, reductions in capital expenditures and non-union labor and retiree savings.  Debtors made extensive reductions to the medical benefits available to their non-union employees which includes a 10% premium increase, considerably higher annual out-of-pocket maximums, a reduced formulary and coverage elimination for certain drug classifications.

After consideration of the testimony of Mr. Huffard,  Mr. Schwartz, Mr. Mandarino and Mr. Akunuri, and review of the associated support for their positions, the Court must conclude that while coal prices will eventually recover, the preponderance of the evidence indicates that Debtors have neither understated their revenues nor overstated their expenses.  Rather, the price forecasts represented in the October 2012 Business Plan are reasonable.  Debtors' forecasted prices for its

coal are within a reasonable margin of the futures market prices forecast.

During the five-day hearing on the 1113/1114 Motion, much ado was made about the correlation between natural gas prices and coal prices. The record demonstrates that while spot prices for natural gas have increased, the long-term futures prices for natural gas have declined, which tends to show that natural gas will continue to be an economical alternative to coal over the coming years. Mr. Akunuri propounds the theory that while the price of natural gas is low today, particularly spot prices, in the near future, the price of natural gas will increase to a point that it will be more economical for energy producers to rely on coal as a primary source of steam production and therefore, Debtors' potential revenues will be higher than Debtors predict based on Mr. Akunuri's sensitivity analysis. The evidence before the Court does not support this oversimplistic conclusion. There were demonstrably numerous flaws in Mr. Akunuri's sensitivity analysis and overall conclusions, particularly Mr. Akunuri's failure to account for various taxes (including severance and black lung), royalty payments that must be made, Debtors' coal sale contracts pursuant to which certain prices are already set irrespective of the current market price of coal and the variance in the coal's MMBTU content and sulphur content over time in that it is incorrect to assume that the content of coal mined from a particular complex will remain constant over the years. Slight changes to the MMBTU content and sulphur content gravely affect the price and saleability of coal. The Court accepts that even if some of these errors were corrected, following Mr. Akunuri's projections, the forecasted price might still be higher than that made by Debtors in the October 2012 Business Plan, however, the Court concludes that the speculation required for Mr. Akunuri's conclusions is well beyond what this Court will accept as a basis to challenge Debtors' well supported forecasts, the October 2012 Business Plan and the overall support in the record. Moreover, it borders on absurd to assume that energy companies can change from coal to natural gas on a whim. Millions of dollars in corporate infrastructure would be required for such changes. In any event, Mr. Akunuri does not profess to be an expert in coal pricing or coal price

forecasts, which is the precise skill set required for many of the conclusions Mr. Akunuri made.  Mr. Akunuri is an expert in his own right, which is the valuation of oil & gas and mining companies, a completely different animal from the matter at hand.

Having accepted Debtors' price forecasts as reasonable, the Court will now discuss Debtors' projection of expenses.  The UMWA principally challenges that Debtors have failed to explore additional savings before Debtors sought concessions of the UMWA-represented minors.  In particular, the UMWA challenges that Debtors could reduce their capital expenditures budget through foregoing certain capital expenditures that the UMWA deems unnecessary, and Debtors could explore leasing options rather than the purchase of certain equipment.  Mr. Mandarino however admitted that the capital expenditure budget suggested by the UMWA would result in relatively modest savings.[229]  The UMWA also suggested that there was a considerable "cushion" built-into Debtors' budget, albeit roughly 50% of what the UMWA initially believed.[230]  This Court cannot make heads nor tails of where the UMWA believes these additional savings could reasonably come.  It appears that at times, the UMWA has merely made arbitrary reductions to Debtors' October 2012 Business Plan and then determined through self-consultation that those additional savings are "achievable."  It goes without saying that proffers of this nature are insufficient for this Court to accept.

So too, the UMWA suggests that certain stock options awards be removed from Debtors' compensation structure.  It is however not certain that any stock options will be offered by the reorganized Debtors because that determination is yet to be made by the board of directors for the reorganized Debtors which is yet to be established.  In any event, offering stock options, even if the recipient elects to exercise those options, will not reduce Debtors' available cash.  This argument is therefore a non-starter.  Furthermore, this Court has already concluded in a separate matter that

---

[229]See 1113/1114 Hr'g Tr. 274:7- 24, May 2, 2013.

[230]See 1113/1114 Hr'g Tr. 275:6-12, May 2, 2013.

Debtors' compensation structure of its executive and managerial staff must be within the range of its competitors, otherwise, Debtors will suffer attrition which will ultimately impede Debtors' ability to emerge from bankruptcy and compete. Skilled human labor is a necessity – as is appropriately compensating that skilled human labor for the application of their intellect. As such, the Court concludes that by a preponderance of the evidence, the savings represented in Debtors' October 2012 Business Plan are needed for Debtors to go forward.

Debtors October 2012 Business Plan demonstrates that Debtors will have a negative cash flow for 2013, 2014 and 2015. In 2016, Debtors predict that sufficient EBITDA will be achieved such that after expenses are satisfied, there will be a relatively modest net cash flow. Therefore, Debtors argue that the CBA modifications are necessary beyond 2016 because the certainty of Debtors' cost structure must continue beyond when Debtors first achieve a positive cash flow in order to secure exit debt and equity financing.

The evidence before the Court supports Debtors' position that Debtors will not yield a positive cash flow until at least the end of 2016. This Court's experience dictates that unless Debtors' prospective financiers are offered some proffer of Debtors' financial stability and viability, which must necessarily extend beyond when Debtors show their first signs of emergence from the current financial rut, Debtors will experience grave difficulty both negotiating and securing reasonable terms of exit financing. The UMWA wants to reopen negotiations with Debtors to create a new CBA that would become effective as early as January 1, 2017. The timing of this reopener is congruent with the predicted timing of Debtors' first signs of a positive cash flow. The uncertainty that surrounds negotiations of a CBA will necessarily affect the investment decisions of even an imprudent financier, let alone the highly sophisticated financiers that are presently involved or have the potential to become involved in the exit financing for these Debtors. On all accounts therefore, termination of the relief requested in the Fifth 1113 Proposal on December 31, 2018 is appropriate and is not beyond that which is necessary for Debtors to reorganize because Debtors will need to

-85-

offer some degree of comfort to potential investors.  The December 31, 2018 timing will ensure that when the negotiations are reopened with the UMWA, Debtors should be in a considerably better financial position to make such renegotiations serious and ultimately productive.

Many of the modifications to the current CBA contained in the Fifth 1113 Proposal involve non-economic changes.  For example, among other things previously described, Debtors suggest a more stringent absentee policy and to permit use of non-union labor to perform union labor under certain circumstances.  The record is clear that for Debtors to succeed, its operations will need to be nimble so that management can be in a position to optimally handle the unforseen challenges of day-to-day operations.   The non-economic changes to the CBA will allow Debtors that opportunity.  The UMWA challenges that the proposed changes to the absentee policy are not necessary because Debtors do not pay its miners when absent, nor do Debtors retain staff that fill in when employees are absent.  While true, logic dictates that completion of a task that requires ten miners will be more challenging with only eight miners.   Those eight miners will be left to compensate for the lack of labor which will ultimately affect the productivity of that day.  Other alternatives to that situation include paying other employees overtime or to pull employees from other projects, each of which affect Debtors' productivity.  An operation is the sum of its parts, and if some parts are missing, the remaining parts must shoulder the burden.  Upon the Court's review of these changes, the Court concludes that they are neither unreasonable or beyond the scope of what is necessary for Debtors to reorganize, particularly in light of the totality of the amendments Debtors seek to implement.

The UMWA argues that Debtors have essentially manufactured some of the need for concessions based on the covenants in the DIP Facility.  The main covenant of which Debtors discuss and the UMWA complains are that Debtors must maintain liquidity of $100 million, otherwise, the DIP Facility will be breached.  The UMWA argues that this covenant is self-imposed, and is therefore not an economic reality imposed by the marketplace.  As such, Debtors' needs for

concessions would be decreased if Debtors' liquidity requirements were reduced either through replacement or renegotiation of the DIP Facility.

This Court does not conclude, and the UMWA has not demonstrated, that Debtors could, either in the past or present, achieve more favorable terms for the DIP Facility.  The record indicates that the DIP Facility was negotiated in good faith through numerous bargaining sessions.[231]  Moreover, there is no dispute that the coal market has further deteriorated since the DIP Facility was negotiated, only further weakening any prospects that Debtors could renegotiate or replace the current DIP Facility.  Debtors have not self-imposed the covenants of the DIP Facility.  Those covenants are standard in large Chapter 11 cases such as these, and these covenants offer the DIP financiers the appropriate remedies if their investments near a threat.  Debtors did not manufacture necessity through entering into the direly-needed DIP Facility.

Finally, considerable time was expended both in the pleadings and at the hearing in attempt to substantiate or dispel the notion that the mining complexes that are operated by UMWA-represented miners are safer and more productive.  This line of argument and the muddy evidence presented by both sides is of little value.  For the reasons stated above, this Court concludes that by the preponderance of the evidence, Debtors have demonstrated that the relief requested in the 1113/1114 Motion is necessary.

### 4.  Modifications Assure That All Creditors, The Debtor And All Of The Affected Parties Are Treated Fairly And Equitably

The purpose of the fair and equitable standard is to "spread the burden of saving the company to every constituency while ensuring that all sacrifice to a similar degree."  *In re Northwest Airlines Corp.,* 346 B.R. at 325 (citation omitted).  "Congress drafted § 1114 to insure that debtors did not seek to effect reorganizations 'on the back of retirees' for the benefit of other parties in

---

[231] The Court also acknowledges the comments made by counsel for Bank of America that it would not waive any of the covenants contained in its DIP Facility during this Court's April 23, 2013 hearing on the Motion to Appoint a Chapter 11 Trustee. See Hr'g Tr. 150:11-19, April 23, 2013.

interest." *Ionosphere Clubs,* 134 B.R. 515, 523 (Bankr. S.D.N.Y. 1991). "It is also appropriate for a court to consider a group's prepetition cost reductions in determining whether that group would 'shoulder a proportional' share of the debtor's proposed cost reductions." *In re Northwest Airlines Corp.,* 346 B.R. at 325 (citation omitted). The debtor should only seek concessions from the unionized labor force after exhausting other means of cost-savings for the company. *Mesaba II,* 350 B.R. at 460.

The debtor must show that it has not "place[d] a disproportionate share of the financial burden of avoiding liquidation upon" the union or retirees. *In re National Forge, Co.,* 279 B.R. at 501. The court must thus look to whether the proposal "treats the union fairly when compared with the burden imposed on other parties by the debtor's additional cost-cutting measures and the Chapter 11 process generally." *In re Northwest Airlines Corp.,* 346 B.R. at 326 (citation omitted). The court can also make general inferences about the sacrifices of other interested parties when so supported by the record. *Id.* at 326 (where the court concluded that the unsecured creditors will also be required to make huge concessions and that the position of the current stockholders is at best uncertain).

Courts are typically flexible in determining what constitutes fair and equitable treatment because differing sacrifices of parties in interest are not always easy to compare. *Id.*; *In re Indiana Grocery Co.,* 136 B.R. at 194 (Section 1113 contemplates fairness under the circumstances) (citation omitted). "[I]t is not necessary for all affected parties to receive identical modifications, and concessions asked of various labor groups may reflect differences in the groups' wage and benefit levels." *In re Northwest Airlines Corp.,* 346 B.R. at 325 (citing *In re Allied Delivery Sys. Co.,* 49 B.R. 700, 702-03 (Bankr. N.D. Ohio 1985)). It is not necessary that the debtor show that managers and non-union employees will have their salaries and benefits cut to the same degree as the union workers' benefits, rather, "a debtor can rely on proof that managers and non-union employees are assuming increased responsibilities as a result of staff reductions without receiving commensurate

-88-

salary increases; this is surely a sacrifice for these individuals." *Carey Transp.,* 816 F.2d at 90.

When the unionized employees covered by collective bargaining agreements receive pay and

benefits that are above industry standards, "it is not unfair or inequitable to exempt the other

employees from pay and benefit reductions." *Id.* at 90-91.  While some difference in treatment of

creditors is assumed in the legal term "fair and equitable" in the Bankruptcy Code, the debtor must

nonetheless account for this disparate treatment of creditors in some manner. *In re Kaiser

Aluminum Corporation,* 456 F.3d 328, 342 (3d Cir. 2006).

Courts also look at the fairness and equitableness of the proposals by evaluating whether

the *quid pro quo* aims to alleviate some of the pain to the unionized labor force through action to

be taken in the future such as profit sharing, issuance of equity, or a share in the fruits of future

profits that sacrifices made by the unionized workers make possible. *Pinnacle*, 483 B.R. at 416.

A debtor can meet the fair and equitable standard "by showing that its proposal treats the union

fairly when compared with the burden imposed on other parties by the debtor's additional cost-

cutting measures and the Chapter 11 process generally." *In re AMR Corp.,* 477 B.R. at 408

(citations omitted); *In re Delta ("Delta I"),* 342 B.R. 685, 699 (Bankr. S.D.N.Y. 2006) ("[S]imilar does

not mean identical, and 'fairly and equitably' surely admits of differences in treatment where justified

by the particular facts of the case.").  Fair and equitable must be viewed in the conjunctive by the

court, not the disjunctive. *Wheeling-Pittsburgh Steel Corporation,* 791 F.2d at 1090.

Debtors' Fifth 1113 Proposal requests that Debtors delete Article XX from which derives the

obligation to contribute to the 1974 Pension Plan and instead, suffer the associated withdrawal

liability <u>unless</u> Debtors are given assurances from the UMWA Funds that Debtors' contributions will

not increase when the 2011 NBCWA expires.  Should Debtors fail to obtain those assurances,

Debtors will withdraw from the 1974 Pension Plan and suffer the withdrawal liability.  A point of

contention has been whether under ERISA, in the event of withdrawal, the 1974 Pension Plan will

be granted an unsecured claim for the total present value of Debtors' obligation to contribute to the

-89-

1974 Pension Plan or if Debtors will be permitted to make payments in annual installments. This Court is not tasked to resolve this question, therefore it will not. Suffice it to say, however, that any such total unsecured claim to the 1974 Pension Plan will likely near $1 billion dollars, and will gravely affect the funds available for the unsecured pool, to the inclusion of the UMWA. The Court can easily dispense with this challenge to fair and equitableness because it is clear that Debtors cannot survive if Debtors continue to contribute to all of the NBCWA Plans to which Debtors currently contribute. What is before the Court is Debtors' certain withdrawal from the 1993 Benefit Plan, the 2012 Retiree Bonus Account Plan and the possible withdrawal from the 1974 Pension Plan. Should Debtors withdraw from the 1974 Pension Plan and Debtors incur the withdrawal liability, be it to make installment payments in perpetuity[232] or for the 1974 Pension Plan to be granted an unsecured claim of close to $1 billion, it will be a burden for all creditors to bear in direct proportion to that creditor's stake in Debtors. This is as fair and equitable as it gets in cases like these.

So too, the UMWA challenges that its represented employees are tasked to bear a disproportionate share of the burden relative to the savings derived from non-labor sources and non-union labor. Both Debtors and the UMWA expended considerable effort to demonstrate and dispel the notion that the UMWA-operated mines are more profitable and therefore, it is not fair for union labor to be disproportionately targeted as a means to save Debtors. This Court was not presented with an apples-to-apples evaluation of which labor – union or non-union – is more productive. There are numerous factors that affect the productivity and profits of a coal mine such as the age and efficiency of the equipment used, location of the mine, whether the mine is a surface or underground mine, the associated taxes, royalty payments, previously entered coal sales contracts, whether there is a lease and the terms of the lease, how the coal is shipped and the

---

[232]It is also suggested to the Court that any such installment payments will be in an amount certain that will be sufficient only to satisfy the interest of Debtors' obligation, therefore, those payments will likely continue in perpetuity.

geology of the mine (the thickness of the seam, the strip ratio[233]), to name a few.  In any event, this entire line of evidence is rather immaterial, particularly because it is Debtors' bottom line that matters and, as Mr. Hatfield testified, no coal customer is interested in whether it was unionized or non-unionized labor that mined the coal.  It is the final cost of the coal that matters.  The Court declines to further entertain the union vs. non-union debate because among other things, it is a red herring to the task at hand.

A more pertinent challenge along these lines is the UMWA's argument that the relief requested in the Fifth 1113 Proposal is excessive relative to the concessions sought from non-union labor.  This evaluation has been a consistent challenge to courts, and this Court is no exception. What are fair and equitable concessions?

Judge Davis stated in *Mesaba II* that "[b]ankruptcy law is draconian to labor unions." *Mesaba II,* 350 B.R. at 443.  The UMWA has steadfastly negotiated improved working conditions for its membership, and with Debtors' Chapter 11 filings, the fruits of that labor is threatened. Prebankruptcy, Debtors' workforce was roughly 50% unionized, 50% non-unionized.  Today, roughly 57% of Debtors' workforce is unionized.  This is a result of several non-union lay-offs that Debtors have already implemented.  Debtors have limited non-union salaries even when unionized workers continued to receive raises pursuant to their CBAs.  The argument here is therefore that the gravity of the concessions sought by the unionized miners is in effect just a 'catch-up' to the cut-backs that the remainder of Debtors' employees have endured for the past few years.  But of course, the unionized workforce escaped those pay freezes, vacation limitations, unrestricted work-hours and the like in exchange for lower pay, promised pensions, health care coverage and retiree benefits.  The question is not is this fair to the unionized miners; is this equitable to the unionized miners.  Rather, the question presented is whether these overall changes are fair and equitable to all interested parties which necessarily includes an evaluation of the treatment of the unionized

---

[233]The strip ratio is the amount of rock that needs to be removed per ton of coal produced.

labor.

Under federal law, employees have the choice of whether or not to be unionized. Bankruptcy law is also federal law and Section 1113 takes no prisoners. So it was written by Congress. Years of toil, perseverance and determination of miners past yielded the employment terms and conditions of miners today, but this does not matter where, as here, savings everywhere else have already been explored within reason and exhausted.

This Court has already discussed the savings achieved before Debtors sought concessions from Debtors' UMWA-represented labor. Those savings are significant. Now, the only place left to turn is Debtors' UMWA-represented labor and the Retiree Benefits. This is not a union versus non-union evaluation; it is an evaluation of what is necessary for Debtors to emerge from bankruptcy as a viable company and whether or not the path chosen to implement what is necessary is fair and equitable. Given the grave disparity between union and non-union pay and benefits prebankruptcy, the limitations placed on non-union labor that have been in place for years, and acceptance of the reality of the savings needed, the Court concludes that the UMWA-represented employees are not tasked to disproportionately shoulder the burden of Debtors' bankruptcy. The UMWA has fought for benefits and it will continue to do so, of this there is no doubt.[234]

With regard to the Fifth 1114 Proposal, the UMWA also challenges that neither it, nor this Court, can evaluate whether the 35% of equity is fair and equitable because among other things, the stock is not valued and the UMWA was not given sufficient information about the other stock holders for the UMWA to evaluate the governance rights associated with the 35% equity. To

---

[234] There was some argument that the proposed modifications to the CBAs are fair and equitable because they are generally similar to the employment agreements at Debtors' Gateway mines. This Court gives this comparison little weight because the record is clear that the Gateway mines are relatively small and that there were acute circumstances that surrounded the negotiations of the Gateway employment agreements. The Court therefore does not consider the Gateway employment contracts or the surrounding circumstances to be comparable to the matter before the Court.

determine that 35% was the appropriate equity stake that reasonably equates to the present value of the UMWA's unsecured claim, Debtors considered several mathematical outcomes based on varied probabilities that would affect Debtors' total enterprise value. Based on these computations, Debtors determined that 35% appropriately characterized both the strength and weakness, thus certainty and risk, associated with the UMWA's claim. Mr. Huffard testified that a regression model was not created to determine the appropriate equity stake allocable to the UMWA in that Debtors cannot ably say that a certain percentage was allocated to a certain factor to determine the 35% equity stake. Debtors however explained how the 35% equity stake was derived in the April 24 and 25, 2013 meetings with the UMWA, which included discussions with Mr. Hatfield, a presentation by Bankruptcy Counsel for Debtors and a presentation by Blackstone. Debtors explained that based on Debtors' calculations, in the most pessimistic of scenarios, the UMWA claim could be worth as little as 12% of the reorganized Debtors and in the most optimistic of scenarios, which includes a 100% weighting for substantive consolidation – a determination which this Court has expressed on numerous occasions it will not make at this premature time – the UMWA claim could be worth as much as 57% of the reorganized Debtors. Simplistically, the UMWA stated in its Fourth Counterproposal that it wants a 57% equity stake in the reorganized Debtors, including all subsidiaries, partnerships and related entities.[235]

Granting the UMWA a 57% equity stake could never be deemed fair and equitable because there are other creditors that must be considered. Nonetheless, the question is whether Debtors' proposal is fair and equitable. This Court has stated several times, and will here state once again, there is no certainty in cases like these. Everything is based on forecasts and probabilities. Debtors considered a myriad of assumptions and determined that 35% was appropriate. A 35% equity stake is likely as good of an estimation as any other because on one side, the UMWA thinks 35% is too little, and on the other side, several interested parties believe that 35% is too much. At

---

[235]See Joint Ex. 290, Section IV, C, 1.

closing argument, the Official Committee of Unsecured Creditors stated that it conducted its own analysis and determined that Debtors' Fifth 1114 Proposal is in actually a 35% equity stake, plus royalty contributions which are worth 4% of the reorganized Debtors, for a total of 39% of value to the UMWA. The Official Committee of Unsecured Creditors considers Debtors' Fifth 1114 Proposal to be fair and equitable to all creditors solely for the purposes of the 1113/1114 Motion and therefore withdrew its limited objection.

Prior to the offer of a 35% equity stake, the UMWA was offered an unsecured claim. To some extent, the clarity that followed the offer of a 35% equity stake is further shadowed by uncertainty surrounding the same. Just like the actual value of the 35% depends on many wonders to be seen, so too, the monetization of that equity stake is still to be determined. The UMWA could determine, at its own election, that it is only appropriate to monetize a portion of the 35% equity today, and that at some opportune time in the future, likely after Debtors are cash flow positive, to monetize another portion of the equity. This alone could drastically affect the total dollar value ultimately derived from the 35% equity stake. This is the time for hedging bets and making the best projections possible, to make the best decisions possible. All creditors are fairly and equitably in this same reality of uncertainty. The UMWA's general uncertainty does not exceed that of any other creditor.

The Court also considers the inclusion of profit sharing and royalties to fund the VEBA to intimate fairness and equitableness in that this stream of additional funding is a stride towards alleviating at least some of the strain imposed by Debtors Fifth 1114 Proposal. After all, any profits achieved by the reorganized Debtors will be in large part a fruit of the sacrifices of the retiree beneficiaries, so it is only fair and equitable that at least some of those funds revert to prebankruptcy purposes. Debtors responsibly proposed that profit sharing would only begin after Debtors' minimum financial thresholds are achieved which shows consideration for Debtors' financiers and investors. This is reasonable and demonstrates that Debtors have sought to craft

the most fair and equitable solution to the wrath that is reorganizing Debtors.  By a preponderance

of the evidence, Debtors have met their burden that the concessions are fair and equitable.

**6. Meeting At Reasonable Times**, and, **7. Confer In Good Faith Attempt To Reach Mutually Satisfactory Modifications**

Little discussion is warranted here concerning whether Debtors and the UMWA met at

reasonable times. Suffice it to say, both parties demonstrated a commendable effort to meet and

accommodate each other.  Those conferences were in good faith and were an attempt to reach

mutually satisfactory modifications.  The record is clear that Debtors' progressive Proposals were

each tailored to meet specific concerns of the UMWA.  Each UMWA Counterproposal showed some

additional compromise.  Sections 1113 and 1114 contemplate a compressed schedule and this

Court commends both parties' attempts to consensually resolve this matter while simultaneously

representing their clients.  As it happens so much in life, a mutually satisfactory resolution was out

of reach.[236]

**8. Union Must Have Refused To Accept The Proposal Without Good Cause**

The union has the burden of proof that it had good cause to reject the debtor's proposal. *In

re Northwest Airlines Corp.,* 346 B.R. at 328; *In re Bowen Enterprises, Inc.,* 196 B.R. 734, 741

(Bankr. W.D. Pa. 1996); *In re Express Freight Lines, Inc.,* 119 B.R. at 1011; *In re Garofalo's Finer

Foods,* 117 B.R. at 370.  While it is the debtor's motion for rejection or modification that is before

---

[236]The Court acknowledges that Mr. Traynor testified that he believes Debtors' post-filing proposals, particularly the Fourth 1113 Proposal and Fifth 1114 Proposal, as well as Debtors' Fifth 1113 Proposal to be made in bad faith in that Debtors' timing was tactical.  Mr. Traynor however does not believe that the Fourth Counterproposal made by the UMWA on April 27, 2013, two days before the commencement of the hearing, to have been made in bad faith.  The statute does not support Mr. Traynor's position in that there are no timing requirements for Section 1113 or 1114 motions under the Bankruptcy Code.  The mere fact that most of the movement towards a resolution took place within the final weeks before the commencement of the hearing is of no consequence because the Bankruptcy Code contemplates that negotiations continue until the commencement of the hearing.  So too, the Bankruptcy Code contemplates that the hearing could commence as early as 14 days after the motion is filed.  Further acknowledgment of Mr. Traynor's challenge to Debtors' good faith would leave the Court to also evaluate the excessive time that lapsed before the UMWA derived its First Counterproposal and the modest concessions the UMWA was willing to make, the length of time that the UMWA took to respond to Debtors' requests for information and of course the good faith effort of the UMWA to achieve a mutually satisfactory resolution based on the unreasonable contents of the Fourth Counterproposal.

the court, a union may show that it had good cause to reject the debtor's proposal if the union's counterproposal meets the debtor's needs to obtain savings. *In re Horsehead Indus. Inc.,* 300 B.R. at 585 (citing *Maxwell Newspapers, Inc.,* 981 F.2d at 90; *Royal Composing Room, Inc.,* 848 F.2d at 349). "[D]epending on the facts of the case, a debtor may not be obligated to reduce the total amount of cost savings requested in its original proposal to demonstrate good faith" and thereby give the union good cause to reject the debtor's proposal. *In re Northwest Airlines Corp.,* 346 B.R. at 327 (citing *In re Indiana Grocery Co.,* 136 B.R. at 195-96). A court may look at the debtor's flexibility in the allocation of concessions as a means of evaluating whether the union had good cause to refuse the debtor's proposal. *In re Northwest Airlines Corporation,* 346 B.R. at 327.

At the outset, this Court comfortably concludes that the UMWA's Fourth Counterproposal lacked the compromise needed to meet the test for the *American Provision* factors and therefore, the UMWA did not have good cause to reject the Proposals on that basis. This Court could never conclude that the UMWA-centric Fourth Counterproposal is fair and equitable to all stake holders. This Court's review of the Original Proposals in relation to the Fifth 1113 Proposal and the Fifth 1114 Proposal demonstrates that Debtors aimed to be flexible in their approach to the achievement of the required savings. The overall amount of Debtors' savings has not changed over the course of the iterations of Proposals, however, this is reasonable because the requested savings are what is needed for Debtors to emerge from bankruptcy and none of the UMWA counterproposals were even in the neighborhood of the required savings.

October 31, 2007 is in the past and the future is unwritten. Ideally, the UMWA would maintain its bargaining position and its membership would continue to enjoy the rights that were bargained for. Debtors are in bankruptcy, and bankruptcy changes everything. Good cause to reject the Proposals must be evaluated in the context of bankruptcy where other creditors are in the mix. Debtors and the UMWA have made considerable strides towards a mutually uncomfortable milieu, but they simply did not get there. For example, the UMWA accepted the concept of the

VEBA and Debtors accepted the inclusion of a litigation trust and better defined profit sharing and royalty contribution provisions. President Roberts even publicly acknowledged that the Fifth 1114 Proposal "appears to be a step forward."[237]

Finally, there was some discussion that perhaps the UMWA has good cause to refuse the Proposals because if Debtors are forced into liquidation, the responsibility to pay some Retirees Benefits would revert to Arch. While possible based on a cursory review of the chain of responsibility for the provision and finance of the Retiree Benefits for some of the affected retirees, such a position is untenable because it fails to account for the implications of the remaining components of the requested relief in the event of liquidation, for example, the fate of those retirees who will be left orphaned and thus included in the 1993 Benefit Plan, whose inclusion could most likely cause the collapse of the 1993 Benefit Plan, in addition to the loss of jobs of current UMWA-represented miners. Suffice it to say, this is an insufficient basis for the UMWA to reject the Proposals outright. Therefore, this Court must conclude given the necessity, fairness and equitableness to all interested parties, and the tailored components of the requested relief – to the inclusion of the development as reflected in the iterations of the Proposals – the UMWA has not demonstrated that it had good cause to reject the Proposals.

## 9. <u>Balance Of The Equities Must Clearly Favor Rejection</u>

To engage in a balance of the equities with regard to the debtor's proposed rejection of a CBA, courts generally consider some or all of the following:

> 1) probability and consequences of liquidation if the CBA remains intact;
> 2) impact of the CBA remaining intact on the value of creditors' claims;
> 3) probability and impact of a strike if the CBA is rejected;
> 4) probability and value of employees' rejection damage claims;
> 5) each party's ability to absorb and spread the costs of rejection; and
> 6) the parties' good or bad faith conduct in the reorganization

_____
[237] Joint Ex. 87.

-97-

process.

*Carey Transp.,* 816 F.2d at 82; *see also In re Horsehead Indus. Inc.,* 300 B.R. at 585.  The court in *Mesaba I* notes that the likelihood and consequences of liquidation if the CBA remains intact overrides the rest of these balancing factors.  *Mesaba I,* 341 B.R. at 757.  The court in *Pinnacle* also considered the "consequences of inaction" generally and the consequences of inaction to the other employees of the debtor. *Pinnacle*, 483 B.R. at 418.

In this case plagued with uncertainty, there are a few certainties.  One, without relief from Debtors' current Retiree Benefit costs and CBA requirements, Debtors will be forced into liquidation.  This, by all accounts, is the worst scenario.  Two, if the UMWA calls a strike, especially a lengthy strike – a decision which at least initially lies with President Roberts[238] –  Debtors will be forced to liquidate.  The sealed record before the Court indicates that President Roberts is well aware of the gravity of the decision to strike and its consequences, and therefore whatever decision he makes will be made after careful deliberation, irrespective of the this Court's present ruling.  All evaluating this matter can see that a strike, or more importantly, Debtors' liquidation caused by a strike, is a zero sum proposition.   If Debtors liquidate, the overwhelming majority of Debtors' current employees, which includes UMWA-represented employees, will be unemployed.  There is no question that even today, numerous miners remain unemployed from the liquidation of Debtors' former competitors, and Debtors' employees would add to this joblessness.  If there is no VEBA and Debtors liquidate, state and federal governments will likely be left to remedy the carnage, a situation which will highly likely yield the current employees and retirees less than what is proposed by Debtors today.  Yet, in the wake of these cold hard realities, the UMWA takes the indefensible position that the UMWA might strike because it can, at any time it chooses – for example, before confirmation – and, as elected representatives of its membership, the decision to strike, irrespective of the consequences, is in effect the decision of its membership.

---

[238]Roberts Dep. 54:7-55:16, April 19, 2013.

The court in *Horsehead* stated the following:

> The [union] has stated that it will strike if the Debtors are allowed to reject their collective bargaining agreements, and force the union to accept the terms its members previously rejected. A strike is an inherent risk in every § 1113 motion, and in the end, it makes little difference if the Debtors are forced out of business because of a union strike or the continuing obligation to pay union benefits to avoid one. The unions may have the legal right to strike, but that does not mean that they must exercise that right. The union's right to strike carries with it the burden of holding the fate of the rank and file in its hands. Little purpose would be served by a strike if a strike results in the termination of operations and the loss of jobs by the strikers.

*In re Horsehead Indus.,* 300 B.R. at 587.  With a slightly different backdrop where the Union insisted to the court that if the 1113 motion was granted the union leadership would call a strike, the court in Mesaba I said:

> In a way, it is almost embarrassing to see it presented in a forum that is to receive principled discourse structured by the dictates of reason. In contrast, this seems to be a matter of posturing only, and posturing in the height. One message to be gleaned from it is jarringly out of place in a legal proceeding: "If you don't watch out, I'm really going to hurt myself, and you, too." An image comes to mind, of standing under a high bridge, and hearing a voice coming from above: "If you don't give me what I want, I'm going to grab you and take us both over the edge!"
>
> In point of fact, the power to conduct a strike rests solely with the unions. That is where the impetus for one must lie—and, too, the attribution of any consequences. To raise the threat as an ostensible and compelling reason to deny the motion is truly ignoring the plank in the eye for the splinter in the finger, if the thought is that above all else it is "necessary" for the Debtor to continue operations...
>
> But threatening to cause a catastrophe in the wake of one outcome to the § 1113 process, and then saying that the making of the threat should conclusively deter that outcome, elevates a bullying tactic to a mask over the underlying problem.  There is an aura of self-righteousness and self-possession here that borders on solipsism. And, ultimately, would the threatened outcome *really* be in the best interest of the regular working people who make up the unions' locals?

*Mesaba I,* 341 B.R. at 747-48 (where the bankruptcy court also acknowledges that the Union may

have the right to strike but that no determination concerning the interplay between the Bankruptcy Code and the Railway Labor Act would take place at that time).

Counsel for the UMWA commented that the above quote from *Horsehead,* and in theory *Mesaba I,* reads like a "1920s diatribe against the right of employees to engage in self-organization and mutual aid and protection in the form of a work stoppage" and that those courts condemned rather than balanced the likelihood of a strike in balancing the equities of the relief requested.[239] The above quotes however, with which in principle – from the perspective of bankruptcy law and its inevitable consequences – this Court must agree, is not an attack on unions or the federally protected right to strike.  This Court's criticism is of the undoubtedly lugubrious (and certain) result of any such strike, particularly a lengthy strike – Debtors' liquidation.  And, with Debtors' liquidation comes the highly likely loss of jobs of those who need them most – the rank and file – and even less Retiree Benefits than Debtors propose today.  Could this possibly be the UMWA's desired result? It is fathomable that the UMWA might desire to bring about Debtors' liquidation, however, the record does not logically compel this suspicious conclusion.  The record indicates that the UMWA is intently deliberating what is in the best interest of its rank and file, and retirees, both in the short and long-run.  It is this Court's expectation that the UMWA will, as the Court has, consider the voices of the thousands who have lined the streets of St. Louis in peaceful demonstration as well as the hundreds who have written the Court.

Again, the world of pre-October 31, 2007 is gone with the wind.  Whether or not Debtors and the Official Committee of Unsecured Creditors' pursuit of potential claims against Peabody, and perhaps Arch, will yield some recovery is unknown by all accounts, particularly the legal soundness of any potential claims,  the likelihood of success, and if successful, the timing and amount of any recovery.  Unity of purpose is key and it would bode well for all to stay focused on that.

So too, the Court is mindful of the cost-spreading abilities, or lack thereof, of the subject

---

[239]1113/1114 Hr'g Tr. 103:1-22 May 3, 2013.

miners and retirees.  But ultimately, the Court is faced with this cheerless and rather doleful question: What is better? Something for a time or nothing in a short time?  Half a loaf or no loaf at all? There are no pre-bankruptcy options.  The Court has almost entirely dispelled the naive hope that the parties will settle the matter.  In balancing the equities of the 1113/1114 Motion, and this Court's evaluation of the Fifth 1113 Proposal and Fifth 1114 Proposal, the various claims that will arise as a result of this Court's ruling, the effect of the 1113/1114 Motion on Debtors' current employees and dependent retirees, the conduct of both the UMWA and Debtors both before the 1113/1114 Motion was filed, to the inclusion of the timing of Debtors' April 23, 2013 Fifth1113 Proposal and its April 10, 2013 Fifth 1114 Proposal, as well as the UMWA's April 27, 2013 Fourth Counterproposal – all three of which were before the commencement of the hearing – and with most seriousness, the potential consequences of this Court's inaction, the Court concludes that Debtors have met their burden of persuasion in that by the preponderance of the evidence, the equities favor granting the 1113/1114 Motion.

### V. CONCLUSION

Was Debtor Patriot Coal Corporation created to fail? Maybe not. Maybe. Maybe the executive team involved at Debtor Patriot Coal Corporation's inception thought the liabilities were manageable and thus the reality of Debtors' bankruptcy was more attributed to unwarranted optimism about future prospects.  Unions generally try to bargain for the best deal for their members, however, there is likely some responsibility to be absorbed for demanding benefits that the employer cannot realistically fund in perpetuity, particularly given the availability of sophisticated actuarial analysts and cost trend experts.  Further, Congress could have incorporated pre-funding requirements for health benefits as it did for pensions when Congress enacted ERISA, but it did not. "The legacy of unfunded retiree medical benefits was itself the result of Congressional inaction, a changing manufacturing landscape, and the benign neglect and false hopes of companies and

-101-

unions alike."[240]

Before this Court engaged in the above application of the law, the Court posed the question: What does the Bankruptcy Code and *stare decisis* require? As stated by both Debtors and the UMWA, Debtors' reorganization has many paths to failure. This Court's task is limited to applying the law to the facts and evidence presented. So done. Therefore,

**IT IS ORDERED THAT** the Motion to Reject Collective Bargaining Agreements and to Modify Retiree Benefits Pursuant to 11 U.S.C. §§ 1113, 1114 of the Bankruptcy Code is **GRANTED** in that the Obligor Debtors are authorized to reject their collective bargaining agreements pursuant to Section 1113 of the Bankruptcy Code and implement the terms of the Fifth Section 1113 Proposal on June 1, 2013; and in that the Obligor Debtors are authorized to terminate retiree benefits for certain of their current retirees pursuant to Section 1114 of the Bankruptcy Code, implement the terms of the Fifth Section 1114 Proposal and transition the retiree health care to the UMWA Retiree Healthcare Trust, which shall be structured as a Voluntary Employee Beneficiary Association, on July 1, 2013, unless the conditions proscribed are met whereby the transition date will be January 1, 2014; and

**IT IS FURTHER ORDERED THAT** all objections are **OVERRULED**.

_Kathy A. Surratt-States_

KATHY A. SURRATT-STATES
Chief United States Bankruptcy Judge

DATED: May 29, 2013
St. Louis, Missouri 63102

Copies to:

All Creditors and Parties in Interest.

---

[240] Daniel Keating, Transforming a Non-Claim into a Claim: § 1114 and the Curious Case of In re Visteon, 85 Am. Bankr. L.J. 1, 8 (2011).